# No. 24-5078

## IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

---

### FITZGERALD TRUCK PARTS & SALES, LLC,

Plaintiff-Appellee

v.

### UNITED STATES OF AMERICA,

Defendant-Appellant

---

## ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

---

## BRIEF FOR THE APPELLANT

---

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

MICHAEL J. HAUNGS            (202) 514-4343
DOUGLAS C. RENNIE            (202) 305-7546
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel:*
HENRY C. LEVENTIS
  *United States Attorney*

# TABLE OF CONTENTS

**Page**

Table of contents.................................................................i

Table of authorities ........................................................iv

Statement regarding oral argument.................................x

Glossary ..........................................................................xi

Jurisdictional statement ..................................................1

    A.    District Court jurisdiction ...............................1

    B.    Appellate jurisdiction ....................................2

Statement of the issues ...................................................3

Statement of the case ......................................................4

    A.    Legal background............................................5

    B.    Facts ...............................................................7

    C.    Pretrial proceedings.....................................10

    D.    Trial...............................................................15

    E.    Post-trial proceedings ..................................18

Summary of argument ...................................................20

Argument .......................................................................23

    Fitzgerald's glider tractors could not qualify for the safe harbor from the heavy-truck excise tax under either subsection of I.R.C. § 4052(f) .................................23

    Standard of review ...............................................23

    A.    Introduction..................................................24

        1.    Principles of statutory and regulatory interpretation.....................................24

**Page**

2.    Burden of proof ....................................................25

3.    History of the safe harbor ...................................26

B.    Fitzgerald did not satisfy § 4052(f)(1) because it did not "repair" existing, identifiable "article[s]" ........32

1.    Under the statutory and regulatory framework, an engine is a "component," not "the article" ...................................................32

a.    A taxpayer must repair or modify one specific "article" to qualify for relief under § 4052(f)(1) .......................................32

b.    "Article" has a specific meaning under the statute...................................................33

c.    "Components" and "parts" are distinct from "articles" ............................................36

d.    The remaining tools of statutory construction further confirm that an individual component, like an engine, is not "the article"..........................................38

2.    The safe harbor's 75% test does not apply to every instance of alleged manufacturing............42

3.    Fitzgerald did not "repair" or "modif[y]" existing "article[s]" ..............................................44

4.    *Schneider* does not require a different result.....50

C.    Fitzgerald could not satisfy § 4052(f)(2) because it made no effort to link any of the engines it salvaged with a preexisting, donor truck that was taxable when new .........................................................55

**Page**

Conclusion................................................................65
Certificate of compliance....................................66
Certificate of service.........................................67
Addendum.........................................................68

# TABLE OF AUTHORITIES

**Cases:**                                                    **Page(s)**

*Boise Nat. Leasing, Inc. v. United States*, 389 F.2d 633
    (9th Cir. 1968) ................................................................. 26

*Bower v. Fed. Exp. Corp.*, 96 F.3d 200 (6th Cir. 1996) ................ 60-61

*Bragdon v. Abbott*, 524 U.S. 624 (1998) ...................................... 35, 57

*Burgess v. United States*, 553 U.S. 124 (2008) ................. 25, 35-36, 52

*Burnet v. Houston*, 283 U.S. 223 (1931) ............................................ 64

*Cattin v. Gen. Motors Corp.*, 955 F.2d 416 (6th Cir. 1992) .............. 29

*CenTra, Inc. v. United States*, 953 F.2d 1051
    (6th Cir. 1992) .............................................................. 58-60

*CFE Racing Prod., Inc. v. BMF Wheels, Inc.*,
    793 F.3d 571 (6th Cir. 2015) ......................................... 23

*Chisom v. Roemer*, 501 U.S. 380 (1991) ......................................... 40

*City of San Antonio, Texas v. Hotels.com, L.P.*,
    593 U.S. 330 (2021) ....................................................... 57-58

*Coloman v. Commissioner*, 540 F.2d 427 (9th Cir. 1976) ............ 63-64

*Delek US Holdings, Inc. v. United States*,
    32 F.4th 495 (6th Cir. 2022) ...................................... 24-25, 57

*Donovan v. FirstCredit, Inc.*, 983 F.3d 246 (6th Cir. 2020) .............. 25

*Downs v. Commissioner*, 307 F.3d 423 (6th Cir. 2002) .................... 29

*Gen. Dynamics Land Sys., Inc. v. Cline*,
    540 U.S. 581 (2004) ........................................................ 24

*Gen. Elec. Capital Corp. v. Manager of Revenue (In re W.
    Pac. Airlines, Inc.)*, 273 F.3d 1288 (10th Cir. 2001) ..................... 58

*Grand Trunk W. R.R. Co. v. U.S. Dep't of Lab.*,
    875 F.3d 821 (6th Cir. 2017) ......................................... 24

*Hikvision USA, Inc. v. FCC*, 97 F.4th 938 (D.C. Cir. 2024) ............. 35

*Hostar Marine Transp. Sys., Inc. v. United States*,
    592 F.3d 202 (1st Cir. 2010) ...................................... 6, 41

*Keene Corp. v. United States*, 508 U.S. 200 (1993) ........................... 39

*King v. Zamiara*, 788 F.3d 207 (6th Cir. 2015) ............................... 61

*Mackey v. Dyke*, 29 F.3d 1086 (6th Cir. 1994) ............................... 61

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
    512 U.S. 218 (1994) ........................................................ 43

**Cases (cont'd):** Page(s)

*Mediofactoring v. McDermott (In re Connolly N. Am., LLC)*, 802 F.3d 810 (6th Cir. 2015)................... 44, 54, 64

*Michigan Exp., Inc. v. United States*, 374 F.3d 424 (6th Cir. 2004)............................................................ 14

*Monterey Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 743 F.2d 589 (7th Cir. 1984)........................ 39

*Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*, 462 U.S. 810 (1983) ................................. 39

*Nielsen v. Preap*, 586 U.S. 392 (2019) ......................... 24, 33

*Niles Bement Pond Co. v. United States*, 281 U.S. 357 (1930)................................................................... 25

*Nolfi v. Ohio Kentucky Oil Corp.*, 675 F.3d 538 (6th Cir. 2012)............................................................ 23

*Oates v. Commissioner*, 316 F.2d 56 (8th Cir. 1963) ...... 64

*Pritchett v. Commissioner*, 63 T.C. 149 (1974) ............... 63

*Roberts v. Hamer*, 655 F.3d 578 (6th Cir. 2011) .............. 23

*Ruan Fin. Corp. v. United States*, 976 F.2d 452 (8th Cir. 1992)............................................................ 26

*Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018).... 38

*Rumsfeld v. Padilla*, 542 U.S. 426 (2004) ........................ 33

*Schneider Nat'l Leasing, Inc. v. United States*, 486 F. Supp. 3d (E.D. Wis. 2020) .................... 13, 53-54

*Schneider Nat'l Leasing, Inc. v. United States*, 11 F.4th 548 (7th Cir. 2021)................... 13-15, 50-55, 63

*Sherwin-Williams Co. v. United States*, 403 F.3d 793 (6th Cir. 2005)............................................. 25, 55, 62

*Sierra Club v. U.S. E.P.A.*, 793 F.3d 656 (6th Cir. 2015)................. 24

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ........................ 25

*Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791 (6th Cir. 2007)............................................................ 48

*Thompson Truck & Trailer, Inc. v. United States*, 901 F.3d 951 (8th Cir. 2018) ......................................... 5

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ....................... 44

*United States v. Detroit Med. Ctr.*, 557 F.3d 412 (6th Cir. 2009)............................................................ 41

*United States v. Janis*, 428 U.S. 433 (1976) ................... 25

**Cases (cont'd):**                                            **Page(s)**

*United States v. Zipkin*, 729 F.2d 384 (6th Cir. 1984) ............... 17-18

*Valetti v. Commissioner*, 260 F.2d 185 (3d Cir. 1958) ...................... 62

*Watkins v. Chapman*, 144 S. Ct. 222 (2023) ..................................... 33

*Watkins v. Stephenson*, 57 F.4th 576 (6th Cir. 2023) ...................... 33

*Welch v. Helvering*, 290 U.S. 111 (1933) ......................................... 25

*Wilson v. United States*, 588 F.2d 1168 (6th Cir. 1978) .............. 41, 63

*Worldwide Equip., Inc. v. United States*,
    605 F.3d 319 (6th Cir. 2010) ....................................................... 34

**Statutes:**

Internal Revenue Code (26 U.S.C.):

§ 63 ..................................................................................................... 58

§ 4051 ............................. 1, 3-6, 20, 31, 33, 38, 41-42, 54-56, 59, 64

§ 4051(a) ................................................................. 5, 37-38, 53

§ 4051(a)(1) ......................................................... 5, 31-34, 41, 63

§ 4051(a)(1)(A) ..................................................................... 40

§ 4051(a)(1)(C) ..................................................................... 38

§ 4051(a)(1)(E) ..................................................................... 34

§ 4051(a)(2) ............................................................................ 6

§ 4051(a)(3) ............................................................................ 6

§ 4051(a)(4) ............................................................................ 6

§ 4051(b) .................................................................... 37-38, 53

§ 4052 ................................................................................... 28

§ 4052(a)(1) ..................................................................... 5, 26

§ 4052(b)(1)(B)(iii) ................................. 21, 36-37, 47, 53

§ 4052(f) ......................... 3-4, 6, 20, 23, 31-32, 35, 42, 44-45, 52, 57

§ 4052(f)(1) ................. 6, 21, 31-34, 40-42, 44, 49-50, 54-55, 59, 63

§ 4052(f)(2) .......................... 4, 6, 22, 32, 55-57, 59-60, 64

§ 4053(8)(C) ..................................................................... 5, 38

§ 4061 (1982) ......................................................................... 5

§ 4061(b) (1982) .................................................................. 37

§ 4216(f) ............................................................................... 26

§ 4221 .................................................................... 26, 56-58, 61

§ 4221(a) ........................................................................ 57, 61

**Statutes (cont'd):** **Page(s)**

Internal Revenue Code 26 U.S.C. (cont'd):

§ 6110(k)(3) .................................................. 29
§ 6511(a) ...................................................... 2
§ 6532(a)(1) .................................................. 2
§ 7402 .......................................................... 2
§ 7422(a) ...................................................... 2
§ 9503(b)(1)(B) .............................................. 6

28 U.S.C.:

§ 1291 .......................................................... 3
§ 1340 .......................................................... 2
§ 1345 .......................................................... 2
§ 1346(a)(1) .................................................. 2

Colo. Rev. Stat. § 39-1-102(16) ..........................58
Highway Revenue Act of 1982, Pub. L. No. 97-424,
    § 512, 96 Stat. 2097 ...................................5
Revenue Act of 1932, Pub. L. No. 72-154,
    § 606, 47 Stat. 169 ...................................37
Revenue Act of 1971, Pub. L. No. 92-178,
    § 401, 85 Stat. 497 ...................................5
Taxpayer Relief Act of 1997, Pub. L. No. 105-34,
    § 1401(b), 111 Stat. 788.............................37
Taxpayer Relief Act of 1997, Pub. L. No. 105-34,
    § 1434(a), 111 Stat. 788.............................31
Technical and Miscellaneous Revenue Act of 1988,
    Pub. L. No. 100-647, § 6111, 102 Stat. 3342 .............27
War Revenue Act of 1917, Pub. L. No. 65-50,
    § 600(a), 40 Stat. 300.................................5

**Regulations:** Page(s)

*Excise Tax on Heavy Trucks, Truck Trailers and Semitrailers, and Tractors*, 53 Fed. Reg. 16867-01, 16869 (May 12, 1988) ................................................... 57

*Floor Stocks Credits or Refunds*, 48 Fed. Reg. 14361-02, 14370–72 (Apr. 4, 1983) ........................................ 26

*Floor Stocks Credits or Refunds*, 48 Fed. Reg. 14361-02, 14370 (Apr. 4, 1983) .............................................. 34

*Highway Motor Vehicle Use Tax Regulations*, 42 Fed. Reg. 2670-01, 2673 (Jan 13, 1977) ............................... 34

