No. 24-5078

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
―――――――――――――――――

Fitzgerald Truck Parts and Sales, LLC
*Plaintiff-Appellee,*

v.

UNITED STATES OF AMERICA,

*Defendant-Appellant.*

―――――――――――――――――

Appeal from the United States District Court for the
Middle District of Tennessee
Case No. 2:20-cv-00026

―――――――――――――――――

**BRIEF OF PLAINTIFF-APPELLEE
FITZGERALD TRUCK PARTS AND SALES, LLC**

―――――――――――――――――

Kendall C. Jones
Zachariah W. Lindsey
EVERSHEDS SUTHERLAND (US) LLP
700 Sixth Street, NW, Suite 700
Washington, DC 20001-3980
(202) 383-0100
kendalljones@eversheds-sutherland.com
zacklindsey@eversheds-sutherland.com

Counsel for Plaintiff-Appellee

# CORPORATE DISCLOSURE STATEMENT

Pursuant to 6th Cir. R. 26.1, Plaintiff-Appellee Fitzgerald Truck Parts

and Sales, LLC makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

     No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

     No.

*s/ Kendall C. Jones*
Kendall C. Jones

# <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ...............................i

TABLE OF CONTENTS....................................................ii

TABLE OF AUTHORITIES ........................................... v

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................... x

STATEMENT OF THE ISSUES................................... 1

STATEMENT OF THE CASE ............................................ 1

    I.    Fitzgerald's Business. ............................................. 4

    II.    This Suit ............................................................. 6

    III.    The Trial ........................................................... 8

    IV.    Post-Trial Motions.................................................. 13

SUMMARY OF ARGUMENT ..................................... 15

ARGUMENT ............................................................ 19

    I.    The Safe Harbor Applies to Worn or Wrecked Tractors Repaired Using Glider Kits. .................................. 19

        A.    Fitzgerald Was Repairing an Article; the Government Is Wrong on the Facts............................. 20

        B.    § 4052(f)(1) Is Unambiguous:  Fitzgerald Was Not Required to Retain or Use Certain Parts and Pieces. .................................................................. 25

        C.    The IRS Has Issued No Guidance That Would Change This Analysis.................................................. 32

        D.    Other Provisions in the Tax Code Do Not Alter the Safe Harbor............................................................. 34

        E.    *Schneider* Was Correctly Decided. ............................... 35

F.  The Legislative History and Reasons for the Safe Harbor's Enactment Disproves a Parts-and-Pieces Test ...................................................... 36

    1.  The safe harbor was meant to replace the fact-based parts-and-pieces test with a straightforward 75 percent test. ......................... 37

    2.  The government distorts the purpose of the safe harbor by arguing it was meant to add more rules, not lessen existing burdens. ............ 40

    3.  The purpose of a bright-line test would be lost if a parts-and-pieces test controls the safe harbor. .......................................... 42

G.  The Safe Harbor Is Not an Exemption Statute. ........... 44

II. Fitzgerald Satisfied the Safe Harbor Requirement That the Repaired Worn or Wrecked Tractors Were Taxable When New Because All Were Class 8 Taxable Tractors. ...... 47

A.  Taxable Means Subject to Tax, Not That the Tax Was Payable. ................................................. 47

B.  The Government's Reliance on an Exemption Statute Is Misplaced; "Taxable" Plainly Applies to an Article as Described in § 4051, Not to Exemptions Found Elsewhere in the Tax Code. ......... 51

C.  The Government Has Waived Its Payable Argument, and the Failure to Include That Instruction Does Not Constitute Plain Error. ............. 53

D.  The Government Previously Argued Taxable Means Taxed and That's What Payable Implies. ......... 58

E.  The Government's Speculation About the Purpose of the Safe Harbor Is Wrong. ........................................ 59

     F.     Any of the Government's Policy Concerns Should Have Been Addressed by the IRS But Were Not. ........ 62

CONCLUSION ........................................................................... 63

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ........................ 64

CERTIFICATE OF SERVICE ................................................... 65

ADDENDUM .......................................................................... 66

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allen v. United States,*
    83 F. 4th 564 (6th Cir. 2023) ............................................... 48

*Am. Bankers Ins. Co. v. United States,*
    265 F. Supp. 67 (S.D. Fla. 1967) .......................................... 49

*Bates v. Dura Auto. Sys., Inc.,*
    625 F.3d 283 (6th Cir. 2010)................................................ 26

*Boise National Leasing, Inc. v. United States,*
    389 F.2d 633 (9th Cir. 1968)................................................ 38

*Borenstein v. Commissioner,*
    919 F. 3d 746 (2d Cir. 2019) ................................................ 46

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ............................................................. 61

*CenTra, Inc. v. United States,*
    953 F.2d 1051 (6th Cir. 1992).................................. 51, 53, 61

*Connecticut Nat'l Bank v. Germain,*
    503 U.S. 249 (1992) ............................................................. 27

*Craddock v. FedEx Corp. Servs. Inc.,*
    102 F.4th 832 (6th Cir. 2024) ....................................... 18, 54

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) ................................................................. 63

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ....................................................... 34, 63

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.,*
    651 F. 3d 329 (2d Cir. 2011) ................................................ 43

*FDIC v. Meyer,*
510 U.S. 471 (1994) ............................................................ 28

*Guilzon v. Commissioner,*
985 F. 2d 819 (5th Cir. 1993) ............................................. 33

*Gould v. Gould,*
245 U.S. 151 (1917) ............................................................ 46

*Hoge v. Honda of Am. Mfg., Inc.,*
384 F.3d 238 (6th Cir. 2004) .............................................. 50

*Howe v. City of Akron,*
723 F.3d 651 (6th Cir. 2013) ............................ 17, 18, 24, 54

*Hughes Aircraft Co. v. Jacobson,*
525 U.S. 432 (1999) ............................................................ 26

*In re Oilfield Instruments,*
53 B.R. 199 (E.D. La. 1985) ............................................... 46

*Merit Mgmt. Gp. v. FTI Consulting, Inc.,*
583 U.S. 366 (2018) ............................................................ 45

*Norfolk S. Ry. Co. v. Perez,*
778 F.3d 507 (6th Cir. 2015) .............................................. 27

*Ruan Financial Corp. v. United States,*
765 F. Supp. 985 (S.D. Iowa 1990) .................................... 38

*Ruan Financial Corp. v. United States,*
976 F.2d 452 (8th Cir. 1992) .............................................. 39

*Schneider Nat'l Leasing, Inc. v. United States,*
11 F.4th 548 (7th Cir. 2021) ........................................ *passim*

*Scott v. Miller,*
361 F. App'x 650 (6th Cir. 2010) ........................................ 53

*Sherwin-Williams Co. v. United States,*
403 F.3d 793 (6th Cir. 2005) .............................................. 56

*United States v. Menasche,*
348 U.S. 528 (1955) ................................................................ 44

*United States v. Miller*,
734 F.3d 530 (6th Cir. 2013)................................... 18, 53, 54

*United States v. Veggacado,*
37 F. App'x 189 (6th Cir. 2002) ................................ 17, 24

*United States v. Wagner,*
382 F.3d 598 (6th Cir. 2004)............................................ 26

*United States v. Woods,*
571 U.S. 31 (2013) ........................................................... 36

*Weingarden v. Commissioner,*
825 F. 2d 1027 (6th Cir 1987)........................................ 46

*Ysleta del Sur Pueblo v. Texas,*
596 U.S. 685 (2022) ............................................. 32, 60, 61

**Statutes**

26 U.S.C. § 4051.................................................... *passim*

26 U.S.C. § 4051(a) ...................................... 5, 49, 51, 54

26 U.S.C. § 4051(a)(1)(A) ............................................. 19

26 U.S.C. § 4051(a)(1)(B) ............................................. 19

26 U.S.C. § 4051(a)(1)(E) ............................................. 19

26 U.S.C. § 4052(a) ..................................................... 53

26 U.S.C. § 4052(b)(1)(B)(iii) ...................................... 34

26 U.S.C. § 4052(f) ............................................. *passim*

26 U.S.C. § 4052(f)(1)......................................... *passim*

26 U.S.C. § 4052(f)(2)......................................... *passim*

26 U.S.C. § 4221 ......................................................... 45, 51, 52

Taxpayer Relief Act of 1997,
    Pub. L. No. 105-34, 111 Stat. 788 (1997) ............................. 39

Technical and Miscellaneous Revenue Act of 1988,
    Pub. L. No. 100-647, 102 Stat. 3342 (1988) ........................ 38

**Legislative History**

105 H. Rpt. 220; S. Rep. No. 105-33, at 297 (1997) .................................. 39

H.R. Conf. Rep. 105-220 (1997) .................................................. 46

H.R. Rep. No. 100-1104 (1988) (Conf. Rep.) ............................................. 38

**Other Authorities**

Fed. R. Civ. P. 51(b)(2) ...................................................... 17, 18, 24

Fed. R. Civ. P. 51(c)(1) ...................................................... 17, 18, 24

Fed. R. Civ. P. 51(d)(1)(A) .................................................. 17, 18, 24

I.R.S. C.C.A. 201306019, 2013 WL 474552 (Feb. 8, 2013) ...................... 33

I.R.S. C.C.A. 201403014, 2014 WL 189552 (Jan. 17, 2014) .............. 33, 46

I.R.S. Notice 2017-5, 2017-6 I.R.B. 779 .................................. 8, 33, 45, 58

I.R.S. Tech. Adv. Mem. 92-25-004 (Mar. 11, 1992),
    1992 WL 801902 ................................................................. 39

I.R.S. Tech. Adv. Mem. 92-38-008 (June 11, 1992),
    1992 WL 226784 ................................................................. 41

I.R.S. Tech. Adv. Mem. 93-33-007 (May 11, 1993),
    1993 WL 315090 .......................................................... 39, 41, 42

Merriam-Webster Online Dictionary, https://www.merriam-
    webster.com/dictionary ................................................ 28, 49

Rev. Rul. 54-61, 1954-1 C.B. 259 .......................................... 37

Rev. Rul. 63-128, 1963-2 C.B. 476 .......................................... 37

Rev. Rul. 63-210, 1963-2 C.B. 497 ................................. 5, 6, 25

Rev. Rul. 86-130, 1986-2 C.B. 179 .......................................... 38

Rev. Rul. 91-27, 1991-1 C.B. 192 .................................... *passim*

Priv. Ltr. Rul. 97-02-018 (Oct. 9, 1996), 1997 WL 8212 ......................... 39

Richard Lattanzio & Sean Lowry, Cong. Rsch. Serv., R45286,
Glider Kit, Engine, and Vehicle Regulations (Aug. 10, 2018).............. 6

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Oral argument may be helpful because the case involves the government's attempt to restrict a safe harbor relied on by taxpayers for decades with additional extra-statutory requirements. Oral argument may assist the Court in understanding the plain meaning of the statutory text in the context of the trucking industry.