Treasury Regulations (26 C.F.R.):

§ 40.6011(a)-1(a)(1)-(2) ................................................... 6
§ 48.0-2 ...................................................................... 26, 28
§ 48.0-2(a)(4)(i) .................................................. 26, 45, 49
§ 48.4061(a)-1(d)(1) .............................................. 4, 34-35
§ 48.4061(a)-1 ........................................................ 26, 28
§ 48.4216(f)-1 ............................................................ 36-37
§ 145.4051-1(a)(2) .................................................. 26, 34
§ 145.4051-1(e)(1) ......................................................... 4
§ 145.4051-1(e)(1)(i) ................................................ 34-35
§ 145.4052-1(a)(2) ..................................................... 56-58
§ 145.4052-1(a)(2)(i) ..................................................... 61
§ 145.4052-1(a)(3) ......................................................... 36
§ 145.4052-1(f) ............................................................ 26
§ 145.4052-1(f)(4) ......................................................... 36
§ 145.4052-1(f)(5) ................................................... 57, 61

**Miscellaneous:**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ..................... 24, 35

*Ballentine's Law Dictionary* (3d ed. 1969) ....................... 58

*Black's Law Dictionary* 768 (7th ed. 1999) .................... 58

Fed. R. App. P. 4(a)(4)(A) ............................................... 3

Fed. R. App. P. 4(a)(1)(B) ............................................... 3

**Miscellaneous (cont'd):**                              **Page(s)**

Fed. R. Civ. P. 50 .......................................................... 18, 23

Fed. R. Civ. P. 59 .......................................................... 18, 23

H.R. Conf. Rep. 100-1104 (Vol. II), (1988), *as reprinted in* 1988 U.S.C.C.A.N. 5048 ............................................ 27

H.R. Conf. Rep. 105-220, at 727, *as reprinted in* 1997 U.S.C.C.A.N. 1129 ................................................ 31, 39

IRS Chief Couns. Advisory 2013-06-019, 2013 WL 474552 (Jan. 7, 2013) ........................................................ 41

IRS Chief Couns. Advisory 2014-03-014, 2014 WL 189552 (Jan. 17, 2014) ................................................... 40-41

IRS Notice 2017-5, 2017-6 I.R.B. 779 ............................... 41

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1997) ................ 43

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2005) ................ 33

Rev. Rul. 68-40, 1968-1 C.B. 452, 1968 WL 15368 ..................... 38, 42

Rev. Rul. 71-584, 1971-2 C.B. 358, 1971 WL 26825 .................... 36-37

Rev. Rul. 86-130, 1986–2 C.B. 179, 1986 WL 327974 ................. 28-29

Rev. Rul. 91-27, 1991-1 C.B. 192, 1991 WL 734870 .............................. 17, 28-30, 40, 47, 51

*Random House Unabridged Dictionary* (2d ed. 1993) ...................... 57

Tech. Adv. Mem. 92-38-008, 1992 WL 226784 (Sept. 18, 1992) ................................. 30, 40, 46-47, 55

Tech. Adv. Mem. 93-33-007, 1993 WL 315090 (Aug. 20, 1993) .................................... 30-31, 40, 51-52

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for the United States believe that oral argument may be helpful to the Court because this case involves issues of first impression in this Circuit.

# GLOSSARY

| *Term* | *Meaning* |
|---|---|
| Chief Couns. Advisory | IRS Chief Counsel advisory |
| Code | Internal Revenue Code (26 U.S.C.) |
| Fitzgerald | Fitzgerald Truck Parts & Sales, LLC |
| FET | Federal excise tax |
| Glider kit | A "set of unassembled new parts" that could be "combined with other new components and with the retained used components." Rev. Rul. 86-130, 1986-2 C.B. 179, 1986 WL 327974, at *1.  Or, alternatively, "a new tractor . . . missing the engine and transmission."  (Tr., R. 208, #16766.) |
| Glider tractor | Highway tractor manufactured using a glider kit |
| I.R.C. | Internal Revenue Code (26 U.S.C.) |
| Manufacturers tax | Prior excise tax on manufacturers' sales of automobiles and trucks.  *E.g.*, I.R.C. § 4061 (1982). |
| Retail tax | Current excise tax on "first retail sales" of heavy-duty vehicles.  *See* I.R.C. § 4051–4053. |
| Rev. Rul. | IRS revenue ruling |
| Subsection (1) | I.R.C. § 4052(f)(1) |
| Subsection (2) | I.R.C. § 4052(f)(2) |
| Tech. Adv. Mem. | IRS technical advice memorandum |

| Term | Meaning |
|---|---|
| Tractor/Truck | A self-propelled highway vehicle (as defined in Treas. Reg. § 48.4061(a)-1(d)(1)) primarily designed to tow a vehicle, such as a trailer or semitrailer, but that does not carry cargo on the same chassis as the engine. *See* Treas. Reg. § 145.4051-1(e)(1). |
| Treas. Reg. | Treasury regulations (26 C.F.R.) |
| VIN | Vehicle identification number |

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

————————————

### No. 24-5078

### FITZGERALD TRUCK PARTS & SALES, LLC,

#### Plaintiff-Appellee

v.

### UNITED STATES OF AMERICA,

#### Defendant-Appellant

————————————

## ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

————————————

## BRIEF FOR THE APPELLANT

————————————

## JURISDICTIONAL STATEMENT

### A.   District Court jurisdiction

The IRS assessed excise taxes under § 4051 of the Internal

Revenue Code ("I.R.C." or "Code") (26 U.S.C.) against Fitzgerald Truck

Parts & Sales, LLC for the quarterly tax periods from 2012 through

2017.  (Stip., R. 173, #13949 ¶¶ 2–3.)[1]  Fitzgerald paid the taxes on one tractor for each quarter and claimed a refund under I.R.C. § 6511(a).  (*Id.* ¶ 5; Compl., R. 1, #8, 10–11.)  The IRS denied those requests.  (Stip., R. 173, #13949 ¶ 6; Compl., R. 1, #8, 11–12.)  Fitzgerald then timely filed two suits seeking refunds, *see* I.R.C. § 6532(a)(1), the Government counterclaimed, and the District Court consolidated the actions.  (Stip., R. 173, #13949–50 ¶¶ 7–9; Compl., R. 1, #1, 8.)  The District Court had jurisdiction over Fitzgerald's suits under 28 U.S.C. § 1346(a)(1) and I.R.C. § 7422(a), and had jurisdiction over the Government's counterclaims under I.R.C. § 7402 and 28 U.S.C. §§ 1340 and 1345.

## B.    Appellate jurisdiction

In July 2023, the District Court entered judgment in Fitzgerald's favor pursuant to a jury verdict.  (Judgment, R. 194, #15704; Verdict Form, R. 191, #15648–49.)  On November 21, 2023, the District Court denied the Government's motion seeking judgment as a matter of law or

---

[1] "R." refers to a District Court record entry number in the lead case, No. 2:20-cv-26; "19R" refers to a District Court record entry number in the consolidated case, No. 2:19-cv-8; "#" refers to the "PageID" numbers in the District Court's record.

a new trial.  (Order, R. 218, #17146.)  On January 19, 2024, the Government filed a notice of appeal.  (Notice, R. 219, #17147.)  That notice was timely under Fed. R. App. P. 4(a)(1)(B), (a)(4)(A).  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The IRS assessed heavy-truck excise taxes on Fitzgerald under I.R.C. § 4051.  The parties dispute whether Fitzgerald qualifies for an exemption under I.R.C. § 4052(f), which provides a "safe harbor" from the heavy-truck excise tax if a taxpayer makes "repairs" or "modifications" to an "article" (*i.e.*, vehicle) when the cost of those repairs does not exceed 75 percent of the retail price of a comparable new article.

The issues on appeal are:

1.  Whether the safe harbor requires a taxpayer to repair an identifiable, existing vehicle such that it does not apply when a taxpayer combines a salvaged engine from a used highway tractor with other new and remanufactured components to produce a functioning tractor.

2. Whether § 4052(f)(2), indicating that repaired vehicles must have been "taxable" when new to qualify for relief under the safe harbor, requires a taxpayer to show that each such vehicle was previously capable of being taxed under the law and was not exempt.

## STATEMENT OF THE CASE

Fitzgerald manufactured highway tractors[2] by combining salvaged engines and remanufactured transmissions with "glider kits." The glider kits that Fitzgerald used were essentially new tractors missing engines and transmissions. The IRS assessed taxes against Fitzgerald under I.R.C. § 4051. Fitzgerald contended that its tractors were exempt from the tax under the safe harbor provided by I.R.C. § 4052(f). Fitzgerald sued for a refund and prevailed after a jury trial. The Government now appeals.

---

[2] In this context, a "tractor" is the motorized front unit of a tractor-trailer combination—commonly called a "semi," "18-wheeler," or "big rig." The applicable statutes and regulations provide that a "tractor" is a self-propelled highway vehicle (as defined in Treas. Reg. § 48.4061(a)-1(d)(1)) that is primarily designed to tow a vehicle, such as a trailer or semitrailer, but that does not carry cargo on the same chassis as the engine. *See* Treas. Reg. Reg. § 145.4051-1(e)(1); (*see also* Part B.1.b, *infra*.) Throughout this brief, we use "tractors" and the informal term "trucks" interchangeably to refer to the type of tractors at issue.

### A.    Legal background

Congress first enacted an excise tax on manufacturers' sales of automobiles and trucks as part of the War Revenue Act of 1917, Pub. L. No. 65-50, § 600(a), 40 Stat. 300, 316.  In 1971, it repealed the tax on passenger automobiles and light-duty trucks.  Revenue Act of 1971, Pub. L. No. 92-178, § 401, 85 Stat. 497, 530.  And in 1983, Congress repealed the remainder of that manufacturers tax and replaced it with a retail tax that is imposed on the "first retail sale" of various heavy-duty "articles."  Highway Revenue Act of 1982, Pub. L. No. 97-424, § 512, 96 Stat. 2097, 2168, 2174–75; *cf.* I.R.C. § 4061 (1982) (repealed manufacturers tax).

The new tax was codified at I.R.C. §§ 4051–4053.  *See generally Thompson Truck & Trailer, Inc. v. United States*, 901 F.3d 951, 953 n.2 (8th Cir. 2018).  As is relevant here, § 4051(a) imposes a 12-percent tax on the "first retail sale" of certain "articles"—highway tractors and the chassis and bodies of trucks, trailers, and semitrailers.  I.R.C. § 4051(a)(1).  The term "'first retail sale' means the first sale, for a purpose other than for resale or leasing in a long-term lease, after production, manufacture, or importation."  I.R.C. § 4052(a)(1).  Articles

under various "gross vehicle weight" limits are excluded from the tax. I.R.C. § 4051(a)(2)–(4).

Section 4052(f) provides a safe harbor from the retail tax. It states that the tax shall not apply to "[a]n article . . . solely by reason of repairs or modifications to the article . . . if the cost of such repairs and modifications does not exceed 75 percent of the retail price of a comparable new article." I.R.C. § 4052(f)(1). But that safe harbor does not apply if the repaired article "would, if new, be taxable" under § 4051 and "the article when new was not taxable." I.R.C. § 4052(f)(2).

The revenue collected is used to finance the Highway Trust Fund. I.R.C. § 9503(b)(1)(B). The tax thus ensures that heavy vehicles, which cause the most damage to and reap the most benefit from the maintenance of public roads, pay for their share of road use. *Hostar Marine Transp. Sys., Inc. v. United States*, 592 F.3d 202, 203 (1st Cir. 2010) (citation omitted). Taxpayers subject to the excise tax must file quarterly federal excise tax returns on Forms 720, *Quarterly Federal Excise Tax Return*, reporting, among other things, federal excise taxes due under I.R.C. § 4051. *See* Treas. Reg. § 40.6011(a)-1(a)(1)-(2).