## STATEMENT OF THE ISSUES

The issues on appeal are:

1.    Whether the § 4052(f)(1) safe harbor is solely a math test that does not depend on the parts-and-pieces retained when repairing a worn or wrecked highway tractor.[1]

2.    Whether § 4052(f)(2) requires only that the repaired tractor must have been taxable under § 4051 when new, or whether it also requires a tracing showing that the tax was payable by the original purchaser in a nontax-exempt sale when the repaired tractor was new.

## STATEMENT OF THE CASE

Decades ago, Congress mandated a safe harbor that provides certainty for imposing the § 4051 excise tax on repaired highway tractors. Before then, there was great uncertainty as to whether the tax applied to repaired tractors, depending on whether they underwent substantial repairs amounting to the manufacture of a new item. This old ambiguous test was replaced with a straightforward math test: a repaired worn or

---

[1] Unless otherwise indicated, all statutory references (section or §) are to the Internal Revenue Code of 1986 as amended and in effect for all years at issue.

wrecked tractor is deemed by statute to not be manufactured unless the repair cost exceeds 75 percent of the retail price of a comparable new one, and as long as the repaired tractor was taxable when new. Congress mandated the safe harbor in 1988, the IRS explained it in a 1991 ruling, and it was modified and codified by Congress in 1997. Rev. Rul. 91-27, 1991-1 C.B. 192; § 4052(f).

This case involves the safe harbor's application to repairs of highway tractors. Fitzgerald extracted engines and transmissions from worn or wrecked tractors, repaired the engines and combined them with rebuilt transmissions, glider kits and other parts, and sold the tractors to customers. The government does not dispute that Fitzgerald met the 75 percent test while doing so. Instead, ignoring clear statutory text and despite issuing no guidance since 1991, the government comes after Fitzgerald for taxes it never collected from customers, with a strained extra-statutory reading of the safe harbor that requires retention of an unspecified portion or certain pieces of the worn or wrecked tractor.

This is the IRS's second bite at the apple. The Seventh Circuit rejected the same parts-and-pieces argument that the government repeats here. *Schneider Nat'l Leasing, Inc. v. United States*, 11 F.4th 548

(7th Cir. 2021). As *Schneider* held, there is no repair test separate from the 75 percent test, and it does not matter what or how many parts a taxpayer used from a worn or wrecked tractor for the repair. *Schneider*, 11 F.4th at 555. The essence of the government's argument is that Fitzgerald needed to have used more than just the engine from a tractor during the repair, an argument that ignores a safe harbor intended to allow substantial repairs with no minimum on how many parts or pieces are used. The undisputed record showed that all worn or wrecked tractors Fitzgerald repaired were taxable when new, satisfying the statute's straightforward requirements.

Further, the appeal rests on allegations of supposed facts that are either not in the record or the jury rejected. Fitzgerald was not simply buying used engines. After a bad wreck, the engine is often the only remaining part that can be repaired. Fitzgerald identified a worn or wrecked tractor, salvaged the engine and transmission, and then the remainder was shredded or disposed of by either salvage yards or Fitzgerald. Thus, the engine was all that remained of a tractor when Fitzgerald repaired it. Engines are the "heart and soul" of a tractor and 40 to 50 percent of the value of a functioning tractor. Regardless,

ownership of every part is not required under the safe harbor and is impossible where a tractor is wrecked and so by definition is missing most of its parts. While the government argues "engines are not trucks," the engine can be the only workable component left following a wreck. Fitzgerald only needed to use the engine (the most substantial part) for the repair.

Finally, the government misstates the second safe harbor requirement that a repaired tractor was "taxable under section 4051" when new. It argues the tax had to be payable at the first retail sale, relying on exemptions not found in § 4051. But an article can be taxable without tax being owed on a specific sale since the taxable tractor requirement focuses on the type of highway tractor subject to tax, not the specific sale. The record shows Fitzgerald repaired only tractors taxable under § 4051, and the government's speculation about tax-exempt sales, which it never proved, wouldn't have changed the trial.

## I.    Fitzgerald's Business.

Fitzgerald is a family owned and operated Byrdstown, Tennessee company that sold highway tractors known as gliders. (Transcript, R.

205, #15936.)[2] Fitzgerald sold gliders since 1989. (*Id.*, #15936.) Fitzgerald would find worn or wrecked Class 8 tractors, mostly from salvage yards across the country. (*Id.*, ##15941, 16069-70.) Class 8 highway tractors are taxable under § 4051(a) because the cab in combination with a trailer weighs 33,000 pounds or more (the gross vehicle weight). (Transcript, R. 205, #15954; Transcript, R. 206, ##16036, 16049.) Fitzgerald combined repaired engines from those tractors, rebuilt transmissions, glider kits, and other parts to create the gliders.[3] (Transcript, R. 205, ##15940-43.) The end products, gliders, were sold to customers, mostly small trucking businesses. (Transcript, R. 205, ##15944-45; Transcript, R. 206, ##16042, 16123.) Today Fitzgerald's business is winding down, and the entire glider industry is no more.[4]

---

[2] "R." refers to the District Court record entry number; "App.R." refers to the Appellate Court record entry number, and "#" refers to the "Page ID" numbers in the District Court's record.

[3] A glider kit is an assemblage of new parts including a cab, frame, sheet metal, mounting brackets, steering gear, front axle, front wheels and front tires and sometimes a rear axle, rear wheels and rear tires, but not the engine or transmission. (Transcript, R. 206, ##16036-37); Rev. Rul. 63-210, 1963-2 C.B. 497. The government erroneously argues that the IRS understood that glider kits were unassembled; the 1963 ruling clearly said the glider kit was "assembled."

[4] The glider industry was eliminated in 2020 by EPA's Phase 2 emissions and fuel efficiency regulations. (Transcript, R. 205, ##15936-37); *see*

Fitzgerald never built new tractors, never built new engines, and did not buy engines at some imagined engine store as the government suggests. Instead, it located worn or wrecked tractors to repair. Fitzgerald repaired those tractors using glider kits and met the safe harbor. Before the years at issue, the IRS audited Fitzgerald repeatedly, always determining that the safe harbor applied. Relying on the unambiguous statute, the government's published positions in Rev. Rul. 91-27 and Rev. Rul. 63-210, and dozens of prior audit results, Fitzgerald did not collect the excise taxes from its customers. The asserted taxes always exceeded Fitzgerald's profits. (Transcript, R. 206, #16162.)

## II.    This Suit

For decades the IRS agreed that Fitzgerald's gliders were not subject to tax because the repairs met the safe harbor. But then IRS changed its mind, arguing that Fitzgerald must retain and use an unspecified number of parts or pieces. Fitzgerald filed suit over the

---

Richard Lattanzio & Sean Lowry, Cong. Rsch. Serv., R45286, Glider Kit, Engine, and Vehicle Regulations (Aug. 10, 2018). The industry's demise makes the government's continued litigation puzzling given that its argument was rejected in *Schneider*.

alleged liability for taxes on thousands of Class 8 glider tractors sold between 2012 and 2017.[5]

Early on, Fitzgerald moved for partial summary judgment on the question of whether the safe harbor contains an unwritten parts-and-pieces test (Fitzgerald I[6], Motion for Partial Summary Judgment, R. 62-1.) The District Court later ruled that its order allowing Fitzgerald's motion was improvidently granted. (Fitzgerald I, Order, R. 74.) Shortly thereafter, the Seventh Circuit in *Schneider* held the safe harbor was a simple math test, not a parts-and-pieces test. At a January 27, 2023 status conference, the District Court indicated that it was inclined to follow *Schneider*. (Transcript, R. 110, ##6781-82; Order, R. 108, #6773.) The government then moved for summary judgment[7] which the District

---

[5] Fitzgerald paid taxes on one glider tractor sale per quarter from 2012-2017 and brought this refund action. The government counterclaimed for unpaid taxes on the remaining gliders. The tax in dispute is $267,796,594, plus accrued interest and penalties. (Stip., R. 173, ##13948-49.)

[6] Fitzgerald I references are to the consolidated District Court Case No. 2:19-cv-8.

[7] The Government's original motion filed March 1, 2023 was struck because it exceeded a reasonable length. (Order, R. 127.) A new motion was filed on March 10, 2023. (Revised Motion for Summary Judgment, R. 128.)

Court denied on May 2, 2023.[8] (Memorandum Opinion, R. 137.) The case was set for a bifurcated trial starting July 10, 2023.[9]

## III. The Trial

At a jury trial in Cookeville, Tennessee from July 10 to July 14, 2023, Fitzgerald presented evidence showing how it met the safe harbor for all repaired worn or wrecked tractors. The government countered with its own evidence and expert, but failed to convince a jury that Fitzgerald did not meet the safe harbor.

First, Fitzgerald's witnesses testified that the company easily met the 75 percent test by historically monitoring its repair costs versus the retail prices of comparable new tractors. The government does not challenge on appeal the fact that Fitzgerald met the 75 percent math test.

---

[8] The Court only granted summary judgment against Fitzgerald's Administrative Procedures Act claim concerning I.R.S. Notice 2017-5, 2017-6 I.R.B. 779.

[9] Fitzgerald raised estoppel claims relying on the long-standing IRS position and dozens of audits. The District Court bifurcated the issues and because the jury found that Fitzgerald met the safe harbor, the estoppel claim was not submitted to the jury. The court allowed testimony about the prior audits to support Fitzgerald's testimony that it had consistently used the same business model and methodology to meet the safe harbor. (Memorandum Opinion, R. 217, ##17142-43.) That testimony also supported Fitzgerald's claim that penalties were not appropriate given reasonable reliance on the prior audits.