**B.    Facts**

During the tax periods at issue, Fitzgerald built "glider tractors." (Tr., R. 205, #15936.)  Fitzgerald's glider tractors were highway tractors built from a "glider kit" and a rebuilt engine and transmission.  (*Id.* #15939.)  As Fitzgerald explained it, a "glider kit"—or at least the ones Fitzgerald used—"is a new tractor essentially, but it's missing the engine and transmission."  (Tr., R. 208, #16766; *see also* Tr., R. 205, #15917.)



(Ex. 6, R. 225-1, #17275 (glider kits at Fitzgerald's facility).)

To produce its glider tractors, Fitzgerald would obtain the engine and possibly the transmission from a worn or wrecked truck at a salvage yard. (Tr., R. 206, #16015.) Typically, the salvage yard would cut the engine out of the used truck using acetylene torches and wire cutters and deliver it to Fitzgerald. (Tr., R. 205, #15950; Tr., R. 206, #16047–49; Tr., R. 208, #16772.) According to Fitzgerald, the other components were not worth reusing. (Tr., R. 206, #16047.) Thus, during the relevant period, Fitzgerald would only buy the engine and transmission, not the entire worn or wrecked tractor. (*Id.* #16049.) It was cheaper for Fitzgerald to have the supplier cut the engines out and deliver six to eight of them on a flatbed truck rather than buy entire used trucks, which would have to be delivered one at a time. (*Id.* #16186.) Its suppliers generally did not provide the title to, or the vehicle identification number (VIN) number of, the source of the engine (the "donor" truck) since Fitzgerald was not buying an entire truck. (*E.g.*, Tr., R. 207, #16385–86.)

Fitzgerald paid about $4,000 per salvaged engine. (Tr., R. 206, #16059.) The scrap yard would "take the rest of [the truck] and throw it in the metal shredder." (*Id.* #16186.) Fitzgerald typically would rebuild

the engines itself and send the transmissions to a third party, Eaton, to have them remanufactured.  (Tr., R. 205, #15943.)  In most instances, it did not attempt to trace the VIN from the engine's donor tractor to the glider tractor that it produced, let alone ensure that the engine and transmission from the same donor truck ended up in the same glider tractor.  (Ex. 135, R. 225-4, #17723.)  Indeed, when it remanufactured the transmissions, Eaton "reserialize[d]" them so that Fitzgerald would not have been able to match a donor truck's transmission and engine back together even if it had wanted to do so.  (*See* Tr., R. 206, #16206–07.)

Fitzgerald's prospective investors were told that its customers would save by purchasing one of its glider tractors instead of a new truck, including by saving on "FET," *i.e.*, Federal Excise Tax, as follows:

| GLIDER KIT VS. NEW TRUCK COST COMPARISON | | |
|---|---|---|
| | **New Truck** | **Glider** |
| MSRP | $180,000 | |
| Sales Price | $140,000 | $120,000 |
| FET* (12%) | $16,800 | $0 |
| Fuel Cost per Year | $81,250 | $69,643 |
| *Fuel Mileage (mpg)* | *6* | *7* |
| Maintenance Cost per Year | $10,000 | $2,500 |
| *Maintenance per Mile* | *$0.08* | *$0.02* |
| **Total Cost Year 1** | **$248,050** | **$192,143** |
| Year 1 Savings | | $55,907 |
| *Savings %* | | *23%* |
| **Cost per Subsequent Year** | **$91,250** | **$72,143** |
| Subsequent Year Savings | | $19,107 |
| *Savings %* | | *21%* |
| *\*Assumes FET is passed on to customer* | | |
| *Other Assumptions:* | | |
| *Miles Driven per Year* | | *125,000* |
| *Diesel Price per Gallon [1]* | | *$3.90* |
| *Equivalent Truck Body and Specifications* | | |

(Ex. 100, R. 225-3, #17670.) Fitzgerald's customers also benefited from the fact that the glider tractors did not have to comply with newer emissions standards. (*See* Tr., R. 207, #16327–28, 16457–59.)

## C.    Pretrial proceedings

The IRS assessed excise taxes against Fitzgerald for the sale of tractors between 2012 and 2017 in amounts exceeding $267 million, corresponding to the sales of 12,830 tractors. (Stip., R. 173, #13949

¶¶ 2–3; Mem. Op., R. 217, #17118.)  Fitzgerald paid the taxes on one

tractor for each quarter and claimed a refund.  (Stip., R. 173, #13949

¶ 5.)  In its refund requests, as it had during the audit process,

Fitzgerald repeatedly represented that it bought the donor trucks and

that they had been "previously taxed."  (*E.g.*, Summ. J. Ex. 9, R. 129-10,

#11523; Summ. J. Ex. 25, R. 129-26, #11571; Summ. J. Ex. 27, R. 129-

28, #11575.)

The IRS denied Fitzgerald's refund requests.  (Stip., R. 173,

#13949 ¶ 6.)  Fitzgerald then filed two suits seeking refunds, the IRS

counterclaimed, and the District Court consolidated the actions.  (*Id.*

#13949–50 ¶¶ 7–9.)  Along with seeking refunds and an abatement of

the unpaid assessments, Fitzgerald asserted that the assessments were

barred by equitable estoppel based on the IRS's prior guidance and the

results of its previous audits.  (First Am. Compl., R. 36, #2821–23.)

At the outset of the case, Fitzgerald claimed that it satisfied the

safe harbor because "[a]lthough a glider may have a new cab, new

wheels and tires and a fresh coat of paint, beneath its exterior is a used

highway tractor."  (Compl., 19R. 1, #4 ¶ 22.)  It further claimed that it

would prove that its business model involved "acquir[ing] ownership of

a wrecked or worn tractor." (Tr., R. 224, #17257.) This was "fundamental" under the statute "because we have to have ownership of the original tractor in order to meet the 75 percent safe harbor." (*Id*.) Under its view of the statute, "it doesn't matter that you only kept the engine" as long as "we acquire ownership of an entire wrecked tractor" because that is what "the statute requires." (*Id*. #17259.) The District Court relied on these allegations in denying the Government's motion to dismiss. (*See* Mem. Op., 19R. 28, #1071 ("F[itzgerald] retains a copy of the previously taxed tractor's title").) But in its subsequent discovery responses, Fitzgerald acknowledged that it could not trace most of the glider tractors it produced back to a specific donor tractor's VIN. (Ex. 135, R. 225-4, #17723.)

Thereafter, Fitzgerald moved for partial summary judgment asking the District Court to rule that "the safe harbor . . . is a bright-line math test" and "does not depend on the parts and pieces retained from the original used highway tractor." (Mem., 19R. 62-1, #1457.) The District Court rejected that motion, noting that the Government had identified evidence "suggesting that Fitzgerald simply purchased salvaged engine cores without acquiring title to the highway tractors

from which those parts had been salvaged, and in other cases simply purchased engines and transmission[s] separately and rebuilt them and placed them into kits." (Order, 19R. 74, #1817.) "As a consequence," those tractors appeared to fall outside the safe harbor "because Fitzgerald did not repair or modify an 'article' that had previously been taxed." (*Id.*)

After the Seventh Circuit decided *Schneider National Leasing, Inc. v. United States*, 11 F.4th 548 (7th Cir. 2021), *rev'g*, 486 F. Supp. 3d 1247 (E.D. Wis. 2020), the District Court directed the parties to address its potential impact on this case. (Order, R. 96, #6710–12.) Specifically, it asked the Government to address whether it was challenging the Seventh Circuit's conclusion that "the safe harbor does not contemplate a measurement for 'repairs or modifications' apart from the 75% test Congress expressly incorporated into the statutory text." (*Id.* #6711 (quoting *Schneider*, 11 F.4th at 554).) In response, the Government indicated that it disagreed with that conclusion and that, in any event, *Schneider* was factually distinguishable. (Resp., R. 104, #6739–42.)

Nevertheless, the District Court stated that it would follow *Schneider* going forward.[3]  (Tr., R. 110, #6781–82, 6802–03, 6810.)

Prior to trial, the Government moved for summary judgment. (Mot., R. 128, #11261–63.)  Among other things, the Government argued that Fitzgerald could not satisfy either subsection of the safe harbor because the cost of repairs to the glider tractors were more than 75% of the sales price of a comparable new vehicle under subsection (1) and because it could not show that the vehicles were taxable when new under subsection (2).  (Mem., R. 129, #11280–84.)  It also argued that Fitzgerald could not carry its heavy burden to show affirmative misconduct necessary to prevail on an estoppel theory against the Government.  (*Id.* #11285–92 (citing, *inter alia*, *Michigan Exp., Inc. v. United States*, 374 F.3d 424, 427 (6th Cir. 2004).)

The court denied the motion in relevant part, relying heavily on *Schneider*.[4]  (Mem. Op., R. 137, #11735–39.)  The court also rejected the

---

[3] Both the court and opposing counsel subsequently recognized that the Government had preserved the issue for appeal.  (Order, R. 161, #13833; Tr., R. 222, #17204, 17223.)

[4] In two orders, the District Court narrowed the potential scope of the Government's summary judgment motion.  (Order, R. 108, #6773; Order, R. 127, #11258–60.)  Per the court's direction, the Government's

(continued…)

Government's subsection (2) argument, commenting that "certainly the Government cannot be seriously claiming that, to prevail, Fitzgerald will need to prove that each and every one of the thousands of tractors it repaired was taxed when new. Even a lifetime appointment would probably not allow for that to happen." (*Id.* #11739–40.) The court further misunderstood the Government to argue that "taxable" means actually "taxed." (*Id.* #11740.) It then rejected that interpretation, deciding that "taxable" means "subject to tax." (*Id.*) And the court held that Fitzgerald had enough evidence for a jury to decide the estoppel issue. (*Id.* #11741–45). The court did, however, subsequently order the trial to be "bifurcated with the Safe Harbor issue tried first and the remaining issues [*e.g.*, estoppel] to be tried at a later date, if necessary." (Order, R. 161, #13830.)

### D.   Trial

The case went to trial before a jury in Cookeville, Tennessee. (*See* Tr., R. 110, #6809.) Fitzgerald's witnesses testified that the engine is the "heart and soul" and "most expensive part" of one of its glider

---

motion had to follow "the analysis adopted by the Seventh Circuit" in *Schneider*. (Order, R. 108, #6773.)

tractors. (Tr., R. 205, #15939.) They also stated that all the engines it used came from "taxable tractor[s]" in the sense that they were "class 8, which is over 33,000 pound GVW [*i.e.*, gross vehicle weight]." (Tr., R. 206, #16202.) And they claimed that the cost of the engine was roughly 40 to 50 percent of the donor tractor's total cost when it was new. (*Id.* #16048.) Based on that testimony, Fitzgerald argued that the engine represented the preexisting vehicle required by the safe harbor. (Tr., R. 205, #15919; Resp., R. 212, #17052–53.)

Fitzgerald also claimed that its customers would save by purchasing one of its glider tractors instead of a new truck by paying "50 to 60 percent of the cost of list price for retail" and avoiding the federal excise tax. (Tr., R. 205, #15944.) The actual cost of the "repairs or modifications" for the purposes of the safe harbor would allegedly be lower given that the sales price included profit and the cost of the used engine. (Tr., R. 206, #16057–58.) It supported those claims not with contemporaneous business records, but instead with a spreadsheet prepared to persuade the IRS that its sales from 2012 through 2014 satisfied the safe harbor. (Ex. 340 pt. 1, R. 225-5, #17728–95; Ex. 340 pt. 2, R. 225-6, #17796–864.)

Fitzgerald also introduced a declaration from the engine manufacturer Detroit Diesel purportedly showing that engines used in Fitzgerald's glider tractors corresponded to specific engine models. (Ex. 16, R. 225-2, #17276–649). From that, Fitzgerald's witnesses offered lay testimony that the engines had originally been manufactured for, and installed in, "previously taxed" highway tractors. (Tr., R. 206, #16062–68.) And Fitzgerald claimed that its business model required it to satisfy the safe harbor. (Tr., R. 205, #15922; Tr., R. 206, #16056–57, 16125; Ex. 100, R. 225-3, #17657, 17670–71.)