Second, Fitzgerald explained how it determined that tractors identified for repair were taxable when new. Fitzgerald's business practice was to either acquire worn or wrecked Class 8 highway tractors or find them in salvage yards to repair, and so those tractors were taxable when new. (Transcript, R. 205, ##15944, 15947; Transcript, R. 206, ##16004, 16088, 16181, 16185-86, 16202, 16212-14.) Below is an illustrative picture of a wrecked Class 8 tractor:



(Ex. 2, R. 226-1; Transcript, R. 205, #15942.)

When tractors were located in salvage yards, the engines and transmissions were extracted, the engines repaired, and the transmissions exchanged for rebuilt ones. (Transcript, R. 205, ##15942-43; Transcript, R. 206, #16047.) The repaired engines were the hearts and souls of the tractors, and the uncontroverted record showed that they came from Class 8 tractors that were taxable when new. Fitzgerald's former Vice President of Operations Nick Bresaw testified that the engine's "model number denotes that it was from a Class 8 tractor of the type that would have been previously taxed." (Transcript, R. 206, #16062.) To corroborate this point, Fitzgerald subpoenaed information from Detroit Diesel (the engine manufacturer) showing the Class 8 engine types utilized from the worn or wrecked tractors and that all engines were from tractors that had a gross vehicle weight of in excess of 33,000 pounds. That data alone confirmed that "99.999%" of the engines came from tractors that were of the type that were previously subject to tax. (Transcript, R. 206, ##16067-68.) Tommy Fitzgerald explained that Fitzgerald "had an inspection process," and the engines came from tractors subject to tax: "all [C]lass 8 tractors. That would be 80,000 pounds, which would be over the 33 GVW." (Transcript, R. 205, #15947.)

This undisputed testimony proved that Fitzgerald was repairing tractors that were taxable when new.

Further, the witnesses explained the significance of a tractor's engine. Joe Depew testified that the engine is about 40 to 50 percent of a new tractor's cost, and if you used only minor parts from a wrecked tractor, you would not meet the 75 percent test. (Transcript, R. 206, ##16215-16.) And Tommy Fitzgerald testified that "it wouldn't be economically feasible to build a glider kit if you didn't have the engine/transmission." (Transcript, R. 205, #15939.)

Multiple witnesses explained that Fitzgerald's business practice of extracting the engines left the remaining parts largely unusable. Engines were extracted by "use a torch to cut out the engine mounting brackets and use, you know, a -- wire cutters to clip the hoses and any wiring." (Transcript, R. 206, #16047.) The government's witness, salvage yard owner Anthony Waite, testified that "we tore the truck apart, pulled the cab off the frame, cut the frame, scrapped the frame, destroyed the cab." (Transcript, R. 207, ##16353-54.)

The government failed to rebut the testimony that Fitzgerald was repairing highway tractors. It never refuted that Fitzgerald identified

worn or wrecked tractors, repaired them using the engines, and the remainder was sent to the shredder. And the government had every opportunity to explain its theories on the importance of VIN, title, and ownership of all the tractor's parts and pieces. The jury heard and rejected them all, finding there were ways besides VINs and titles to determine if the repaired tractors were taxable when new and that Fitzgerald sufficiently identified tractors using the above process. The jury heard testimony from a government witness that a tractor owner cannot transfer title—the government's favorite red herring argument it claims is an indicator of ownership—once a tractor is wrecked. (Transcript, R. 207, #16344.) Tommy Fitzgerald confirmed that titles generally were not available after the salvage yard tractor was cut up and the engine and transmission removed. (Transcript, R. 205, ##15942-43.)

The jury found that Fitzgerald was not liable for tax on some 12,830 gliders sold from 2012 to 2017. And the jury found that Fitzgerald met the safe harbor for all repairs because it met the 75 percent test and proved that the original tractor was taxable when it was new. (Jury Verdict, R. 191.)

## IV. Post-Trial Motions

The government filed motions for a new trial and judgment as a matter of law, raising a litany of issues, most of which it has chosen not to raise.[10] (Renewed Motion for Judgment as a Matter of Law, R. 198; Appellant's Civil Appeal Statement, App.R. 12.) The District Court rejected all arguments including the two raised in this appeal, finding that Fitzgerald met its burden of showing that it was more likely than not that "the cost of the repair or modification to the highway tractor did not exceed 75 percent of the retail price of a comparable tractor"; and (2) "the highway tractor, when new, was taxable." (Memorandum Opinion, R. 217, #17128.) The government did not object to these verdict form questions.

First, the District Court rejected the argument that Fitzgerald was just using old parts and not repairing an article. The court repeated that it followed *Schneider* which held "the safe harbor does not contemplate a measurement for 'repairs or modifications' apart from the 75% test Congress expressly incorporated into the statutory text." Then the

---

[10] The District Court rejected the government's post-trial motion accusing the court of libel and seeking to redact a portion of a hearing. (Reply ISO Motion to Redact, R. 201, #15789.)

District Court found that Fitzgerald's business practices consisted of repairing highway tractors, like in *Schneider*. "The reality of what Schneider's refurbishment process looked like [was this]: a used tractor was dismantled, a few parts were recovered and combined with ones from a new glider kit, and any components left behind were scrapped." *Id.* at 555. The court found that this closely mirrored what Fitzgerald did: "[T]he reality of what Fitzgerald did (at least later on when it did not buy the entire wrecked tractor) was this: a used tractor was rendered inoperable when the engine (and perhaps transmission) was removed, this was combined with a glider kit, and whatever remained was scrapped." (Memorandum Opinion, R. 217, ##17134-35.) It rejected the argument that Fitzgerald was merely buying parts, noting that the uncontested record showed Fitzgerald possessed the entire remains of the tractor, even though the junkyard shredded the unusable portions. The court found there was not even a "shred of evidence to suggest that the wrecked and scrapped tractor (on any part thereof) from which the engine was removed was also refurbished." (*Id.*, #17135.)

Second, the District Court found that there was sufficient evidence for the jury to find that the tractors Fitzgerald repaired were taxable

when new. The court pointed out that "the evidence was undisputed that Class 8 engines are the 'heart and soul' of a tractor 'chiefly used for highway transportation in combination with a trailer' that weighs more than 33,000 pounds. As such, the Class 8 engines that Fitzgerald harvested came from a tractor that was subject to taxation when new." (Memorandum Opinion, R. 217, #17133.) While the court acknowledged that the government presented "some proof" that it was *possible* some of the repaired tractors were sold to tax-exempt entities, the court concluded that this was not relevant to the analysis since Fitzgerald only needed to show that the article when new was subject to tax—meaning that the original tractor weighed more than 33,000 pounds and so would be subject to tax under § 4051, and it was not necessary to show that tax was actually paid on the first sale. (*Id.*) The court did not need to reach Fitzgerald's argument that the government's speculation about tax exempt sales would not have impacted the trial, even if one assumed the flawed argument was correct.

## SUMMARY OF ARGUMENT

The safe harbor is a straightforward bright-line math test: if the repair cost for an article (a statutorily defined term that includes

highway tractors) is 75 percent or less than the cost of a comparable new tractor, then the repaired tractor has not been manufactured. The safe harbor also requires in § 4052(f)(2) that the repaired tractor must have been taxable under § 4051 when it was new. The uncontroverted evidence showed that Fitzgerald identified worn or wrecked Class 8 tractors that were taxable when new, extracted the only repairable parts, and therefore met the safe harbor.

The government argues that because Fitzgerald only extracted and used the engines from the worn or wrecked tractors, the tractors no longer existed, but the jury heard all the evidence and concluded that Fitzgerald was repairing tractors. On its face, the safe harbor does not impose a parts-and-pieces test requiring a certain number of parts be repaired or reused and does not dictate how repairs are made. The Seventh Circuit previously rejected the government's part-and-pieces argument in *Schneider*, and the reasoning there applies equally here: the safe harbor is a simple math test that does not quantify the parts that must be reused in the repair process (indeed, substantial repairs are allowed and often necessary). The government's argument ignores the statute's plain meaning.

Further, the government failed to object to the lack of a jury instruction on whether Fitzgerald was only buying and repairing just the engine or the entire tractor, and that failure is fatal to its argument here unless the alleged error is obvious and prejudicial. Fed. R. Civ. P. 51(b)(2), (c)(1), and (d)(1)(A); *Howe v. City of Akron,* 723 F.3d 651, 661 (6th Cir. 2013); *United States v. Veggacado*, 37 F. App'x 189, 191 (6th Cir. 2002). The uncontroverted evidence proved by a preponderance of the evidence that Fitzgerald identified worn or wrecked tractors in salvage yards for repair and acquired the usable remains, so there was no "obvious and prejudicial" failure to include an instruction.

The government also argues that the safe harbor's requirement that the repaired tractor must have been taxable when it was new somehow requires that tax must have been payable on the first retail sale of the tractor. The statute says no such thing. The word "taxable" refers to the repaired article and only requires that the repaired tractor was and is of the type that is subject to tax under § 4051. The word "taxable" does not refer to "sale" or to tax exempt sales. The uncontroverted evidence established that all repaired worn or wrecked tractors were Class 8 tractors that were taxable when new. The government's

argument depends on an extra-statutory convoluted path unsupported by the plain meaning of the statute.

The government did not object or ask for an instruction that "taxable" means "payable" or "non-exempt." It only asked to add language that "not all sales are necessarily subject to tax", and the court did that. (Transcript, R. 208, #16592.) Any complaint that the jury should have been told that "taxable" means "payable" or "not exempt" has been waived and can only be reviewed for plain error. Fed. R. Civ. P. 51(b)(2), (c)(1), and (d)(1)(A); *Howe*, 723 F. 3d at 661. But plain error only exists if the instructions were so wrong as to cause a miscarriage of justice, and the government falls far short of meeting that standard. *Craddock v. FedEx Corp. Servs. Inc.*, 102 F.4th 832, 842-43 (6th Cir. 2024); *see United States v. Miller*, 734 F.3d 530,538 (6th Cir. 2013).

Further, the safe harbor is not a tax exemption statute as the government asserts. Rather, it provides a definitional rule, i.e., if its requirements are met then the repaired tractor has not been manufactured.

Finally, the government suggests that somehow Fitzgerald was evading tax, profiting from the sale of gliders that were essentially new.

The evasion assertion is bewildering because the IRS audited Fitzgerald for decades and always found that its glider sales met the safe harbor. Moreover, the record showed that gliders were not sold as new trucks but were sold as gliders. (Transcript, R. 206, #15123.) The evasion argument is based on a re-imagined reading of the statute, even though the IRS long ago in 1991 said that repairs such as Fitzgerald's met the safe harbor.