Despite the bifurcation order, the court also allowed Fitzgerald's counsel and witnesses to repeatedly invoke its estoppel theory, discussing its audit history and their proffered interpretation of the relevant legal authorities. (*E.g.*, Tr., R. 205, #15951–53, 15958–59; Tr., R. 208, #16764–72.) Among other things, a representative of a third-party trucking company was allowed to testify about that separate company's audit history (Tr., R. 206, #16147–55) and Fitzgerald's in-house counsel was permitted to provide his legal interpretation of Revenue Ruling 91-27 (*id.* #16164–68). The District Court appeared to recognize that this evidence was impermissible, *cf. United States v.*

*Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984), but believed it could cure the errors with limiting instructions, (*see* Tr., R. 206, at #16167; Tr., R. 209, #16833–34). Nevertheless, after the jury retired to deliberate, it sent a note to the judge asking whether it had a complete copy of that same revenue ruling, which it understood was the controlling "law." (*See* Tr., R. 209, #16831–34.) The jury subsequently returned a verdict in Fitzgerald's favor. (Verdict Form, R. 191, #15648–49.)

### E. Post-trial proceedings

The Government then moved for judgment as a matter of law and a new trial pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure. (Mot., R. 198, #15747–49.) Among other things, it argued that Fitzgerald failed to satisfy the safe harbor as a matter of law because it did not repair an "article" as required by subsection (1), and it failed to show that each such "article" was taxable when new as required by subsection (2). (*See* Rev. Br., R. 213-1, #17081, 17085–86, 17089–92.)

The District Court denied the motion. (Mem. Op., R. 217, #17118–45.) The court rejected the Government's subsection (1) argument that Fitzgerald failed to show that it repaired preexisting articles because

the salvaged engine was allegedly the "heart and soul" and "most costly component" of the glider tractors. (*Id*. #17135.) It held that Fitzgerald did not need to buy "an entire wrecked tractor" to meet the safe harbor. (*Id*.) Such a requirement, "given the reality of what Fitzgerald was doing," would "exalt[ ] form over substance and is really a distinction without a difference." (*Id*.)

As to the subsection (2) argument, the court acknowledged that "there was at least some proof that Fitzgerald purchased engines from A&A Truck Parts that sometimes salvaged wrecked municipal tractors, and Fitzgerald may have purchased an engine or two from trucks that had been originally shipped to Mexico or Canada." (*Id*. #17131.) Yet it rejected the Government's argument out of hand. It repeated its earlier statement that Fitzgerald did not have to "to prove that each and every one of the thousands of tractors it repaired was taxed when new." (*Id*. #17127 n.4 (quoting Mem. Op., R. 137, #11740).) And, using its prior definition of "taxable" as meaning "subject to tax," it held the requirement was satisfied. (Mem. Op., R. 217, #17132–33 (quoting Mem. Op., R. 137, #11740).) According to the court, Fitzgerald's showing that it "harvested" engines designed for tractors used to

transport trailers with a gross vehicle weight over 33,000 pounds was sufficient to show that its glider tractors were "subject to taxation" when new.  (*Id.* #17133.)

## SUMMARY OF ARGUMENT

Engines aren't trucks.  That may seem obvious, but in this case, it wasn't.  The opposite conclusion was the lynchpin of the judgment below.

Fitzgerald Truck Parts & Sales, LLC manufactured trucks (*i.e.*, highway tractors) by installing salvaged engines and remanufactured transmissions in otherwise new trucks.  Truck manufacturers are generally liable for heavy-truck excise taxes on the "first retail sale" of those vehicles under I.R.C. § 4051.  But Fitzgerald claimed that because its engines came from used trucks, it could avoid that tax through the safe harbor provided by § 4052(f) if its costs stayed below 75% of the price of a comparable new vehicle.  The IRS concluded that Fitzgerald was not eligible for the safe harbor, but Fitzgerald convinced a judge and jury otherwise.

There were two fundamental problems with Fitzgerald's position, which compel reversal as a matter of law.  First, Fitzgerald did not

"repair" or "modif[y]" an existing "article" as required by the first part of the safe harbor. I.R.C. § 4052(f)(1). The text, structure, history, and purpose of the relevant statutory and regulatory provisions compel this reading of the statute. Congress used the definite article "the" when describing "the article"—that is, vehicle—that a taxpayer must repair or modify to obtain relief under § 4052(f)(1). That usage indicates that Congress was referring to one specific truck that had to exist at the beginning and end of the manufacturing process. Moreover, "article" has a specific meaning in this context: a self-propelled vehicle designed to transport a load over a highway. Engines are "components," which are treated differently under the statute. A taxpayer reusing a component can get a tax break that reduces the amount on which the tax is calculated, *see* I.R.C. § 4052(b)(1)(B)(iii), but it cannot evade the tax entirely. Moreover, the safe harbor applies "solely by reason" of a taxpayer's "repairs" or "modifications" to an existing article. Fitzgerald made neither. Although it may have "repair[ed]" the salvaged engines that it installed in the trucks that it sold, that does not entitle it to relief under § 4052(f)(1). The Seventh Circuit decision that Fitzgerald

relied on for its arguments to the contrary is both distinguishable and wrong.

Second, even if it had satisfied the first aspect of the test, Fitzgerald failed to show that the trucks from which it harvested its engines had been "taxable" "when new" as required by the second part of the safe harbor. I.R.C. § 4052(f)(2). Fitzgerald had to show that those trucks were capable of being taxed when they were new, but the undisputed evidence showed that some of them were exempt from taxation because they were originally sold to municipalities or exported to Mexico or Canada. Under this Circuit's precedent and the applicable regulations, those sales were not "taxable" under § 4051. The District Court ignored these authorities and concluded that Fitzgerald could satisfy this requirement merely by showing that the engines were salvaged from vehicles that *could have been* taxable when they were new depending on where they were sold and who purchased them. That was error. Merely showing that something *could have been* "taxable" is not sufficient—particularly when some of those trucks were undisputedly exempt from taxation when they were new.

The decision below allowed Fitzgerald to profit from selling trucks that were essentially new, and that cause the same wear and tear on the public roads, but without contributing to the maintenance of those roads. The District Court's judgment should be reversed with instructions to enter judgment for the Government.

## ARGUMENT

**Fitzgerald's glider tractors could not qualify for the safe harbor from the heavy-truck excise tax under either subsection of I.R.C. § 4052(f)**

### Standard of review

The proper interpretation of a statute is a question of law that this Court reviews *de novo*. *Roberts v. Hamer*, 655 F.3d 578, 582 (6th Cir. 2011). A district court's ruling on a Rule 50 motion is also reviewed *de novo*. *Nolfi v. Ohio Kentucky Oil Corp.*, 675 F.3d 538, 545 (6th Cir. 2012). When reviewing such a ruling, this Court views the evidence "in the light most favorable to the party against whom the motion is made," giving that party "the benefit of all reasonable inferences." *Id.* (citation omitted). The Court reviews the denial of a Rule 59 motion for abuse of discretion, which occurs when a district court "improperly applies the law[ ] or uses an erroneous legal standard." *CFE Racing Prod., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 584 (6th Cir. 2015) (citation omitted).

A.    **Introduction**

1.    **Principles of statutory and regulatory interpretation**

Courts use the traditional tools of statutory interpretation to construe statutes and regulations by examining "text, structure, purpose, and history." *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004); *see also Sierra Club v. U.S. E.P.A.*, 793 F.3d 656, 665 (6th Cir. 2015). Interpretation begins "with the language of the statute." *Grand Trunk W. R.R. Co. v. U.S. Dep't of Lab.*, 875 F.3d 821, 824 (6th Cir. 2017) (citation omitted). That "language must be read in context since a phrase gathers meaning from the words around it." *Delek US Holdings, Inc. v. United States*, 32 F.4th 495, 498 (6th Cir. 2022) (citation omitted).

Similarly, "'the rules of grammar' govern statutory interpretation 'unless they contradict legislative intent or purpose.'" *Nielsen v. Preap*, 586 U.S. 392, 408 (2019) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 140 (2012)). The court may also consult legislative history in order "to effectuate legislative intent." *Grand Trunk*, 875 F.3d at 829 (citation and emphasis omitted). And "[t]he traditional canons of statutory interpretation" may be used

to "determin[e] whether the statutory text is susceptible to more than one reasonable interpretation." *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 256 (6th Cir. 2020).

"When a statute includes an explicit definition, [a court] must follow that definition." *Burgess v. United States*, 553 U.S. 124, 130 (2008) (quoting *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000)). Otherwise, courts will give undefined terms their ordinary meaning, which is discerned by reference to contemporaneous dictionary definitions. *Delek*, 32 F.4th at 498 (citation omitted).

## 2. Burden of proof

The IRS's tax liability determinations are presumed to be correct. *Sherwin-Williams Co. v. United States*, 403 F.3d 793, 796 (6th Cir. 2005) (citing *Welch v. Helvering*, 290 U.S. 111, 115 (1933)). Thus, in a tax refund suit, "the taxpayer bears the burden of proving the amount he is entitled to recover." *Id.* (quoting *United States v. Janis*, 428 U.S. 433, 440 (1976)). This means that the taxpayer bears the burden of proving "all the facts necessary to establish the illegality of the collection." *Id.* (quoting *Niles Bement Pond Co. v. United States*, 281 U.S. 357, 361 (1930)).

### 3.	History of the safe harbor

The heavy-truck excise tax applies to the "first retail sale" after "production, manufacture, or importation."  I.R.C. § 4052(a)(1). Manufacturing has long been interpreted as production of "a taxable article from scrap, salvage, or junk material, or from new or raw material, by processing, manipulating, or changing the form of an article or by combining or assembling two or more articles."  Treas. Reg. § 48.0-2(a)(4)(i) (defining "manufacturer").[5]  Prior to the adoption of the safe harbor, courts held that manufacturing occurred when a used vehicle underwent a process that caused "a change of entity" rather than a "mere restoration of [its] utility."  *See Ruan Fin. Corp. v. United States*, 976 F.2d 452, 455 (8th Cir. 1992) (citing *Boise Nat. Leasing, Inc. v. United States*, 389 F.2d 633, 636 (9th Cir. 1968)).

---

[5] Soon after the adoption of the retail tax, Treasury incorporated other rules—including some of the guidance it had previously issued under the prior manufacturers tax—within the retail tax's regulatory framework.  *Floor Stocks Credits or Refunds*, 48 Fed. Reg. 14361-02, 14370–72 (Apr. 4, 1983).  The provisions listed include portions of Treas. Reg. § 48.0-2, Treas. Reg. § 48.4061(a)-1, I.R.C. § 4216(f) and its regulations, and I.R.C. § 4221 and its regulations.  *See id.*; Treas. Reg. § 145.4052-1(f); Treas. Reg. § 145.4051-1(a)(2).

A "safe harbor" from the heavy-truck excise tax was first proposed in a 1988 conference committee report. H.R. Conf. Rep. 100–1104 (Vol. II), at 178 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 5048, 5238. The report observed that "[t]hree categories of operations performed on a vehicle may be considered manufacturing under Treasury Department rulings." *Id.* Those included (1) "additions or modifications to a chassis or body that change the transportation function of the vehicle," (2) "fabrication of a usable truck from a wrecked vehicle," and (3) "a used vehicle on which repairs or other modifications are so extensive that they extend its useful life." *Id.* The proposed amendment sought to "clarif[y]" that the three tests were "consistent with the intent of the statute." *Id.* In addition, it would provide that, in the third instance, repairs would not be treated as manufacture when their cost did not exceed "75 percent of the price of a comparable new truck." *Id.* The proposal was not adopted. *See* Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, § 6111, 102 Stat. 3342, 3713 (enacted law).

Nevertheless, in a 1991 Revenue Ruling, the IRS retroactively adopted the proposal for the repair or modification of used articles.

Rev. Rul. 91-27, 1991-1 C.B. 192, 1991 WL 734870.  The ruling

described two situations—one involving a "worn" tractor and a second

involving a "wrecked" tractor.  *Id.* at *1.  In Situation 1, the owner

restored the worn tractor by adding new components and rebuilding

others at a cost "equal to 65 percent of the price of a comparable new

tractor." *Id.*  In Situation 2, "[t]he owner returned the vehicle to a

functional condition by combining salvaged components with a 'glider

kit' (an assemblage of parts usually including a cab) that it purchased."