The District Court's judgment should be affirmed.

## ARGUMENT

### I. The Safe Harbor Applies to Worn or Wrecked Tractors Repaired Using Glider Kits.

Section 4051(a)(1) imposes a 12 percent excise tax on the first retail sale of certain enumerated items referred to as "articles" which includes highway tractors. § 4051(a)(1)(A)-(B), (E). But not all repairs constitute manufacturing. The safe harbor in § 4052(f)(1) provides a straight-forward math test that unambiguously says if the cost to repair the worn or wrecked tractor does not exceed 75 percent of the cost of a comparable new truck, then manufacturing has not occurred and therefore the tractor is not taxable.

By its plain meaning, the term "wrecked" includes instances whether the tractor is severely damaged. If it can be repaired for 75 percent or less than a comparable tractor's cost, the repaired tractor has not been manufactured and is not taxable. The government wrongly argues this is not so, insisting that Fitzgerald simply bought engines, which the government failed to show at trial, and the tractor must be operational or complete when repairs begin. This interpretation reads "wrecked" out of the statute and goes directly against the statutory text. It also flies in the face of a safe harbor intended to stop the IRS from employing a facts-based test about repairs versus manufacturing. The safe harbor is a simple math test, and the Court should reject an attempt to add requirements not in the statute.

### A. Fitzgerald Was Repairing an Article; the Government Is Wrong on the Facts.

The government's appeal centers on the false factual premise that Fitzgerald was only repairing engines. Gov't Br. 4, 20-21, 38-42, 44-50. Yet the record shows that Fitzgerald identified worn or wrecked Class 8 highway tractors, repairing them by extracting the engines and transmissions. When Fitzgerald took possession of those parts that is all that remained of the tractor. The salvage yard scrapped and shredded

the rest. The government presented no evidence that Fitzgerald was simply buying a part of a tractor or buying parts from a used parts store. Instead, the uncontroverted record shows that Fitzgerald identified worn or wrecked tractors for repair, extracted the engines and transmissions, and any remaining parts were shredded or disposed of.

First, the government wrongly insists that repairs began *after* Fitzgerald extracted the engine from a worn or wrecked tractor, and thus was simply repairing an engine. But this wrongly starts the repair process mid-way through, instead of at the beginning. During any repair, there will be a point where the tractor is disassembled. For the safe harbor analysis, logically you start at the beginning—there was a worn or wrecked tractor in a salvage yard that could be repaired. The evidence on that point is uncontroverted. Witnesses testified that Fitzgerald identified worn or wrecked tractors from salvage yards and then repaired them by extracting the engines and transmissions and combining them with glider kits. Salvage yards are where worn or wrecked tractors are found. (Transcript, R. 206, #16047.) All the engines here were extracted

from worn or wrecked tractors.[11] (Transcript, R. 205, #15943; Transcript, R. 206, #16046); Ex. 2, R. 226-1.) Fitzgerald's former employees and salvage yards testified that this left the remaining parts unusable, and they were shredded. (Transcript, R. 206, ##16186, 16047, 16212-13, 16353-54.) There are no "new engine" stores, and Fitzgerald could not acquire new engines from a manufacturer. (Transcript, R. 206, #16202.) The government never rebutted this testimony or presented evidence that Fitzgerald was simply buying engines. The government ignores that Fitzgerald identified a worn or wrecked tractor and used parts from it for the repairs.

Second, that Fitzgerald only repaired the engines (the transmissions were exchanged for rebuilt ones) does not change this analysis since that was all that remained of the tractor. The junkyard shredded the rest. The government ignores that the engine was all that remained of the original tractor and the remainder was so damaged that it was unusable and valueless. (Transcript, R. 207, ##16353-54.) So,

---

[11] Fitzgerald sometimes acquired worn or wrecked tractors at auctions but began having salvage yards cut out the engines and transmissions rather than have the entire tractor hauled to Fitzgerald. (Transcript, R. 206, ##16185-86.)

Fitzgerald's process could be described as having a salvage yard disassemble a wrecked tractor by cutting out the engine and transmission then shredding the remainder.[12]

The District Court rejected the argument that Fitzgerald was simply acquiring used engines and not repairing an identifiable article. As the court found, the uncontroverted evidence showed that "there was always only one 'article,' the 'heart and soul' and unquestionably the most costly component of which was removed to create a glider tractor that was less than 75% of a new tractor." (Memorandum Opinion, R. 217, #17135.) The court found there was no evidence that the wrecked and scrapped tractor (or any part of it) from which the engine was removed was also refurbished. (*Id.*) The government provided no evidence disputing that Fitzgerald was repairing tractors.

Finally, the government did not object to the lack of a jury instruction on whether Fitzgerald was repairing just the engine or the

---

[12] The government tries to downplay the importance of the engine, wrongly describing it as a "cheap and interchangeable component." Gov't Br. 47-48. The undisputed testimony was that the engine is the "heart and soul" of the tractor and is where most of the value comes from. (Transcript, R. 206, ##16047, 16158, 16184, 16215-16.) The amount Fitzgerald paid junkyards to cut engines out of worn or wrecked highway tractors is irrelevant.

entire tractor. (Transcript, R. 208, #16594.) A party may not assign error to a jury instruction not given unless it objects, stating distinctly the matter objected to and the grounds for the objection before the instructions and arguments are delivered to the jury. Fed. R. Civ. P. 51(b)(2), (c)(1), and (d)(1)(A); *Howe,* 723 F.3d at 661 (the failure to object specifically constitutes waiver "even if the party had raised the issue in its trial brief and even raised it 'obliquely in written and oral objections to jury instructions'"). Here, the government did not object to the court not giving an instruction on whether Fitzgerald was repairing an identifiable article (highway tractor). (Transcript, R. 208, #15594.) If a party fails to object, this Court will not address the matter on appeal unless the error is obvious and prejudicial and therefore should be considered in the interest of justice. *Veggacado*, 37 F. App'x at 191. The uncontroverted evidence proved to the jury that Fitzgerald identified worn or wrecked tractors in salvage yards for repair and acquired the usable remains of the tractor. Because there was no "obvious and prejudicial" failure to include an instruction on whether Fitzgerald was just buying engines, the government has waived this argument.

At bottom, this appeal does not concern whether Fitzgerald can buy an engine to avoid paying tax, as the government argues contrary to the facts. The appeal concerns whether Fitzgerald met the safe harbor when it identified worn or wrecked tractors and repaired them by salvaging their remaining usable parts and rebuilding them with glider kits.

**B. § 4052(f)(1) Is Unambiguous: Fitzgerald Was Not Required to Retain or Use Certain Parts and Pieces.**

There is no requirement that a certain type or number of parts be kept. The government misleadingly frames the issue as Fitzgerald just purchased a single part, an engine, and built a tractor from that one part. Of course, an engine is made up of dozens and dozens of parts (e.g., pistons, injectors, oil pump, oil cooler, alternator, crankshaft, etc.). But the statute does not look to particular parts or pieces since in a worn or wrecked tractor scenario there would be no way of knowing what would be usable, if at all—rather, the statute applies a math test. In its 1991 ruling, the IRS told taxpayers that an assembled glider kit could be used for repairs to meet the safe harbor, acknowledging that certain parts and pieces need not be used in the repair process. A glider kit can include all parts except the engine and/or transmission. Rev. Rul. 63-210. Whether the safe harbor math test can apply to worn or wrecked tractors

refurbished using glider kits is a question of statutory interpretation. The starting point is the words of the statute. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). If the language is plain and understood, then the inquiry ends. *Bates v. Dura Auto. Sys., Inc.*, 625 F.3d 283, 285 (6th Cir. 2010). Plain meaning is examined by looking at the language and design of the statute. *United States v. Wagner*, 382 F.3d 598, 607 (6th Cir. 2004).

The safe harbor rule in § 4052(f)(1) provides:

> An article described in section 4051(a)(1) shall not be treated as manufactured or produced solely by reason of repairs or modifications to the article (including any modification which changes the transportation function of the article or restores a wrecked article to a functional condition) if the cost of such repairs and modifications does not exceed 75 percent of the retail price of a comparable new article.

The statutory requirements are clear. There must have been a highway tractor and repair costs cannot exceed 75 percent of the retail price of a comparable new article. There are no limitations on who may make the repairs or on the types or number of repairs that may be made. There are no requirements as to the state of disrepair of the tractor, and the statute explicitly applies to wrecked tractors with no limitations or

qualifications as to the extent of damage from the wreck. There are no conditions as to how many or which components must be retained. The only limitation is one of math.

Repairing a worn or wrecked tractor with a glider kit, that is, repairing the tractor's engine and combining it with a rebuilt transmission and a glider kit, as Fitzgerald did for all its gliders, falls squarely within the scope of the permissible repairs under the safe harbor which speaks in mathematical terms. There is no ambiguous statutory language. A test that analyzes the retained parts and pieces cannot be inserted into the statute when Congress clearly said what it meant. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992); *Norfolk S. Ry. Co. v. Perez*, 778 F.3d 507, 512 (6th Cir. 2015). This issue was examined and decided in *Schneider* which held that the taxpayer who repaired its tractors with glider kits met the safe harbor and because it applies a math test, the parts used during a repair are irrelevant. *Schneider,* 11 F.4th at 554.

Absent statutory definitions of "repair" or "wrecked," it is illogical to propose a test that limits these terms beyond their ordinary meaning and looks at the nature of the repairs or how they were done. Because

there are no statutory definitions, the Court should give the words "repair" and "wrecked" their ordinary meanings. *FDIC v. Meyer*, 510 U.S. 471, 476 (1994).

Repair is broadly defined as "to restore." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/repair. The word "repair" does not on its own imply or quantify the degree or scope of the repair. Similarly, the word "wrecked" is broadly defined as "something disabled or in a state of ruin." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/wreck. The word "wrecked" does not describe the wreck's severity. The safe harbor contemplates minor to substantial repairs, and we need not ponder the philosophical question of whether a badly wrecked tractor has ceased to exist if the repairs are extensive—it is irrelevant how badly wrecked a tractor is as long as the 75 percent math test is met. While the government argues that "repair" and "modification" suggest incremental change, the description of an article as "wrecked" explicitly provides that extensive repairs may be needed to restore it to working condition. Gov't Br. 43-44. And the word "wrecked" certainly extends to instances where all that remains repairable is an engine.