*Id.*  The IRS observed that "[g]enerally, the repair or restoration of a

vehicle that is sufficiently extensive to extend the useful life of the

vehicle is an act of manufacture for purposes of section 4052 of the Code

and section 48.0-2 of the regulations." *Id.* at *2.  That general rule also

applied when a glider kit was used.  *See id.* (citing Rev. Rul. 86-130,

1986–2 C.B. 179, 1986 WL 327974).  The IRS then "adopt[ed]" the

conference report's safe harbor for used, but not "wrecked" vehicles.  *Id.*

at *2–3.  Thus, it held that in Situation 1, the repaired tractor fell

within the safe harbor and that same result would also apply when "the

owner uses a glider kit to repair the vehicle." *Id.* at *3.  In Situation 2,

however, the tax still applied to the restoration of the "wrecked" vehicle.
*Id.*

At the time it issued Revenue Ruling 91-27, the IRS understood

that a "glider kit" constituted "a set of unassembled new parts" that

could be "combined with other new components and with the retained

used components."  Rev. Rul. 86-130, 1986-2 C.B. 179, 1986 WL 327974,

at *1.  It had observed that "[a] glider kit usually consists of a cab,

fenders, dash instruments, wiring, steering wheel, steering gear, seats,

chassis frame, front axle, and copper tubing for the brake system."  *Id.*

After issuing Revenue Ruling 91-27, the IRS had several

opportunities to interpret it.  In a Technical Advice Memorandum[6]

issued in 1992, a taxpayer had "fabricated a truck tractor by combining

a newly purchased glider kit . . . with other new parts and certain

salvaged parts—engine, transmission, and tandem axles—from two

---

[6] Technical advice memoranda and certain other IRS "written determinations" (including IRS Chief Counsel advisories) "have no precedential value to parties other than the taxpayer they are issued to, and [the Code] prohibits taxpayers from relying on them in proceedings before the agency."  *Downs v. Commissioner*, 307 F.3d 423, 429 (6th Cir. 2002) (citing I.R.C. § 6110(k)(3)).  Although they are not authoritative, they "may be given 'some weight' in the construction of the Internal Revenue Code."  *Cattin v. Gen. Motors Corp.*, 955 F.2d 416, 424 n.5 (6th Cir. 1992).

truck tractors that were originally built by different manufacturers."
Tech. Adv. Mem. 92-38-008, 1992 WL 226784 (Sept. 18, 1992). The IRS
explained that Revenue Ruling 91-27 applies "to the modification or
restoration of an *existing* vehicle and provide[s] a safe harbor to be used
in determining whether that vehicle has been modified or restored to
the extent that a new vehicle has resulted." *Id.* (emphasis added). In
that case, however, "there [wa]s no existing vehicle that has been
modified, repaired, or restored." *Id.* "[A]lthough comprised of some
used components, [the resulting tractor was] essentially a new vehicle—
a truck tractor that did not exist prior to the fabrication and that is
created as a result of the combining of new components with salvaged
materials and components." *Id.* Consequently, the IRS determined
that "a repair or restoration of a worn vehicle, as contemplated in
Revenue Ruling 91-27, has not occurred and the safe harbor provided in
Revenue Ruling 91-27 does not apply to this case." *Id.*

The following year, the IRS determined that the safe harbor did
apply when a taxpayer combined glider kits with the engines,
transmissions, and axles of the same tractors. Tech. Adv. Mem. 93-33-
007, 1993 WL 315090 (Aug. 20, 1993). Significantly, "[t]he used

components of the worn tractors were not intermingled." *Id.* Thus, "the restored tractors are essentially the same vehicles as the prerestoration tractors" and the safe harbor could apply. *Id.*

In 1997, Congress codified the safe harbor and made it applicable to the other two categories of modifications (*i.e.*, wrecked articles and changes in transportation function). I.R.C. § 4052(f)(1); Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1434(a), 111 Stat. 788, 1052. Regardless of the category, the statute contemplated that the modifications were being made "to an *existing* vehicle." H.R. Conf. Rep. 105-220, at 727, *as reprinted in* 1997 U.S.C.C.A.N. 1129 (emphasis added). As enacted, the safe harbor provides:

(1) In general.

An article described in section 4051(a)(1) shall not be treated as manufactured or produced solely by reason of repairs or modifications to the article (including any modification which changes the transportation function of the article or restores a wrecked article to a functional condition) if the cost of such repairs and modifications does not exceed 75 percent of the retail price of a comparable new article.

(2) Exception.

Paragraph (1) shall not apply if the article (as repaired or modified) would, if new, be taxable under section 4051 and the article when new was not taxable under such section or the corresponding provision of prior law.

I.R.C. § 4052(f) (emphasis omitted).

## B. Fitzgerald did not satisfy § 4052(f)(1) because it did not "repair" existing, identifiable "article[s]"

Under the plain language of the statute, § 4052(f)'s safe harbor only applies when "repairs" or "modifications" have been made to an existing "article" as defined in § 4051(a)(1). That requirement is not satisfied when a taxpayer installs a salvaged engine in an otherwise new tractor.

### 1. Under the statutory and regulatory framework, an engine is a "component," not "the article"

#### a. A taxpayer must repair or modify one specific "article" to qualify for relief under § 4052(f)(1)

By its terms, § 4052(f)(1) applies only to situations when "repairs" or "modifications" have been made to "the article." Subsection (2) similarly refers back to "the article (as repaired or modified)." I.R.C. § 4052(f)(2). "[T]he article" referenced is a single, specific preexisting "article" as that term is defined "in section 4051(a)(1)," such as a highway tractor. I.R.C. § 4052(f)(1).

Congress's use of the definite article ("the") within § 4052(f) to refer to the vehicle that the safe harbor applies to confirms this understanding. "Here grammar and usage establish that 'the' is a

function word indicating that a following noun or noun equivalent is definite or has been previously specified by context." *Nielsen*, 586 U.S. at 408 (quoting *The*, *Merriam-Webster's Collegiate Dictionary* 1294 (11th ed. 2005) (alterations omitted)). "The use of the definite article ('the') shows that [the text] refers to one specific" thing. *Watkins v. Stephenson*, 57 F.4th 576, 580 (6th Cir.) (citing *Nielsen*, 586 U.S. at 408; *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004)), *cert. denied sub nom. Watkins v. Chapman*, 144 S. Ct. 222 (2023). In the safe harbor's text, the noun being referenced was previously specified in the opening clause: "[a]n article described in section 4051(a)(1)." I.R.C. § 4052(f)(1). Thus, the provision can only apply to "one specific" article that fits the description provided in § 4051(a)(1). *Watkins*, 57 F.4th at 580.

Accordingly, repairs or modifications to an existing article are a prerequisite for the application of the safe harbor. But when no repairs or modifications have been made to "the article," by its plain text, § 4052(f)(1) does not apply.

### b.    "Article" has a specific meaning under the statute

The statutory and regulatory definitions indicate that an "article" for purposes of § 4051 is a self-propelled vehicle designed to transport a

load over a highway. Thus, it has a specific meaning distinct from the components that make up an article.

The safe harbor only applies to "[a]n article described in section 4051(a)(1)." I.R.C. § 4052(f)(1). Section 4051(a)(1) provides that the tax applies to a specific list of "articles" including—as is applicable here— "[t]ractors." I.R.C. § 4051(a)(1)(E). A "tractor," in turn, "means a highway vehicle" designed to tow a trailer or semitrailer. Treas. Reg. § 145.4051-1(e)(1)(i). And, as this Court has recognized, "'[h]ighway vehicle' is defined as 'any self-propelled vehicle, or any trailer or semitrailer, designed to perform a function of transporting a load over public highways." *Worldwide Equip., Inc. v. United States*, 605 F.3d 319, 322 (6th Cir. 2010) (quoting Treas. Reg. § 48.4061(a)-1(d)(1)) (ellipsis omitted); *see also* Treas. Reg. § 145.4051-1(a)(2) (incorporating the § 48.4061(a)-1(d)(1) definition).

Significantly, the regulatory definitions of "tractor" and "highway vehicle" predate the safe harbor. *See Highway Motor Vehicle Use Tax Regulations*, 42 Fed. Reg. 2670-01, 2673 (Jan 13, 1977) ("highway vehicle"); *Floor Stocks Credits or Refunds*, 48 Fed. Reg. 14361-02, 14370 (Apr. 4, 1983) ("tractor"). "Congress' repetition of a well-established

term carries the implication that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations." *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 946 (D.C. Cir. 2024) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)). Thus, Congress would have had those definitions in mind and understood that an "article" (in this context, a "tractor") is a self-propelled vehicle designed to transport a load over public roads when it enacted § 4052(f).

Moreover, the definitions of "tractor" and "highway vehicle" declare what those terms "mean[ ]." Treas. Reg. § 145.4051-1(e)(1)(i); Treas. Reg. § 48.4061(a)-1(d)(1). This language "excludes any meaning that is not stated." *Burgess*, 553 U.S. at 130 (alterations omitted). In other words, "the clear import is that this is its *only* meaning." Scalia & Garner, *supra*, at 226.

Under this framework, the components that are integral to such an "article" are those that contribute to self-propulsion and highway transportation. A salvaged engine, standing alone, is an individual component incapable of self-propulsion or transportation over the public roads. The statutory and regulatory definitions exclude any meaning of

"article" that would consist solely of a salvaged engine. *See Burgess*, 553 U.S. at 130.

### c. "Components" and "parts" are distinct from "articles"

On top of providing a specific definition of "article," the statutory and regulatory framework distinguishes articles from individual "components" or "parts."

Under the statute, if "any component" of an "article" is reused in creating a new article, the taxpayer gets the benefit of a reduction in the tax base. *See* I.R.C. § 4052(b)(1)(B)(iii); Treas. Reg. § 48.4216(f)-1; *see also* Treas. Reg. § 145.4052-1(f)(4). Thus, the proper treatment of reusing an engine to manufacture a tractor is to reduce the sales price on which the tax is calculated. *See* Treas. Reg. § 145.4052-1(a)(3) (calculation of tax). By way of example, if the sales price were $100,000 and the value of the used engine was $4,000, the tax would apply to the price as reduced by the value of the engine—$96,000. *Cf.* Rev. Rul. 71-

584, 1971-2 C.B. 358, 1971 WL 26825 (reused components such as the engine may reduce the tax base).[7]

This subsection was renumbered, but retained, when Congress added the safe harbor. *See* Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1401(b), 111 Stat. 788, 1046. Thus, Congress explicitly contemplated that it would continue to apply despite adding the safe harbor. As a result, individual "components" are treated differently than "articles."

Similarly, the statute distinguishes between articles and "parts or accessories," which are taxable in specific circumstances. *See* I.R.C. § 4051(a)–(b). Congress has made this distinction since 1932. Revenue Act of 1932, Pub. L. No. 72-154, § 606, 47 Stat. 169, 261–262. Under the prior manufacturers tax, "parts and accessories" were generally taxable at a reduced rate. *See* I.R.C. § 4061(b) (1982). Under the current retail tax, they are taxable at the same rate as articles if included on the article or installed within 6 months of the article being placed in service. *See* I.R.C. § 4051(a)–(b). But replacement parts and

_____

[7] The benefit would not apply to Fitzgerald because it only applies when the component is supplied by the "first user" of the resulting article. I.R.C. § 4052(b)(1)(B)(iii); Treas. Reg. § 48.4216(f)-1.

those costing less than $1,000 in the aggregate are excluded. *Id.* Thus, "parts and accessories" have long received different treatment than § 4051 articles.