The government takes too narrow of an interpretation of the "broad sweep of 'repairs or modifications.'" *Schneider*, 11 F.4th at 555. As *Schneider* held, "[t]he limiting condition for the safe harbor's protection . . . is not found in definitions of 'repairs or modifications' versus 'manufacture,' but rather derives from the 75% threshold." *Id*. The statute does not look to see if the core identity of the article is lost. *Id*. at 557-58. Indeed, an article may be modified for a different use and still meet the statutory requirements.

Finally, Fitzgerald did not need to own every piece of the tractor before or after it was wrecked to repair it because the statute only requires that it repair a tractor, including by "restor[ing] a wrecked article to a functional condition." *Id*. at 554. This is precisely what Fitzgerald did.

The safe harbor does not dictate owning the entire tractor before repairing it. Still, with no support whatsoever, the government argues that the use of the phrase "the article" implies Congress meant repairs to be to a "self-propelled vehicle designed to transport a load over public roads." Gov't Br. 35. While the use of a definitive article ("the") suggests that the statute applies to the repair of a single tractor, the undisputed

record shows that is what Fitzgerald did. It does not mean a taxpayer needs to acquire every piece of the tractor before repairs begin. The government ignores that the statute was intended to address instances where the tractor was wrecked and, thus, is already dismantled to a large degree. The government disregards testimony that its preferred requirement of ownership, title, cannot be transferred after a tractor is wrecked—the precise scenario the statute is intended to address. (Transcript, R. 205, #15943-4; Transcript, R. 207, #16343.)[13] If a tractor is badly wrecked, was Fitzgerald supposed to gather all the pieces from the road, sweep up the debris, and take possession of everything for the statute to apply? If some parts of the wrecked tractor did not end up in the salvage yard, that doesn't mean that "the article" no longer existed

---

[13] Despite mentioning title, the government does not now argue that title is required. It recounts several allegations that Fitzgerald made but did not prove concerning title and VIN numbers. Gov't Br. 48-49. These statements are irrelevant because if Fitzgerald sought to provide additional evidence but did not, that does not mean this evidence was necessary or dispositive. And, as the District Court noted, unlike other tax statutes, § 4052(f) does not require producing or keeping specific records. (Memorandum Opinion, R. 217, #17126.) The Government also badly misstates the court, claiming that it at one point held that title was required. Gov't Br. 50. This is not the case; it was simply parroting the parties' arguments and observed that "the Court will not address an issue in a vacuum." (Fitzgerald I, R. 74, #1817.)

and could not be repaired. While obviously Fitzgerald needed to use components from a tractor in the repairs, as *Schneider* held, a taxpayer does not need to retain or use specific parts. Requiring ownership or possession of all parts and pieces makes no sense where the statute was designed to address situations where most of the highway tractor is destroyed.

The government again errs arguing that repairs using only the engine would lead to an absurd result. Gov't Br. 48. This ignores that, as a practical matter, the 75 percent test ensures that the original article was repaired because only by using the appropriate parts from the original article can the taxpayer rebuild a tractor from that original article. At the same time, the 75 percent test allows extensive repairs. Fitzgerald extracted or caused to be extracted the engine—the most important component economically of the original tractor—from worn or wrecked tractors and rebuilt them. Fitzgerald could not have met the safe harbor if it was just using the windshield wipers and rear-view mirrors. (Transcript, R. 206, #16215.) Further, "[i]t is not [the] court's place to question whether Congress adopted the wisest or most workable policy,

only to discern and apply the policy it did adopt." *Ysleta del Sur Pueblo v. Texas*, 596 U.S. 685, 706 (2022).

## C.   The IRS Has Issued No Guidance That Would Change This Analysis.

The IRS has never issued public guidance supporting the argument that the safe harbor employs a parts-and-pieces test. After the safe harbor was congressionally mandated in 1988, in Rev. Rul. 91-27 the IRS told taxpayers that assembled glider kits could be used to restore tractors and applied a straightforward math test. Nothing has changed that guidance and the statute, both of which Fitzgerald relied on. (Transcript, R. 206, ##16149-50.)

The government cherry picks internal and unreliable IRS memoranda to suggest that it has consistently interpreted the safe harbor not to include glider kits. Gov't Br. 40 n.9. Of course, that argument is contrary to the IRS's own 1991 ruling which has never been changed. As it must, the government concedes that internal IRS documents are not precedential or binding on taxpayers. Gov't Br. 22 n.6. If anything, the cited memoranda highlight the government's about-face concerning its interpretation of the safe harbor. For example, as the District Court noted, sometime in the 2013 to 2014 timeframe the IRS

apparently began backing away from its ruling. (Memorandum Opinion, R. 137, #11723.) In early 2013, the IRS said in an internal memorandum that the safe harbor applied where a highway tractor is restored using a repaired engine and a glider kit. I.R.S. C.C.A. 201306019, 2013 WL 474552 (Feb. 8, 2013). Then in early 2014, the IRS reversed course saying that extracting an engine and transmission from a wrecked tractor and combining them with a glider kit did not meet the safe harbor. I.R.S. C.C.A. 201403014, 2014 WL 189552 (Jan. 17, 2014). In 2017, in Notice 2017-5, the IRS for the first time opined in non-binding "interim guidance" that a significant number of components of the original tractor must be retained for the safe harbor rule to apply to a repair (a standard that would eliminate the safe harbor). In any event, the internal IRS memoranda and notice have no bearing on this case.[14] The apparent abandonment of the 1991 ruling and reinterpretation of the safe harbor as a parts-and-pieces test suggests a cavalier approach to tax

---

[14] The government below said it is not relying on Notice 2017-5 in this case and the court should give it no weight. (Memorandum Opinion, R. 137, #11748.) The notice states the interim IRS opinion but is not precedential authority. *See Guilzon v. Commissioner*, 985 F. 2d 819, 822 (5th Cir. 1993) (notices and rulings are disregarded when the statute is clear).

administration that demands close scrutiny. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 515 (2009)) ("[T]he agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'")

### D.    Other Provisions in the Tax Code Do Not Alter the Safe Harbor.

The government also wrongly argues that the safe harbor is modified by other statutes, including § 4052(b)(1)(B)(iii) which allows taxpayers to get a reduction of the tax base when using a spare part. Gov't Br. 36-38, 47, 53. By the government's telling, the safe harbor is modified since another provision excludes the value of used components from the price of an article in some cases. This is not the case. The statute does not say that one provision is limited or impacted by the other. Obviously there may be multiple ways one can benefit under the tax code at one time. A taxpayer can reduce taxes by using old parts from an existing tractor or if it can repair the tractor and meet the 75 percent test then the repaired tractor is deemed to have not been manufactured.

### E. *Schneider* Was Correctly Decided.

*Schneider* is directly on point and correctly reasoned. The government is wrong to argue otherwise.

First, the case is not distinguishable because *Schneider* had an existing fleet. Both companies began the repair process by identifying a worn or wrecked tractor in need of repair. Gov't Br. 51-52. As the District Court pointed out, what *Schneider* and Fitzgerald did was essentially the same thing. (Memorandum Opinion, R. 217, ##17134-35.)

Second, *Schneider* did not err in finding that a taxpayer need not use a set number of parts and pieces. Gov't Br. 52. The plain statutory language is not dependent on a parts-and-pieces analysis. The government ignores that while an "article" means a highway tractor, it is modified by "wrecked"—meaning that the tractor can be dismantled and in a state of ruin before repairs begin.

Third, as noted above, other parts of the tax code that discuss reductions for using components do not modify the safe harbor provision. *Schneider* did not err by not mentioning those code sections. Gov't Br. 53.

Fourth, *Schneider* did not hold that nothing from the original tractor needs to be used in the repair. Gov't Br. 53-54. *Schneider* held

that it does not matter what part or parts remain after a wreck, if the repair meets the 75 percent test.

Fifth, the government is wrong that *Schneider* acknowledged the parts-and-pieces test remained for worn tractors. *Schneider* did not hold that there is a different test for worn and wrecked highway tractors or that the parts-and-pieces test ever applied. Gov't Br. 54-55. And there is no statutory basis for treating worn and wrecked tractors differently.

## F. The Legislative History and Reasons for the Safe Harbor's Enactment Disproves a Parts-and-Pieces Test

Where the statutory text is plain and unambiguous, the analysis begins and ends with well-established statutory construction rules, and there is no need to consult legislative history. *United States v. Woods*, 571 U.S. 31, 46 & n.5 (2013). The safe harbor's words unambiguously provide a bright-line math test, not a parts-and-pieces test, and therefore resorting to legislative history to resolve ambiguities is not needed. Even so, a review of the historical IRS position, litigation, and legislative changes responding to that litigation, while unnecessary to resolve this appeal, confirms that Congress intended a bright-line math test. There

is no basis for the claim that legislative history supports a parts-and-pieces test.

### 1. The safe harbor was meant to replace the fact-based parts-and-pieces test with a straightforward 75 percent test.

The safe harbor was adopted in 1988 and codified in 1997, but its creation has its roots in the 1950s when the excise tax was known as the "manufacturers tax," formerly codified at §§ 4061-4063. Similar to today's § 4051 tax, that tax applied to different categories of articles, including highway tractors. But the old statutes did not address how the tax applied to repaired articles, and questions arose as to whether refurbished tractors were taxable. The IRS issued guidance trying to address these issues. In Rev. Rul. 54-61, 1954-1 C.B. 259, the IRS ruled that sales of repaired wrecked trucks were taxable, and in Rev. Rul. 54-329, 1954-2 C.B. 405, *modified by* Rev. Rul. 56-189, 1956-1 C.B. 503, it ruled that rebuilding constituted manufacturing. In Rev. Rul. 63-128, 1963-2 C.B. 476, the IRS said that a truck restoration was subject to tax because of the repair's extensiveness.

But the IRS position was problematically based on how extensive the repairs were, and disputes arose. The government's current position

is similar to that in *Boise National Leasing, Inc. v. United States*, 389 F.2d 633 (9th Cir. 1968), where the court rejected the taxpayer's argument that reconstructed trucks did not constitute manufacturing. In Rev. Rul. 71-584, 1971-2 C.B. 358, the IRS ruled based on *Boise* that using a glider kit to restore a tractor constituted manufacturing. But *Boise* is irrelevant because of the safe harbor statute. In 1986, the IRS issued Rev. Rul. 86-130, 1986-2 C.B. 179, ruling that manufacturing occurred when tractors were refurbished with glider kits.