Accordingly, Congress specifically addressed how to treat individual components and parts. Although a "major" one, an engine has long been understood as a "component" and there are no provisions that allow it to be considered an "article" on its own. *See* Rev. Rul. 68-40, 1968-1 C.B. 452, 1968 WL 15368, at *1. In contrast, the statute specifically provides that a "chassis" can be considered an "article." *Compare* I.R.C. § 4051(a)(1)(C) ("Truck trailer and semitrailer chassis" are "article[s]"), *with* I.R.C. § 4053(8)(C) (suggesting that a chassis may be "a component of a vehicle"). Thus, Congress "knew how to say so" if it wanted engines to be treated as articles. *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 216 (2018). The fact that it did not is determinative.

### d. The remaining tools of statutory construction further confirm that an individual component, like an engine, is not "the article"

The Government's understanding of these provisions is also supported by the legislative history, administrative practice, and the other relevant canons of statutory construction. They demonstrate that

Congress plainly would not have contemplated that a taxpayer could buy a salvaged engine, install it in a new truck, and then sell that new truck for a profit without incurring the tax.

The conference committee's report[8] confirms that the point of the safe harbor was to address "whether a particular modification to *an existing vehicle* constitutes remanufacture (taxable) or a repair (nontaxable)." H.R. Conf. Rep. 105-220, at 726–727 (1997) (emphasis added). And it indicates that Congress contemplated that the preexisting, administrative safe harbor would continue, subject to the "[c]larification" that it could also apply to "wrecked" vehicles. *Id.* at 727. The only other "change" mentioned is the elimination of an unrelated registration requirement. *See id.*

In such circumstances, no other "change in the underlying substantive law" should be presumed. *Keene Corp. v. United States*, 508 U.S. 200, 209 (1993). And before codification, the safe harbor could only apply to a single vehicle that existed at the beginning and end of the

---

[8] "Such reports are, apart from the language of the statute itself, generally the most reliable indicators of congressional intent." *Monterey Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 743 F.2d 589, 598 (7th Cir. 1984) (citing *Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*, 462 U.S. 810, 833 n.28 (1983)).

repair process. *See* Rev. Rul. 91-27, 1991-1 C.B. 192, 1991 WL 734870, at *3 (contemplating "the repair or modification of [a] used vehicle[ ]"). The IRS's administrative determinations provided that the safe harbor could apply when "the restored tractors [we]re essentially the same vehicles as the prerestoration tractors," Tech. Adv. Mem. 93-33-007, but not when "there is no existing vehicle that has been modified, repaired, or restored" because the result was "essentially a new vehicle," Tech. Adv. Mem. 92-38-008. If Congress had intended to do away with the preexisting article requirement when it codified this rule, it stands to reason that it "would have identified or mentioned it at some point." *Chisom v. Roemer*, 501 U.S. 380, 396 (1991).[9]

---

[9] The IRS's post-codification guidance also generally supports this interpretation. Since codification, the IRS has interpreted § 4052(f)(1) as requiring "repairs or modifications" to an existing article in guidance post-dating some of the tax periods at issue. *See* IRS Chief Couns. Advisory 2014-03-014, 2014 WL 189552 (Jan. 17, 2014). In a Chief Counsel Advisory, it explained that the safe harbor did not apply in scenarios in which a party "manufactured a new article from a combination of new and used automotive components." *Id.* That included a scenario where "all of the components of the finished Article were new, except for the engine and transmission that the remanufacturing company refurbished." *Id.* The tax applied because "[a] refurbished engine and transmission are not § 4051(a)(1)(A) taxable articles that could be repaired or modified for purposes of § 4052(f)(1)." *Id.* In the course of issuing that guidance, the IRS reconsidered a prior

(continued…)

And if any doubt remains about the scope of the safe harbor, "'exemptions from taxation are to be construed narrowly,' and the 'taxpayer has the burden to show that it is within the provision allowing the [exemption].'" *Wilson v. United States*, 588 F.2d 1168, 1171 (6th Cir. 1978) (citations omitted); *accord United States v. Detroit Med. Ctr.*, 557 F.3d 412, 414–15 (6th Cir. 2009). As the § 4052(f)(1) safe harbor provides an exemption from the excise tax, it must be narrowly construed. *See Hostar*, 592 F.3d at 208 (applying the narrow-construction principle when the taxpayer claimed an exemption from the heavy-truck excise tax).

\* \* \*

In summary, to qualify for the safe harbor, a taxpayer must repair or modify "the article" that was taxable under § 4051. The statutory and regulatory text, structure, history, and purpose establish that this

---

determination that failed to address whether a taxable article existed before applying the safe harbor. *Compare id. with* IRS Chief Couns. Advisory 2013-06-019, 2013 WL 474552 (Jan. 7, 2013). Additionally, in a formal notice providing interim definitions of certain terms, the IRS indicated that "a taxpayer must repair or modify one of the seven articles identified in § 4051(a)(1) in order to use the safe harbor provision in § 4052(f)(1)." IRS Notice 2017-5, 2017-6 I.R.B. 779. "The § 4051(a)(1) articles are: truck chassis and bodies, truck trailer and semitrailer chassis and bodies, and highway tractors." *Id.*

contemplated that a single vehicle exist at the beginning and end of the manufacturing process. A single component like an engine has "no practical value" as a vehicle. *See* Rev. Rul. 68-40, 1968-1 C.B. 452, 1968 WL 15368, at *1. It cannot propel itself down a highway or carry a load. An engine would not have been taxable as an article under § 4051. It cannot be an "article" for the purposes of § 4052(f).

## 2. The safe harbor's 75% test does not apply to every instance of alleged manufacturing

The safe harbor's text also indicates that it is not a simple math test that applies to any production of a truck. The text includes a clause that limits the safe harbor to instances of alleged manufacturing occurring "solely by reason of repairs or modifications to the article." I.R.C. § 4052(f)(1). Thus, it only applies when "repairs or modifications" have been made to a § 4051 article. In those situations, if the cost of such repairs and modifications does not exceed 75% of the retail price of a comparable new article, "the article" shall not be treated as manufactured or produced "solely by reason" of those repairs or modifications. *See id.* It follows that any other instances of manufacturing are not eligible for relief under the safe harbor.

The statute and regulations do not define "repair" or "modification."  At the time the safe harbor was codified, "repair" meant "to restore by replacing a part or putting together what is torn or broken: *fix*."  *Repair*, *Merriam-Webster's Collegiate Dictionary* 991 (10th ed. 1997).  "Modification" meant "the making of a limited change in something."  *Modification*, *id.* at 748.  These terms thus have "a connotation of increment or limitation."  *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994) (discussing "modify").

Accordingly, if Mary loses a limb in an accident and has a prosthetic one attached, one might say the doctors "repaired" Mary.  But if Mary passes away in the accident, is an organ donor, and her heart is transplanted into Shelly's body, the result is not a "modification" of Mary.  Likewise, one would not say that installing an engine (what Fitzgerald calls the "heart" of a tractor) from a donor tractor into a new truck is a "modification" of the donor tractor.

If Congress did not intend the "repairs or modifications" clause to limit the application of the safe harbor, there was no need to include it.  For example, it could have said that:  "No tax shall apply if the cost of manufacturing or producing an article using one or more components of

a used article does not exceed 75 percent of the retail price of a comparable new article." The fact that it did not use this type of formulation demonstrates that this limiting clause was intentionally included and served a purpose. *Cf. Mediofactoring v. McDermott (In re Connolly N. Am., LLC)*, 802 F.3d 810, 818 (6th Cir. 2015) (noting the "'cardinal principle of statutory construction' that, whenever possible, a statute should be construed so that 'no clause, sentence, or word shall be superfluous, void, or insignificant'" (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001))).

Accordingly, § 4052(f)(1) only excuses alleged instances of manufacturing when "repairs" or "modifications" have been made to a single, preexisting article.

### 3.  Fitzgerald did not "repair" or "modif[y]" existing "article[s]"

As discussed above, § 4052(f) requires that a taxpayer repair an article that exists at the beginning and end of its manufacturing process. (*See* Part B.1.a, *supra*.) The statute, along with the long-standing regulations, define an "article" for these purposes as a self-propelled vehicle designed to tow a load over a public highway. (*See* Part B.1.b, *supra*.) As discussed below, Fitzgerald failed to show that it

repaired "articles" because, during the relevant tax years, it was not refurbishing used "articles."  Rather, it was buying salvaged engines and installing them into new trucks.  A salvaged engine is not an "article" and Fitzgerald did not "repair" the trucks that the engines came from.  Accordingly, Fitzgerald cannot obtain relief under § 4052(f).

Fitzgerald's production process plainly qualified as "manufacturing" under the statute.  *See* Treas. Reg. § 48.0-2(a)(4)(i).  Thus, the tax applies unless Fitzgerald qualified for the safe harbor.  (*Cf.* Mot., 19R. 55, #1179.)  Fitzgerald did not qualify because it did not repair or modify existing articles.

Fitzgerald was producing glider tractors by combining salvaged engines and remanufactured transmissions with new trucks.  Fitzgerald would "harvest[ ]" an engine and possibly a transmission from a salvage yard for $4,000, rebuild the engine, send the transmission (if available) to Eaton, and "marry" the engine with a remanufactured transmission from Eaton.  (*See* Mem. Op., R. 217, #17128–29, 17133; Tr., R. 206, #16059, 16206–07.)  But Fitzgerald had no way to tell whether the transmission it "married" to an engine was the same transmission that originally was paired with that engine because Eaton had

"reserialize[d]" the transmissions. (Tr., R. 205, #15943; Tr., R. 206, #16206–07.) The remainder of the donor trucks that the engines came from ended up in the "metal shredder." (Tr., R. 206, #16186.) Fitzgerald would then install the newly paired engine and transmission in a glider kit. (Tr., R. 205, #15943.) The glider kits that Fitzgerald used were "essentially" "new tractor[s]" missing the engine and transmission.[10] (Tr., R. 208, #16766.) Thus, Fitzgerald was taking an engine from one donor truck, a transmission from a second donor truck, and combining them with a glider kit to produce a new truck, which it then sold for a profit. Its customers then used those trucks for the same purposes—and to cause the same wear on the roads—as trucks assembled from entirely new components.

The fact scenario here resembles the one discussed in Technical Advice Memorandum 92-38-008, where the taxpayer combined salvaged components from two different trucks with a glider kit to produce a functioning vehicle. The salvaged components in that case included the engine, transmission, and axles. *Id.* The IRS concluded that the safe

---

[10] No party contends that the glider kit is an article. The glider kits here were not self-propelled and could not tow a trailer.

harbor did not apply because there was "no existing vehicle that has been modified, repaired, or restored." *Id.* "The truck tractor that the taxpayer has fabricated, although comprised of some used components, is essentially a new vehicle—a truck tractor that did not exist prior to the fabrication and that is created as a result of the combining of new components with salvaged materials and components." *Id.* "Thus, a repair or restoration of a worn vehicle, as contemplated in Rev. Rul. 91-27, has not occurred and the safe harbor provided in Rev. Rul. 91-27 does not apply to this case." *Id.* The scenario here is nearly identical.

Moreover, the proper analysis for reusing one component from a used vehicle is to reduce the tax base under I.R.C. § 4052(b)(1)(B)(iii). At most, reusing a $4,000 salvaged engine should provide a $4,000 reduction off the sale price for the excise tax. It does not entitle a manufacturer to avoid the excise tax altogether on a truck it sells for many multiples of that amount.

Indeed, the cost of the used engines represented a minuscule fraction of Fitzgerald's cost to produce each glider tractor. For example, if the average sales price was about $100,000 (*see*, *e.g.*, Ex. 340, R. 225-5, #17740), $8,000 of which was profit and $4,000 of which was the cost

of the engine (Tr., R. 206, #16057–58), the engine represented less than 5 percent of the cost of manufacturing a glider tractor.  Even if the engine had been the "heart and soul" of a scrapped truck and a significant part of that truck's cost when it was new, it was a cheap and interchangeable component of the glider tractor that Fitzgerald produced.  It would make no sense for the reuse of this component to entitle Fitzgerald to eliminate the tax in its entirety.  *Cf. Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 799 (6th Cir. 2007) ("Interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." (citation omitted)).