Soon thereafter, Congress took its first step to reject the IRS's interpretation. In the Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, 102 Stat. 3342 (1988), Congress made a minor change to § 4052, and the legislative history instructed the IRS to apply a 75 percent safe harbor to repairs. H.R. Rep. No. 100-1104, at 178 (1988) (Conf. Rep.). The IRS then issued Rev. Rul. 91-27 adopting a 75 percent manufacturing safe harbor for worn vehicles repaired using glider kits, but not for wrecked vehicles.

At the time of this law change, another pre-safe harbor case was litigated. In *Ruan Financial Corp. v. United States*, 765 F. Supp. 985 (S.D. Iowa 1990), the court held that certain repairs did not constitute

manufacturing, and the Eighth Circuit agreed, explaining that the taxpayer had disassembled the tractors and replaced a substantial number of parts, including the engines and the cabs. 976 F.2d 452, 452-453 (8th Cir 1992). In upholding the lower court, the court noted that the new 75 percent safe harbor applied to repairs after 1991 in light of the IRS ruling (and did not govern the case). *Id.* at 454 n.5.

After the manufacturing safe harbor was adopted, the IRS continued to argue that the safe harbor did not apply to wrecked trucks. *See e.g.* I.R.S. Tech. Adv. Mem. ("TAM") 92-25-004 (Mar. 11, 1992), 1992 WL 801902; TAM 93-33-007 (May 11, 1993), 1993 WL 315090; Priv. Ltr. Rul. 97-02-018 (Oct. 9, 1996), 1997 WL 8212. Not satisfied with the worn-wrecked distinction, in 1997, Congress codified the safe harbor in § 4052(f). Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1434(a), 111 Stat. 788 (1997). The legislative history explained that the 75 percent test applies to worn and wrecked tractors and was intended to replace the previous factual test that required determining "whether the function of the vehicle is changed." 105 H. Rpt. 220; S. Rep. No. 105-33, at 297 (1997).

In summary, the IRS historically argued that if repairs were extensive, then a new tractor was manufactured, and tax was due. Presumably because it wanted disputes to end, in 1988, Congress told the IRS to adopt a 75 percent safe harbor. The IRS did so in Rev. Rul. 91-27 but excluded wrecked trucks. Congress then codified the safe harbor in 1997 in § 4052(f), eliminating the worn vs. wrecked distinction. The unambiguous 75 percent test of § 4052(f)(1) is the law today, not the parts-and-pieces test urged by the Government.

### 2. The government distorts the purpose of the safe harbor by arguing it was meant to add more rules, not lessen existing burdens.

The government illogically suggests that Congress enacted a safe harbor that still requires detailed auditing and dissecting of the underlying facts, similar to the fact-intensive litigation in cases like *Boise* where the analysis focused on repairs minutia. The government distorts the legislative history by doing so. Gov't Br. 38-42. By the government's account, the safe harbor provision was intended to add new rules to the existing ones rather than replace the IRS's overly complicated position with a straightforward standard. Neither the statute nor the legislative history support this interpretation.

Further, the government fails to show internal IRS documents influenced codification of the safe harbor and, regardless, they don't apply here. The government places undue emphasis on a non-precedential internal IRS document, TAM 92-38-008 (June 11, 1992), 1992 WL 226784, which opined that a taxpayer cannot apply the Rev. Rul. 91-27 safe harbor by using used parts when creating a new highway tractor. Gov't Br. 29-30. There's nothing to indicate that Congress reviewed or approved of that internal document. And this nonprecedential document does not apply to Fitzgerald's actions because in the TAM, a worn or wrecked tractor was never identified. The record shows that Fitzgerald used worn or wrecked tractors, incorporating their remaining usable parts, including the engine, which comprises roughly 40-50 percent of a new tractor's value. If the old TAM suggested a specific number of parts must be used for repairs, then it is wrong and contradicts the statute (the TAM was written before the enactment of the statute and inclusion of a "wrecked" article in the safe harbor).

Fitzgerald's situation is akin to TAM 93-33-007 where the IRS declared that a taxpayer meets the safe harbor when it combines the engine, transmission, and axle of a worn highway tractor with a glider

kit. TAM 93-33-007. This is precisely what Fitzgerald did, except in its case the transmission and axle were unusable. There's nothing in the statute requiring Fitzgerald to use both the transmission and axle. One may erroneously pick and choose from various non-precedential and obviously conflicting internal, nonbinding IRS documents in an attempt to support its position, but it is the words of the statute that control.

In a very real sense, the repair of a worn or wrecked tractor inherently involves the retaining and reuse of only certain parts and pieces—that's how repairs work. The government illogically suggests that Congress enacted a parts-and-pieces safe harbor that still requires detailed scrutinizing of the underlying facts.

### 3. The purpose of a bright-line test would be lost if a parts-and-pieces test controls the safe harbor.

The government's test eviscerates the safe harbor's purpose to permit significant repairs on wrecked tractors. Consider this example. A highway tractor was badly wrecked. The cab was destroyed, the frame was severely compromised and unusable, and the axles cannot be repaired. So, the only readily usable component was the engine which was removed from the wreck, repaired, and then, along with a rebuilt

transmission and other parts, was combined with a glider kit. Does the safe harbor rule apply?

The government says "no" because not enough of the original tractor was retained and used, causing the tractor to cease existing. But other than the engine, the wreck rendered the other parts unusable. The safe harbor does not permit a detailed factual inquiry as to whether enough of the tractor was retained. Congress has precluded that type of factual inquiry by mandating a math test that if met means that the repaired tractor is deemed to have not been manufactured.

One need not ponder the metaphysical question of whether the original tractor disappears if only certain parts survive. Nor does one need to tally up the number of retained parts and compare those to the parts in the glider kit. Instead, the safe harbor's math test eliminated that needless, burdensome factual inquiry—an inquiry that the government wants to pursue. *See Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 336 (2d Cir. 2011) ("This reading of the statute would result in commercial uncertainty and unpredictability at odds with the safe harbor's purpose and in an area of law where certainty and predictability are at a premium.") Under the government's

arguments, so much for the safe harbor being safe. *Schneider*, 11 F.4th at 556 (citing *Carter v. Welles-Bowen Realty, Inc.*, 736 F. 3d 722, 729 (6th Cir. 2013)). As in *Schneider*, the government continues to offer no principled test for deciding when manufacturing occurs under the safe harbor.

The government's theory would render the § 4052(f)(1) wrecked tractor language meaningless: "including any modification which . . . restores a wrecked article to a functional condition." But courts must give effect to the words in a statute. *United States v. Menasche*, 348 U.S. 528, 539 (1955). Giving meaning to the "wrecked article" language precludes a focus on parts and pieces.

## G. The Safe Harbor Is Not an Exemption Statute.

In yet another example of its misreading of the statute, the government argues that § 4052(f) is an exemption statute to be construed narrowly—but on its face it is not. Gov't Br. 3, 41, 45. That interpretation ignores the very purpose of the safe harbor. It is a safe harbor that provides relief for repairs that otherwise would constitute taxable *manufacturing*. Safe harbors are designed as limits on the impact of statutes and are often enacted in response to contentious litigation. *See*

*Merit Mgmt. Gp. v. FTI Consulting, Inc.*, 583 U.S. 366, 369-70 (2018) (the court found it relevant to trace the litigation history leading up to the enactment of a safe harbor—the same sort of historical tracing analyzed above).

The statute provides a definitional rule that treats certain repairs and modifications of tractors as not constituting manufacturing. As *Schneider noted*, the statute unambiguously says that an article "shall not be treated as manufactured" if certain conditions are met. *Schneider*, 11 F.4th at 550. The statute doesn't exempt any taxpayers from paying tax (unlike § 4221 which does exempt certain taxpayers); rather, it says that if you meet the safe harbor then the tractor has not been *manufactured*. And if the tractor has not been manufactured, then it does not exist for purposes of the excise tax.

The IRS even agreed that the safe harbor is a definitional manufacturing rule. In Notice 2017-5, the IRS said that the safe harbor "excludes from the *definition* of "manufactured" or "produced" an article that is repaired or modified." Further, Rev. Rul. 91-27 said that the IRS "adopts a safe harbor." The legislative history characterized the safe harbor rule as a rule that *defines* when a tractor has been

remanufactured. H.R. Conf. Rep. 105-220, at 726-727 (1997).[15] Congress and IRS have long agreed that the statute provides a definitional rule.

Thus, there is no basis for the argument that the safe harbor is an exemption statute, and case law saying (in very different contexts) that exemption statues should be narrowly construed is irrelevant. Section 4052(f) does not exempt particular taxpayers from taxation, rather it establishes a definitional framework for truck repairs, and if one meets that framework, then the repaired truck has not been manufactured. The safe harbor is a direct definitional limitation placed upon the otherwise all-encompassing definition of manufacturing and so "the rule regarding strict construction of exemption provisions . . . is here inappropriate." *In re Oilfield Instruments*, 53 B.R. 199, 203 (E.D. La. 1985). Thus, if there is any doubt about the construction of a tax statute, that doubt should be resolved in favor of the taxpayer and against the government. *Gould v. Gould*, 245 U.S. 151, 153 (1917); *Borenstein v. Commissioner*, 919 F. 3d 746, 752 (2d Cir. 2019); *Weingarden v. Commissioner*, 825 F. 2d 1027, 1029 (6th Cir 1987).

---

[15] Although IRS internal documents are not precedential or authoritative, I.R.S. C.C.A. 201403014, cited by the government, describes the safe harbor as a definitional rule, not an exemption.

## II. Fitzgerald Satisfied the Safe Harbor Requirement That the Repaired Worn or Wrecked Tractors Were Taxable When New Because All Were Class 8 Taxable Tractors.