At the outset of the case, Fitzgerald admitted that it needed to "repair or modify" a donor truck to qualify for the safe harbor.  It claimed at the initial case management conference that it would show that it was "acquir[ing] ownership" of used tractors because it "ha[d] to have ownership of the original tractor" to take advantage of the safe harbor.  (Tr., R. 224, #17257.)  In its original complaint, it alleged that it "retains a copy of the previously taxed tractor's title."  (Compl., 19R. 1, #3 ¶ 19.)  And its own documentation indicated that it understood it

was important to "ensure[ ] that the appropriate title is retained, which is required for FET exemption." (Ex. 100, R. 225-3, #17698; *see also id.* #17671 (safe harbor "[r]equires donor vehicle VIN").)

But during the tax periods at issue, Fitzgerald was not buying the donor trucks and taking title to them. (*See* Tr., R. 206, #16048–49.) It was buying salvaged engines. As it later admitted, it had no ability to determine where those engines came from. (Ex. 135, R. 225-4, #17723.) As one of its suppliers explained, it would not give Fitzgerald the donor vehicle's title or VIN because "[w]e did not associate engines to VINs . . . [t]hese are not trucks; they're engines." (Tr., R. 207, #16385.) Fitzgerald never owned the donor trucks, did not attempt to fix them, and could not even identify them.

Fundamentally, then, Fitzgerald was not "repair[ing]" or "modif[ying]" used tractors. *See* I.R.C. § 4052(f)(1). Under the ordinary meaning of these terms, Fitzgerald may have been "repairing" or "modifying" the engines it salvaged. (*See* Part B.2, *supra*.) But it was not "repairing" or "modifying" the donor trucks that those engines came from. It was building tractors from new materials and scrap. That constituted manufacturing. *See* Treas. Reg. § 48.0-2(a)(4)(i). The

vehicles it produced cause the same wear on the public highways as new trucks. And because Fitzgerald did not "repair" or "modif[y]" the donor tractors, Fitzgerald's acts of manufacturing were not excused as occurring "solely by reason of repairs or modifications to the article." I.R.C. § 4052(f)(1).

As the District Court itself correctly explained at the outset of the case, the safe harbor would not apply if "Fitzgerald simply purchased salvaged engine cores without acquiring title to the highway tractors from which those parts had been salvaged" and "placed them into [glider] kits." (Order, 19R. 74 #1817.) The trial established that that is exactly what happened, and the District Court failed to apply the law correctly. Accordingly, § 4052(f)(1)'s safe harbor did not apply as a matter of law.

### 4. *Schneider* does not require a different result

In *Schneider National Leasing, Inc. v. United States*, 11 F.4th 548, 555, 557 (7th Cir. 2021), the Seventh Circuit held that § 4052(f)(1) did not contemplate a measurement for "repairs or modifications" apart from the 75% test. Below, the District Court and Fitzgerald relied

heavily on *Schneider*. This reliance was misplaced because *Schneider* was both factually very different and misguided.

First, in *Schneider*, the taxpayer was a large trucking company that refurbished a portion of its "existing fleet" with glider kits. 11 F.4th at 551–52. Thus, there was no question that the taxpayer started its refurbishment process with a donor tractor. Each glider tractor reused multiple components from one, specific, identifiable donor truck. *Id.* at 552. These included the transmission, driveline, rear axle, rear suspension, and rear wheel hubs at a minimum, and sometimes also the fuel tank, fifth wheel, and rear brakes. *Id.* The taxpayer owned the trucks before, during, and after the refurbishment process. *Id.* at 551–52.

Thus, *Schneider*'s facts are a closer match with the IRS's pre-codification guidance in Technical Advice Memorandum 93-33-007, describing a scenario where the Rev. Rul. 91-27 safe harbor applied. In that case, the taxpayer restored its own worn vehicles by combining glider kits with engines, transmissions, and axles of identifiable donor tractors without intermingling components. *Id.* The safe harbor applied because "the restored tractors [we]re essentially the same

vehicles." *Id.* But here, Fitzgerald merely reused engines that it bought from salvage yards. It did not hold title to the engine's donor truck and had no ability to figure out what truck the engine even came from.

Second, *Schneider*'s interpretation of § 4052(f) is flawed. The court admitted that it was "[t]rue enough" that Congress's use of the definite article demanded "that the same identifiable article exist before and after the repairs or modifications." 11 F.4th at 557. But it then read the preexisting article requirement out of the statute. The court justified its decision based on its concern that there was "no test" to determine whether "the same identifiable article" existed at the end of the manufacturing process. *Id.* And it suggested that the Government's interpretation had "no basis" in the statute or regulations. *Id.* But as described above, "article" has a specific meaning under the statute and regulations, (*see* Part B.1.b, *supra*), which cannot be ignored simply because it is inconvenient, *Burgess*, 553 U.S. at 130. Those provisions provide the "test" that the court was looking for—the court's statement to the contrary is wrong.

Third, *Schneider* fails to acknowledge that components and parts are treated differently than articles under the statute. (*See* Part B.1.c, *supra*.) The statute separately provides taxpayers with a specific remedy (a tax base reduction) for reusing components from a used vehicle. *See* I.R.C. § 4052(b)(1)(B)(iii). Although Fitzgerald could not qualify for that remedy, a taxpayer in Schneider's situation could. (*See* p. 37, n.7, *supra*.) And parts and accessories have generally been treated separately under both the manufacturers and retail taxes. *E.g.*, I.R.C. § 4051(a)–(b). The Government argued these points in *Schneider*, but the court failed to address them.

Fourth, under *Schneider*'s interpretation, a trucking company could use the safe harbor to replace a worn tractor with a cheaper, new tractor without reusing *anything*. As long as the cost of the replacement tractor is less than 75% of a comparable, new tractor, the company would avoid the excise tax. This could occur when a taxpayer has enough buying power to command bulk discounts, as was the case in *Schneider*. *See* 11 F.4th at 559; 486 F. Supp. 3d at 1250. Yet even the *Schneider* panel would seemingly acknowledge that "repairs and modifications" do not encompass a replacement or substitution.

*Cf. Schneider*, 11 F.4th at 555–56 (discussing dictionary definitions of "repair" and "modify"). As the district court in that case correctly stated: the safe harbor "presume[s] repairs or modifications to a specific tractor, not the replacement of one tractor with another." 486 F. Supp. 3d at 1254.

And although the safe harbor may permit extensive repairs, it also contains limiting language. It exempts instances that would otherwise constitute manufacturing "*solely* by reason" of "repairs" or "modifications" to a § 4051 article that do not exceed the 75% test. I.R.C. § 4052(f)(1) (emphasis added). It does not apply to every instance of alleged manufacturing. (*See* Part B.2, *supra*.) Otherwise, this language would be entirely superfluous. *Cf. Mediofactoring*, 802 F.3d at 818. Consequently, it cannot apply to situations when one article is replaced with another.

Fifth, *Schneider* itself recognized that "[t]here is no evidence that Congress . . . altered the preexisting, IRS-recognized safe harbor protection for a worn vehicle that has been extensively restored to extend its useful life." 11 F.4th at 558. Thus, within the context of a worn vehicle, the safe harbor is no broader than it was before

codification. And before the safe harbor was codified, fabricating a truck with a new glider kit and some salvaged components from multiple vehicles did not qualify for relief from the tax because "no existing vehicle" was restored. Tech. Adv. Mem. 92-38-008. But that is exactly what happened here.

Fitzgerald failed to show that it repaired or modified an existing donor truck as required by the safe harbor. It therefore did not establish "all the facts necessary" to show that it qualified for relief under § 4052(f)(1). *Sherwin-Williams*, 403 F.3d at 796. *Schneider* would not compel a different result, even if this Court were bound by it.

## C. Fitzgerald could not satisfy § 4052(f)(2) because it made no effort to link any of the engines it salvaged with a preexisting, donor truck that was taxable when new

Section 4052(f)(2) provides that the safe harbor "shall not apply if the article (as repaired or modified) would, if new, be taxable under section 4051 and the article when new was not taxable under such section" or prior law. Fitzgerald has never disputed that the glider tractors would be taxable under § 4051 but for the application of the safe harbor. (*See, e.g.*, Mot., 19R. 55, #1179.) Thus, Fitzgerald's glider tractors "would, if new, be taxable." I.R.C. § 4052(f)(2). But, under

§ 4052(f)(2), they could not qualify for the safe harbor if they were "not taxable" "when new." *See id.*

As the Government explained in the court below, Fitzgerald failed to show that its glider tractors were in fact "taxable" when new. (Rev. Br., R. 213-1, #17081, 17085–86.) The District Court acknowledged that Fitzgerald bought engines from trucks that had been exported tax-free to Mexico or Canada or sold tax-free to municipalities. (Mem. Op., R. 217, #17131.) But it still let Fitzgerald off the hook. (*Id.* #17131–33.) As discussed below, the District Court was wrong as a matter of law. This Court's precedent and the applicable regulations, which the District Court ignored, compel a different outcome.

Treasury's regulations define "taxable sale" for the purposes of the § 4051 tax on first retail sales. Section 145.4052-1(a)(2) provides that "the sale of an article is a taxable sale" "unless" it falls under one of the several categories. Treas. Reg. § 145.4052-1(a)(2). The categories include sales considered "tax-free" under § 4221. Treas. Reg. § 145.4052-1(a)(2)(i). Section 4221's list of nontaxable sales includes sales: for export, to local and state governments, to nonprofit

educational organizations, and to "qualified blood collector organization[s]." I.R.C. § 4221(a).

Notably, § 145.4052-1(a)(2)'s definition was promulgated before the safe harbor was codified, so Congress would have had this definition of "taxable sale" in mind when it enacted § 4052(f)(2). *See Excise Tax on Heavy Trucks, Truck Trailers and Semitrailers, and Tractors*, 53 Fed. Reg. 16867-01, 16869 (May 12, 1988). And Congress's repetition of this "well-established term" implies that it "intended the term to be construed in accordance with pre-existing regulatory interpretations." *Bragdon*, 524 U.S. at 631. Moreover, courts generally presume that when "the same words" are used in the same statutory scheme they "mean the same thing." *Delek*, 32 F.4th at 500 (citation and alteration marks omitted). And, even if the regulatory definition of "taxable sale" did not strictly apply to § 4052(f), another provision makes § 4221 generally applicable. *See* Treas. Reg. § 145.4052-1(f)(5).

The regulatory definition also comports with the ordinary meaning of "taxable," which is "capable of being taxed" or "subject to tax." *Taxable, Random House Unabridged Dictionary* 1947 (2d ed. 1993); *see also City of San Antonio, Texas v. Hotels.com, L.P.*, 593 U.S.

330, 338–39 (2021). Moreover, property is "taxable" when it "is not exempt from taxation." *Taxable Property*, *Ballentine's Law Dictionary* 1256 (3d ed. 1969). That is consistent with how the Code and many state tax laws generally operate. *E.g.*, I.R.C. § 63 (defining "taxable income" as gross income minus allowable deductions and exemptions); *Gen. Elec. Capital Corp. v. Manager of Revenue* (*In re W. Pac. Airlines, Inc.*), 273 F.3d 1288, 1291 (10th Cir. 2001) (under Colorado law, "taxable property" is all property "not expressly exempted" (citing Colo. Rev. Stat. § 39-1-102(16))); *Taxable Income*, *Black's Law Dictionary* 768 (7th ed. 1999) ("Gross income minus all allowable deductions and exemptions."). Thus, even apart from the regulatory definition, the sales described in § 4221 would not be "taxable" because they are exempt from taxation.