Just as it disregards the unambiguous text of the 75 percent safe harbor math test in § 4052(f)(1), the government ignores the plain meaning of the § 4052(f)(2) requirement that a repaired highway tractor must have been taxable when new, attempting to inject a new and radically different meaning of the word "taxable." It asserts that the word "taxable" means that the first sale was subject to tax whereas the statute distinctly provides only that the original tractor must have been subject to tax. The statute's focus is on the repaired tractor, not on the first sale, and because of that focus, Fitzgerald is not required to prove that taxes were payable or paid at the time of the initial sale or that a sale was not made to a tax-exempt entity. And even if the government's strained interpretation was plausible, at trial there was no credible evidence that Fitzgerald repaired tractors originally sold in tax exempt transactions.

### A. Taxable Means Subject to Tax, Not That the Tax Was Payable.

The safe harbor only requires that Fitzgerald repaired a taxable article, i.e., an article that when new was subject to tax under § 4051. The statute treats repaired tractors that meet the 75 percent test as not

having been manufactured, so no excise tax is imposed under § 4051.

Section 4052(f)(2) provides that:

> Paragraph (1) shall not apply if the article (as repaired or modified) would, if new, be taxable under section 4051 and the article when new was not taxable under such section or the corresponding provision of prior law.

The taxable article here is the type of highway tractor that would be subject to tax under § 4051. The tax is only imposed on certain articles as defined in § 4051 that have been manufactured. Section 4052(f)(2) requires that the repaired tractors, *not the sales*, were taxable when new and says nothing about sales.

The word "taxable" in the statute is not uncertain, confusing, ambiguous, or subject to different interpretations; the ordinary meaning controls, particularly when viewed in the context of the safe harbor's purpose to deem certain repairs as not constituting manufacturing. *Allen v. United States*, 83 F. 4th 564 (6th Cir. 2023) (Finding courts start with the plain meaning of the text and read the words in context). The parties agree that taxable means subject to tax but differ as to whether the word refers to the repaired tractor or its first sale.

"Taxable" means capable of being taxed or subject to tax. https://merriam-webster.com/legal/taxable; *Am. Bankers Ins. Co. v. United States*, 265 F. Supp. 67, 73 (S.D. Fla. 1967). The government says it agrees with Fitzgerald and the District Court that the word means "subject to tax." Gov't Br. 59; (Memorandum Opinion, R. 137, #11740). But the government then tries to inject potential exemptions for certain first sales into the safe harbor, arguing that "taxable" really means "payable" or "not exempt"—an argument at odds with the plain meaning of "taxable" and illogical given the context of the rule. The fact that a particular type of buyer might exempt the first sale from tax is irrelevant. The tractor was still a taxable tractor.

The definitional safe harbor on its face does not consider possible exemptions to sales of otherwise taxable manufactured tractors. Section 4052(f)(1) provides that "an article described in section 4051(a)(1) shall not be treated as manufactured," and then § 4052(f)(2) says that § 4052(f)(1) "shall not apply" if the repaired article "when new was not taxable" under § 4051(a). The two words "taxable" are adjectives modifying both the repaired tractor and the worn or wrecked tractor when it was new. The words "taxable" do not modify "sale," "income" or

any other word other than "article." It is the tractor that must have been taxable (all Class 8 tractors at issue here were), not the sales transaction where a buyer acquired it.

Further, the government is wrong that "taxable" means the tax was "payable." Gov't Br. 62 n.11. Goods can be subject to tax without the tax being owed on a particular sale. The word "payable" applies to a sale and so would not make any sense if it replaced the word "taxable" because the statute only determines if a repair should not be treated as manufactured. The government points to no words in the statute that support its argument (because those words are not there). *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 246-47 (6th Cir. 2004).

The safe harbor's purpose is to define certain repairs as not constituting manufacturing if the required conditions are met, further underscoring that "taxable" applies to the type of highway tractor that was built (e.g., a Class 8 tractor as opposed to other classes that are not subject to tax), and not to a type of sale that occurred.

**B.   The Government's Reliance on an Exemption Statute Is Misplaced; "Taxable" Plainly Applies to an Article as Described in § 4051, Not to Exemptions Found Elsewhere in the Tax Code.**

The government wrongly relies on a tax-exempt sales provision not referenced in the manufacturing definitional safe harbor. The statutory framework of the "taxable under Section 4051" requirement shows that the word refers to the article (here a Class 8 highway tractor) in § 4051, not to any potential sale that § 4221 might exempt from tax. The first-sale exemption statute provides that if certain categories of taxpayers buy a taxable tractor, then "no tax shall be imposed . . . on the sale." It is the Class 8 tractor that is subject to tax under § 4051(a), with tax being imposed at the time of the first retail sale or use. If Congress meant the word "taxable" in the safe harbor to include § 4221, then it would have said so (just as it could have said that under the safe harbor tax must have been originally paid).

Section 4051 imposes tax at the time of the first retail sale on certain types of manufactured tractors. It does not reference exemption rules in § 4221. *See CenTra, Inc. v. United States*, 953 F.2d 1051, 1056 (6th Cir. 1992). Under § 4221, certain sales may be tax exempt depending on the type of customer (e.g., a state or local government, a customer

outside of the country, or a nonprofit educational organization). That statute provides limited tax exemptions, but it does not say that the tractor was not taxable. All manufactured Class 8 tractors are taxable under § 4051, despite the fact that certain sales may be exempt based on other provisions in the tax code. The problem with the government's reliance on § 4221 and various regulations is obvious, as the District Court observed, because the exemption provision is not found in § 4051 or in the § 4052(f) safe harbor. (Memorandum Opinion, R. 137, ##11740-41.)

Injecting § 4221 into the safe harbor would require Fitzgerald to identify every purchaser of the original tractors, a task the statute does not require. The government's conjecture that Congress must have had taxable sales in mind when it enacted the safe harbor is not supported by the statute or by any legislative history. If Congress meant for the tax to have been paid at least once, then it would have included resales—i.e., the tax is owed if tractors sold to tax-exempt entities are later resold. Similarly, the government's reliance on other statutes that define "taxable sale" makes no sense; the word "sale" doesn't appear in the safe harbor, and the word "taxable" plainly modifies the article. The safe

harbor's definitional rule has nothing to do with sales. Non-definitional statutes where "taxable" modifies sales or another term other than the article are inapposite.

The government erroneously asserts that *CenTra* is "controlling precedent" although on its face it has nothing to do with the safe harbor. Rather, it dealt the first retail sale rule in § 4052(a), and in that case, this Court dealt with the term "taxable sale," not the term "taxable" as used in the safe harbor to modify the word "article." There was no reason for the District Court to address *CenTra*.

## C. The Government Has Waived Its Payable Argument, and the Failure to Include That Instruction Does Not Constitute Plain Error.

The government's argument also fails because it cannot show any legal error concerning tax-exempt tractors impacted the case. To preserve jury instruction objections "an objection must not only be made prior to the jury's being charged, but also *renewed* after it is charged." *Scott v. Miller*, 361 F. App'x 650, 653 (6th Cir. 2010). Yet the government failed to object or request the inclusion of "not exempt" or "payable."[16] (Order,

---

[16] The government only asked to add language that "not all sales are necessarily subject to tax", and the court did that. (Transcript, R. 208, #16592.)

R. 193, ##15689-90.) Any complaint that the jury should have been told that "taxable" means "payable" or "not exempt" has been waived and can only be reviewed for plain error. *Howe*, 723 F.3d at 661. Plain error only exists if "the [jury] instructions, when taken as a whole, were so clearly wrong as to produce a grave miscarriage of justice." *Craddock*, 102 F.4th at 842; *see United States v. Miller*, 734 F.3d at 538 (quoting *United States v. Sanderson*, 966 F.2d 184, 187 (6th Cir. 1992)). The government falls far short of showing the instruction was plainly erroneous since it presented only speculative evidence that Fitzgerald was repairing tractors originally sold to tax-exempt buyers.

The record is clear that Fitzgerald repaired tractors that were of the make and model that would be taxable when new. Again, it is uncontroverted that all the engines Fitzgerald rebuilt came from Class 8 tractors that were taxable when new. (Memorandum Opinion, R. 217, #17133). Fitzgerald only sought worn or wrecked Class 8 tractors for extraction of their engines and transmissions (Transcript, R. 205, ##15944, 15947; Transcript, R. 206, ##16004-05, 16013-15, 16049, 16062, 16066-67, 16070, 16202; Ex. 16, R. 225-1.) Class 8 tractors are taxable under § 4051(a) because the cab in combination with a trailer weighs

33,000 pounds or more. Fitzgerald sought out Class 8 worn or wrecked tractors because only engines from those types of taxable tractors could be used in its Class 8 gliders (rated for 33,000 pounds or greater). (Transcript, R. 205, ##19944, 15947; Transcript, R. 206, ##16004, 16015, 16036, 16062, 16070.) Testimony and documents proved that "99.999" percent of the engines came from Class 8 tractors which would have been taxable. (Transcript, R. 206, #16068.)[17] The government produced no evidence to refute this.

The government misrepresents that "undisputed evidence" showed some repaired tractors were tax-exempt because they originally were sold to municipalities or exported to Mexico or Canada. Gov't Br. 22 (no citations provided); *id.* at 60 (providing citations only showing the record "indicated" that the original tractor *may* have come from Mexico or

---

[17] The assertion that one out of over 12,000 engines was a marine engine is misleading and speculative. Gov't Br. 64 n.12. While one serial number indicated that it was a marine engine, the uncontroverted testimony was that the serial number may have been incorrect, and the jury obviously believed that testimony, so the government's argument was rejected by the jury. (Transcript, R. 206, #16068.) The jury found that Fitzgerald met its burden that all repaired worn or wrecked tractors were taxable when new (the government does not dispute the jury's finding, only the instruction given to the jury).

Canada).[18] Yet the evidence the government put forth to show Fitzgerald may have bought tractors that were originally sold to tax-exempt entities was speculative at best. While Fitzgerald bore the burden of proof, it only needed to show entitlement to a refund by a preponderance of the evidence (more likely than not). *Sherwin-Williams Co. v. United States*, 403 F.3d 793, 796 (6th Cir. 2005) (quoting *United States v. Janis*, 428 U.S. 433, 440 (1976)). Fitzgerald easily met its burden according to the jury, and guessing about possible tax-exempt sales does not change that.