This understanding is also confirmed by controlling precedent. In *CenTra, Inc. v. United States*, 953 F.2d 1051, 1054 (6th Cir. 1992), this Court applied § 145.4052-1(a)(2) to hold that Canadian sales were not "taxable." The taxpayers had purchased trucks in Canada that had been manufactured in the U.S. *Id.* at 1052. After using the trucks in Canada, they imported them into the U.S. and leased them to a

subsidiary. *Id.* The Government argued that the leases constituted "first retail sales" under § 4051 and this Court agreed. *Id.*

The Court explained that the case turned on "the meaning of the word 'taxable'" in the regulation. 953 F.2d at 1054. It agreed with the Government's argument that a "prior taxable sale" meant a prior sale that was "capable of being taxed under current law." *Id.* A sale in Canada would not be "capable of being taxed because it was the kind of 'wholly foreign' transaction not actually taxed under the present Internal Revenue Code." *Id.*

Thus, "taxable" means capable of being taxed or subject to tax under the law. The apparent purpose of § 4052(f)(2) is to ensure that the excise tax is payable at least once for each article. Thus, even if an article satisfies § 4052(f)(1), including the 75% test, it will not qualify for relief if it was exempt from the § 4051 tax when it was new. Although a taxpayer with the burden to prove that an article was "taxable" may not have to show that the tax was actually paid (such as by producing a receipt for each vehicle), it does have to show that it was capable of being taxed under the law and not otherwise exempted.

Accordingly, a taxpayer using donor trucks that were sold in Mexico or Canada or to municipalities cannot qualify for the safe harbor because the trucks were not "taxable" when new under § 4052(f)(2). The evidence here showed that some of Fitzgerald's salvaged engines fell into these categories. A representative from A&A Truck Parts—a scrap yard that supplied engines to Fitzgerald—testified that it obtained trucks from "lots of government agencies" and "a lot of municipalities." (Tr., R. 207, #16375–77.) Other evidence indicated that Fitzgerald bought engines from trucks sold in Mexico and Canada. (*See* Tr., R. 206, #16021–22, 16077–78, 16080.) The District Court even admitted that "Fitzgerald purchased engines from A&A Truck Parts that sometimes salvaged wrecked municipal tractors," and purchased some engines "from trucks that had been originally shipped to Mexico or Canada." (Mem. Op., R. 217, #17131.)

The Government argued below that these trucks were not taxable, citing the regulation and this Court's decision in *CenTra*. (Rev. Br., R. 213-1, #17085–86; Tr., R. 208, #16726.) And even if it had not, the District Court would have had "an independent responsibility to analyze the applicable" authorities. *Bower v. Fed. Exp. Corp.*, 96 F.3d

200, 209 n.14 (6th Cir. 1996). But the District Court failed to even consider them. (Mem. Op., R. 217, #17118–45.) And it erroneously stated that § 4221(a) was inapplicable because it was "an entirely different section of the tax code." (*Id.* #17133.) This was error. *See King v. Zamiara*, 788 F.3d 207, 218 (6th Cir. 2015) (district court's failure "to apply pertinent statutory language" was an abuse of discretion); *Mackey v. Dyke*, 29 F.3d 1086, 1092 (6th Cir. 1994) (district court's failure to consider prison regulation was "clear error"). Section 4221 is explicitly applicable under the regulation that the District Court ignored. *See* Treas. Reg. § 145.4052-1(a)(2)(i), (f)(5).

Based on its incorrect understanding of the law, the District Court failed to hold Fitzgerald to its burden, and Fitzgerald did not attempt to carry it. Fitzgerald merely sought to show that the salvaged engines it used in its glider tractors were the types of engines that *could* have originally been installed in "taxable" vehicles, depending on where those vehicles were sold and who purchased them. (*See* Tr., R. 205, #15921–22; Tr., R. 208, #16794; Resp., R. 212, #17052–53.) But showing that a vehicle *could have been* taxable when new is not the same thing as showing that it *was* taxable when new.

After rejecting an argument that the Government did not make about the meaning of "taxable,"[11] the District Court held that Fitzgerald's showing was sufficient. (Mem. Op., R. 217, #17132–33 (citing Mem. Op., R. 137, #11740).) It dismissed any suggestion that Fitzgerald had to show that "each and every one" of its glider tractors satisfied the statutory requirement because it feared that compliance could take a "lifetime." (Mem. Op., R. 137, #11740.)

But a taxpayer must establish "all the facts necessary" to show that it is entitled to relief. *Sherwin-Williams*, 403 F.3d at 796. Thus, courts have regularly required taxpayers to submit proof for each transaction. *E.g.*, *Valetti v. Commissioner*, 260 F.2d 185, 187 (3d Cir. 1958) (taxpayer's records of "600 separate transactions, showing in each case the amount paid, the payee's name, and the ship served" could not

---

[11] The Government never argued that "taxable" means "previously taxed," as the District Court seemed to think. (Mem. Op., R. 137, #11740.) The Government suggested that Fitzgerald could prove that subsection (2) was satisfied by showing that the tax had been paid, as Fitzgerald indicated it would. (*Compare* Mem., R. 129, #11284, *with* Summ. J. Ex. 25, R. 129-26, #11571 ("Please note that Fitzgerald has ensured that the section 4051(a) excise tax was previously paid on all of the donor tractors when they originally were sold in retail transactions.").) But the Government's position then—as it is now— was that the tax had to be "*payable*." (Reply, R. 134, #11689.)

overcome the presumption of correctness when there was reason to believe they were overstated); *Pritchett v. Commissioner*, 63 T.C. 149, 164 (1974) (taxpayer's "burden must be carried for each sale").

And as even *Schneider* recognized, "[t]he provision imposing the excise tax, § 4051(a)(1), is written in terms of single transactions of individual articles, and the safe harbor in § 4052(f)(1) likewise concerns repairs made to discrete articles." 11 F.4th at 560; *see id.* at 557 ("the safe harbor speaks in terms of a single article"). It follows that each sale of a highway tractor is subject to the excise tax, and it is the taxpayer's burden to show that every such sale is exempt under the safe harbor. *See Wilson*, 588 F.2d at 1171. That does not mean that a taxpayer must produce a receipt for each transaction; but it does have to produce evidence indicating that the donor trucks were capable of being taxed and were not exempt. For example, if Fitzgerald's suppliers had obtained their trucks from non-exempt sources, Fitzgerald could have called them to testify to that fact. It could not do so here because that would not have been true. (*See* Tr., R. 207, #16375.)

The fact that something "may be difficult to establish does not relieve a taxpayer from his burden." *Coloman v. Commissioner*, 540

F.2d 427, 430 (9th Cir. 1976); *accord Oates v. Commissioner*, 316 F.2d 56, 58 (8th Cir. 1963). As the Supreme Court explained long ago, "[t]he impossibility of proving a material fact upon which the right to relief depends simply leaves the claimant upon whom the burden rests with an unenforceable claim, a misfortune to be borne by him, as it must be borne in other cases, as the result of a failure of proof." *Burnet v. Houston*, 283 U.S. 223, 228 (1931). In other words, if Fitzgerald could not satisfy subsection (2), it was out of luck.

Section 4052(f)(2) was obviously intended to ensure that trucks that were exempt from tax when they were new would not escape taxation a second time. But if all Fitzgerald needed to do to satisfy it was to show that its engines came from trucks that theoretically *could* have been taxable, subsection (2) is nearly meaningless. *Cf. Mediofactoring*, 802 F.3d at 818. The only instance when it might apply would be if a manufacturer installed an engine from something other than a § 4051 article (like a boat[12]) into a truck.

---

[12] Fitzgerald actually did that, too. (*See* Mem. Op., R. 217, #17130; Tr., R. 206, #16005.)

Fitzgerald had to show that each glider tractor it produced was taxable when new.  It did not do so, and the District Court explicitly refused to require it to do so.  The court should have entered judgment as a matter of law in the Government's favor.  Its failure to do so was reversible error.

## CONCLUSION

The judgment of the District Court should be reversed and remanded with instructions to enter judgment for the United States.

Respectfully submitted,

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

/s/ Douglas C. Rennie

MICHAEL J. HAUNGS          (202) 514-4343
DOUGLAS C. RENNIE          (202) 305-7546
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel:*
HENRY C. LEVENTIS
  *United States Attorney*

JUNE 10, 2024

## CERTIFICATE OF COMPLIANCE

### Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

    1.  This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    [X]   this document contains 12,909 words, **or**

    [ ]   this brief uses a monospaced typeface and contains _____ lines of text.

    2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X]   this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

    [ ]   this brief has been prepared in a monospaced typeface using _____ with _____.

(s)    /s/ Douglas C. Rennie

Attorney for   United States of America

Dated:     June 10, 2024

**CERTIFICATE OF SERVICE**

It is hereby certified that on June 10, 2024, the foregoing brief for

the United States was electronically filed with the Clerk of the Court by

using the ECF system.  Counsel for other parties are registered ECF

users and will be served by the ECF system.


    /s/  Douglas C. Rennie
        DOUGLAS C. RENNIE
          *Attorney*

# ADDENDUM

# DESIGNATION OF RELEVANT DISTRICT COURT OR TAX COURT DOCUMENTS

## Pursuant to Sixth Circuit Rule 30(g)

| Record Entry No. | Description | Page ID Range |
|---|---|---|
| 19R. 1 | Complaint | #1–18 |
| 19-R. 28 | Memorandum Opinion | #1071–83 |
| 19R. 55 | Fitzgerald's Motion for Leave to File Motion for Partial Summary Judgment | #1175–83 |
| 19R. 62-1 | Memorandum of Law in Support of Fitzgerald's Motion for Partial Summary Judgment | #1352–82 |
| 19R. 74 | Order | #1815–18 |
| R. 1 | Complaint | #1–20 |
| R. 36 | First Amended Complaint | #2804–31 |
| R. 96 | Order | #6710–12 |
| R. 104 | Government Response to Court's Order | #6739–53 |
| R. 108 | Order, R. 108, #6773 | #6773 |
| R. 110 | Status Conference Transcript (January 27, 2023) | #6777–819 |
| R. 127 | Order | #11258–60 |
| R. 128 | Government's Revised Motion for Summary Judgment | #11261–63 |

| Record Entry No. | Description | Page ID Range |
|---|---|---|
| R. 129 | Government's Memorandum in Support of Its Revised Motion for Summary Judgment | #11266–96 |
| R. 129-10 | Government's Summary Judgment Exhibit 9 | #11522–25 |
| R. 129-26 | Government's Summary Judgment Exhibit 25 | #11570–72 |
| R. 129-28 | Government's Summary Judgment Exhibit 27 | #11574–75 |
| R. 134 | Government's Reply in Support of Summary Judgment | #11686–91 |
| R. 137 | Memorandum Opinion | #11733–49 |
| R. 161 | Order | #13830–34 |
| R. 173 | Stipulations | #13948–51 |
| R. 191 | Verdict Form | #15648–49 |
| R. 194 | Judgment | #15704 |
| R. 198 | Government's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial | #15747–49 |
| R. 205 | Trial Transcript Day 1(July 10, 2023) | #15800–984 |
| R. 206 | Trial Transcript Day 2 (July 11, 2023) | #15985–6271 |
| R. 207 | Trial Transcript Day 3 (July 12, 2023) | #16272–583 |
| R. 208 | Trial Transcript Day 4 (July 13, 2023) | #16584–827 |
| R. 209 | Trial Transcript Day 5 (July 14, 2023) | #16828–40 |

| Record Entry No. | Description | Page ID Range |
|---|---|---|
| R. 212 | Fitzgerald's Response in Opposition to Government's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial Resp., R. 212, #17052–53 | #17039–70 |
| R. 213-1 | Revised Brief in Support of Government's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial | #17074–106 |
| R. 217 | Memorandum Opinion | #17118–45 |
| R. 218 | Order | #17146 |
| R. 219 | Notice of Appeal | #17147–49 |
| R. 222 | Final Pretrial Conference Transcript (June 30, 2023) | #17155–231 |
| R. 224 | Initial Case Management Conference Transcript (September 23, 2019), R. 224, #17257 | #17233–70 |
| R. 225-1 | Trial Exhibit 6 | #17274–75 |
| R. 225-2 | Trial Exhibit 16 | #17276–649 |
| R. 225-3 | Trial Exhibit 100 | #17650–720 |
| R. 225-4 | Trial Exhibit 135 | #17721–27 |
| R. 225-5 | Trial Exhibit 340 (part 1) | #17728–95 |
| R. 225-6 | Trial Exhibit 340 (part 2) | #17796–864 |