The government's citations to the record show that the evidence of tax-exempt sales was speculative and non-definitive. First, it relies heavily on a vague statement from one salvage yard owner to argue that Fitzgerald bought tax-exempt tractors. The witness only said that "one of our largest customers is the government." (Transcript, R. 207, #16375.) Yet the government offered no evidence to show what "one of our largest customers" means or that Fitzgerald ever acquired a tractor from a

---

[18] The government misleads when it says that the District Court "acknowledged" that Fitzgerald used engines from tractors that had been exported tax-free to Mexico or Canada. The court only said that Fitzgerald "*may* have purchased" some engines that came from tractors that originally were purchased by tax exempt buyers. (Memorandum Opinion, R. 217, #17131 (emphasis added).)

government vehicle. The witness did not testify that Fitzgerald identified government tractors for the extraction of engines and transmissions. The witness did not even state how many tractors Fitzgerald bought. Further, the statement suggests that there were likely larger customers. Thus, this statement alone hardly shows that Fitzgerald likely repaired tractors from exempt entities (and the jury ignored such speculation).

Similarly, the evidence the government argues proves that some trucks came from Canada or Mexico is equally murky. The government cherry picks testimony suggesting that Fitzgerald bought engines from Mexico but does not show that those engines were used in any repair and ignores unrefuted testimony that Fitzgerald *could not use* those types of engines when rebuilding the highway tractors at issue. (Transcript, R. 206, ##16018-19). The government's remaining evidence to support its argument that Fitzgerald bought tractors sold outside the U.S. consists solely of testimony that manufacturers sold some tractors internationally. (*Id.*, ##16077-80.) The government presented no evidence showing how many sales were made to tax-exempt entities or outside the United States (the IRS collects taxes on original sales, so maybe it would have some evidence). And the government offered no

evidence concerning how many tractors sold outside the country end up in U.S. salvage yards. Without any proof of how likely it was that Fitzgerald acquired a tractor that was sold to a tax-exempt entity, the government cannot argue that it showed that any single new highway tractor would have been more likely than not sold to a tax-exempt entity.

At bottom, the government offered no credible evidence that any Class 8 tractors that Fitzgerald salvaged and repaired likely came from outside the country or were originally sold to a tax-exempt entity (only vague assertions that it was theoretically possible). There is no evidence to show that Fitzgerald repaired tractors that were not "tax payable" when new, and a new trial is not warranted.

## D. The Government Previously Argued Taxable Means Taxed and That's What Payable Implies.

The government misstates its own arguments, asserting it never argued "taxable" means the tax was "paid." In its summary judgment motion on the "taxable" issue, the government argued that "the Court cannot assume that tax was *previously paid* simply because the engines and other parts were taken from a worn or wrecked tractor." (Memorandum ISO Revised Motion for Summary Judgment, R. 129, ##11283-84 (emphasis added).) Similarly, in Notice 2017-5, the IRS

announced its apparent litigating position that the safe harbor only will apply if the repaired article was "*previously taxed*." (Emphasis added). But now the government retreats from that position, asserting that it never argued that "taxable" means "previously taxed"—it most certainly did. Gov't Br. 62 n.11.

Further confusing the government's reinvented extra-statutory position, it now asserts that "taxable" means "payable." If the tax was payable at the time of the first retail sale, then presumably it was collected by the manufacturer or dealer and remitted to the IRS, i.e., the tax most likely was paid if it was payable when the tractor was new. If the buyer was tax exempt, then the tax was not paid. Be that as it may, the safe harbor does not require proof that the tax was payable or that a sale was not tax-exempt.

E.  **The Government's Speculation About the Purpose of Section 4052(f)2) Is Wrong.**

Attempting to bolster its "taxable" means "payable/not tax-exempt" argument, the government posits that the "apparent" purpose of § 4052(f)(2) is to ensure that the tax is payable at least once for each article. Gov't Br. 59. On its face, the safe harbor does not say it is designed to ensure that tax is paid at least once; rather, the words show that it is

intended to define situations where a repaired tractor is deemed to have not been manufactured. For the safe harbor to apply, the repaired tractor must be taxable and when it was originally new it must have been taxable, thereby assuring that the article for purposes of § 4051 was the type of manufactured article that was originally subject to tax.

The word "taxable" as used twice in the same sentence requires "symmetry" between the originally manufactured taxable article and the repaired taxable article. Fitzgerald's gliders were repaired Class 8 tractors that would be taxable under § 4052(f)(1) if new, and similarly the repaired tractors must have also been taxable Class 8 tractors when they were new. If the original tractors had not been Class 8 tractors but had been Class 6 tractors not subject to the manufacturing tax, then "upgrading" the worn or wrecked tractors to Class 8 would not meet the safe harbor's requirements.

The government's guesswork about statutory purpose is at best wishful conjecture. Courts do not second guess the purpose of a statute where the words have clear, ordinary meaning. *Ysleta del Sur Pueblo*, 596 U.S. 685. The government's urging to read more into the "taxable" requirement than is there is "better directed to those who make the laws

than those charged with following them." *Id.* at 706; *Bostock v. Clayton County*, 590 U.S. 644, 655 (2020) ("only the words on the page constitute the law adopted by Congress . . .").

Rather than imagine a hidden purpose that Congress did not express, it is reasonable from the ordinary meaning of the word "taxable" to conclude that Congress wanted to make sure that for the safe harbor to apply you must have the same type of tractor before and after the repairs. This reading of the statute is more credible than the government's strained reading because Congress enacted a straight-forward math test safe harbor that permits substantial repairs and does not on its face require exhaustive investigation of the tractor's provenance. Further, as discussed above, the safe harbor should be construed favorably to the taxpayer.

The government's attempt to read the first retail sale and tax-exempt sales rules into the safe harbor would produce unintended results that render its position untenable and create unintended taxpayer burdens. For example, if a Canadian buyer purchased a new Class 8 taxable highway tractor from a United States manufacturer, the sale would be tax-exempt. If the tractor was later sold to a U.S. buyer, *CenTra*

and the IRS would tell us that the resale is the first retail sale and tax is payable. Now assume that the buyer wrecks the tractor and repairs it, falling within the safe harbor math test. But under the government's position here, because the tax was not payable on the original sale of the tractor when it was new (a requirement in § 4052(f)(2)), the safe harbor cannot be met. Yet the government argues that the "apparent" purpose of the statute is to make sure that the tax has been paid at least once, which it was. Substituting "payable" or "not tax-exempt" for "taxable" makes no sense in the safe harbor as written.

## F. Any of the Government's Policy Concerns Should Have Been Addressed by the IRS But Were Not.

Finally, if the IRS thought that the first retail sales rules and the sales exemption rules should be integrated into the safe harbor, then it had a duty to tell taxpayers and not wait to announce its interpretation during litigation. The IRS has issued no guidance since Rev. Rul. 91-27 was published decades ago, and it did not include a requirement that the tax be "payable" or that the sale of the repaired tractor when new must not have been tax exempt. If the IRS believed that its ruling needed changes to incorporate the payable and tax-exempt terminology into the safe harbor, then it had a duty to explain its new position to taxpayers

years ago and not assert its position for the first time in litigation. *See Encino Motorcars LLC*, 579 U.S. at 221 (2016); *see Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 23 (2020) (noting that public vetting of an agency's position helps ensure that the agency's argument is not simply a "convenient litigating" position).

## CONCLUSION

The judgment of the District Court should be affirmed.


Dated: July 12, 2024          Respectfully submitted,


                              *s/ Kendall C. Jones*
                              Kendall C. Jones
                              Zachariah W. Lindsey
                              EVERSHEDS SUTHERLAND (US) LLP
                              700 Sixth Street, NW, Suite 700
                              Washington, DC 20001-3980
                              (202) 383-0100
                              kendalljones@eversheds-sutherland.com
                              zacklindsey@eversheds-sutherland.com

                              Counsel for Plaintiff-Appellee

# CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒  this document contains 12,940 words, or

    ☐  this brief uses a monospaced typeface and contains _____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒  this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook, or

    ☐  this document has been prepared in a monospaced typeface using _____ with _____.


Dated:  July 12, 2024                  *s/ Kendall C. Jones*
                                       Kendall C. Jones

## CERTIFICATE OF SERVICE

It is hereby certified that on July 12, 2024, the foregoing Brief of Plaintiff-Appellee was electronically filed with the Clerk of the Court by using the ECF system. Counsel for other parties are registered ECF users and will be served by the ECF system.

*s/ Kendall C. Jones*
Kendall C. Jones

# ADDENDUM

## DESIGNATION OF RELEVANT DISTRICT COURT OR TAX COURT DOCUMENTS

### Pursuant to 6 Cir. R. 30(g)

| Record Entry No. | Description | Page ID Range |
| --- | --- | --- |
| Fitzgerald I, R. 1 | Complaint (Consolidated Case No. 2:19-cv-00008) | ##1–18 |
| Fitzgerald I, R. 62-1 | Memorandum in Support of Motion for Partial Summary Judgment | ##1352–1382 |
| Fitzgerald I, R. 74 | Order denying motion for partial summary judgment | ##1815–1818 |
| R. 1 | Complaint (Lead Case No. 2:20-cv-00026) | ##1–20 |
| R. 127 | Order striking motions for partial summary judgment and supporting documents | ##11258–11260 |
| R. 128 | Revised Motion for Summary Judgment | ##11261–11263 |
| R. 129 | Memorandum in Support of Revised Motion for Summary Judgment | ##11266–11296 |
| R. 137 | Memorandum Opinion | ##11733–11749 |
| R. 173 | Stipulations | ##13948–13951 |
| R. 191 | Jury Verdict | ##15648–15649 |
| R. 198 | Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial and Brief in Supp | ##15747–15749 |
| R. 201 | Reply in Support of Motion to Redact | ##15788–15792 |
| R. 205 | Trial Transcript Day 1 (July 10, 2023) | ##15800–15984 |

| Record Entry No. | Description | Page ID Range |
|---|---|---|
| R. 206 | Trial Transcript Day 2 (July 11, 2023) | ##15985–16271 |
| R. 207 | Trial Transcript Day 3 (July 12, 2023) | ##16272–16583 |
| R. 208 | Trial Transcript Day 4 (July 13, 2023) | ##16584–16827 |
| R. 209 | Trial Transcript Day 5 | ##16828-16840 |
| R. 217 | Memorandum Opinion | ##17118–17145 |
| R. 219 | Notice of Appeal | ##17147–17149 |
| R. 225-1 | Trial Exhibit 16 | ##17276–17649 |
| R. 226-1 | Trial Exhibit 2 | ##17867–17868 |