# No. 24-5078

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

### FITZGERALD TRUCK PARTS & SALES, LLC,

Plaintiff-Appellee

v.

### UNITED STATES OF AMERICA,

Defendant-Appellant

---

## ON APPEAL FROM THE JUDGMENT OF THE UNITED
## STATES DISTRICT COURT FOR THE MIDDLE
## DISTRICT OF TENNESSEE

---

## REPLY BRIEF FOR THE APPELLANT

---

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

MICHAEL J. HAUNGS      (202) 514-4343
DOUGLAS C. RENNIE      (202) 305-7546
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel:*
HENRY C. LEVENTIS
  *United States Attorney*

# TABLE OF CONTENTS

**Page**

Table of contents.............................................................i

Table of authorities ..................................................... iii

Introduction ................................................................. 1

Argument ...................................................................... 4

    A.    Fitzgerald could not show that the production of any of its glider tractors occurred "solely by reason of repairs or modifications" to a preexisting "article" as required by I.R.C. § 4052(f)(1) ..................... 4

        1.    Fitzgerald's responses to the Government's textual arguments are unavailing ........................ 4

        2.    The inclusion of "wrecked" vehicles does not change the meaning of § 4052(f)(1) ...................... 8

        3.    The Government did not misconstrue the facts ................................................................ 12

        4.    Revenue Ruling 91-27 does not support Fitzgerald's arguments....................................... 14

        5.    The IRS's pre-codification guidance does not support Fitzgerald's arguments.......................... 15

        6.    Section 4052(f) is a tax exemption ...................... 17

        7.    Fitzgerald's other arguments are irrelevant and off-the-mark .................................................. 18

    B.    Fitzgerald could not show that its trucks were "taxable" when new as required by I.R.C. § 4052(f)(2)....................................................... 21

        1.    Fitzgerald fails to substantively address the applicable caselaw and regulations ................... 22

2.    An article becomes "taxable under section 4051" only upon its first retail sale .................... 23

3.    Fitzgerald's explanation of subsection (2) makes no sense ................................... 24

4.    Fitzgerald failed to carry its burden under subsection (2) .................................... 27

5.    The Government preserved its argument .......... 30

C.    Fitzgerald's jury-instruction arguments are red herrings ....................................................... 31

D.    This case matters ........................................... 32

Conclusion ................................................................ 34

Certificate of compliance ......................................... 35

Certificate of service ................................................ 36

# TABLE OF AUTHORITIES

**Cases:**                                                        **Page(s)**

*Allen v. United States*, 83 F.4th 564 (6th Cir. 2023) ......................... 19

*Am. Bankers Ins. v. United States*, 265 F. Supp. 67
(S.D. Fla. 1967), *aff'd*, 388 F.2d 304 (5th Cir. 1968) ................... 23

*Bostock v. Clayton County*, 590 U.S. 644 (2020) ............................... 7

*Bromley* v. *McCaughn*, 280 U.S. 124 (1929) ...................................... 24

*CenTra, Inc. v. United States*, 953 F.2d 1051
(6th Cir. 1992) ............................................................... 22-23, 26

*Corner Post, Inc. v. Bd. of Governors of Fed.
Rsrv. Sys.*, 144 S. Ct. 2440 (2024) ....................................... 5

*DeNaples v. Commissioner*, 674 F.3d 172 (3d Cir. 2012) ................ 18

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) ................................... 27

*Hall v. Hall*, 584 U.S. 59 (2018) ..................................................... 8

*Hall v. USDA*, 984 F.3d 825 (9th Cir. 2020) ................................... 27

*Hostar Marine Transp. Sys., Inc. v. United States*,
592 F.3d 202 (1st Cir. 2010) ............................................. 18

*Howe v. City of Akron*, 723 F.3d 651 (6th Cir. 2013) ..................... 31

*Indian Motorcycle Co. v. United States*,
283 U.S. 570 (1931) ........................................................ 24

*Michigan Exp., Inc. v. United States*, 374 F.3d 424
(6th Cir. 2004) ............................................................... 20

*Owensby & Kritikos, Inc. v. Commissioner*,
819 F.2d 1315 (5th Cir. 1987) ......................................... 20

*Pryor v. Gulf Oil Corp.*, 704 F.2d 1364 (5th Cir. 1983) ................. 32

*Sandoz v. State of La. Dep't of Rev. & Taxation
(In re Oilfield Instruments)*, 53 B.R. 199
(Bankr. W.D. La. 1985) ................................................... 18

*Schneider National Leasing, Inc. v. United States*,
11 F.4th 548 (7th Cir. 2021) .................. 2-3, 7, 15, 17, 19, 25, 28

*Scott v. Miller*, 361 F. App'x 650 (6th Cir. 2010) ........................... 32

*Sherwin-Williams Co. v. United States*, 403 F.3d 793
(6th Cir. 2005) ............................................................... 27

*United States v. Balderas-Gonzalez*, 264 F. App'x 415
(5th Cir. 2008) ............................................................... 28

**Cases (cont'd):** **Page(s)**

*United States v. Detroit Med. Ctr.*, 557 F.3d 412
(6th Cir. 2009) .......................................................................... 17
*United States v. Latouf*, 132 F.3d 320 (6th Cir. 1997) ..................... 32
*United States v. Miller*, 734 F.3d 530 (6th Cir. 2013) ........................ 8
*United States v. Spoor Trustee*, 838 F.3d 1197
(11th Cir. 2016) ........................................................................ 19
*United States v. Veggacado*, 37 F. App'x 189
(6th Cir. 2002) .......................................................................... 32
*Wilson v. United States*, 588 F.2d 1168 (6th Cir. 1978) ................... 17
*Ysleta del Sur Pueblo v. Texas*, 596 U.S. 685 (2022) ......................... 7

**Statutes:**

Internal Revenue Code (26 U.S.C.):

§ 4051 ................................................................... 3, 18, 23-24, 27
§ 4051(a)(1) ........................................................................... 8, 24
§ 4051(a)(1)(E) ........................................................................... 6
§ 4052 ...................................................................................... 18
§ 4052(a)(1) .............................................................................. 26
§ 4052(b)(1)(B)(iii) ................................................................... 19
§ 4052(f) ..................................................... 1-2, 4-5, 17-19, 31, 33
§ 4052(f)(1) ....................................................... 2-5, 8, 10, 21, 25, 31
§ 4052(f)(2) ........................................................... 3, 21-24, 26-31
§ 4221 ...................................................................................... 22
§ 4221(a) .................................................................................. 26
§ 6110(a) .................................................................................. 16
§ 6110(b)(1) .............................................................................. 16

Ohio Rev. Code Ann.:

§ 4505.11(C)(3) ......................................................................... 11
§ 4505.11(G) ............................................................................. 11
§ 4505.18(A)(4) ......................................................................... 11

**Regulations:** **Page(s)**

Treasury Regulations (26 C.F.R.):

§ 48.0-2(a)(4)(i) ............................................................ 11
§ 48.4052-1 .................................................................. 26
§ 48.4061(a)-1(d)(1) ........................................................ 6
§ 48.4061(a)-1(d)(2)(ii) .................................................. 18
§ 145.4051-1(e)(1)(i) ....................................................... 6
§ 145.4052-1(a)(2) .................................................... 22, 26
§ 145.4052-1(a)(2)(i) ..................................................... 26
§ 145.4052-1(a)(2)(ii) ................................................... 26
§ 145.4052-1(a)(2)(iii) .................................................. 26
§ 145.4052-1(a)(6) ....................................................... 26
§ 145.4052-1(f)(5) .................................................... 22-23

**Miscellaneous:**

*Ballentine's Law Dictionary* (3d ed. 1969) ........................................ 11
Evolectric, Inc., Comment on IRS Notice 2022-56
    (Dec. 8, 2022) ............................................................ 33
Rev. Rul. 63-210, 1963-2 C.B. 497, 1963 WL 13243 ................. 15
Rev. Rul. 71-584, 1971-2 C.B. 358, 1971 WL 26825 ................. 15
Rev. Rul. 78-217, 1978-1 C.B. 346, 1978 WL 42806 ................... 9
Rev. Rul. 79-36, 1979-1 C.B. 336, 1979 WL 50891 ..................... 6
Rev. Rul. 86-130, 1986-2 C.B. 179, 1986 WL 327974 ............... 15
Rev. Rul. 91-27, 1991-1 C.B. 192,
    1991 WL 734870 ..............................................9-10, 14-15, 28
Antonin Scalia & Bryan A. Garner, *Reading Law: The
    Interpretation of Legal Texts* 168 (2012) ........................18-19, 27
Tech. Adv. Mem. 78-36-003, 1978 WL 49021
    (Jan. 1, 1978) .......................................................... 9, 11
Tech. Adv. Mem. 92-38-008, 1992 WL 226784
    (Sept. 18, 1992) .......................................................... 16
Tech. Adv. Mem. 93-33-007, 1993 WL 315090
    (Aug. 20, 1993) ........................................................16-17
9C Charles Alan Wright & Arthur R. Miller, *Federal
    Practice and Procedure* § 2556 (3d ed. 2024) ................. 32

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

———————————

### No. 24-5078

## FITZGERALD TRUCK PARTS & SALES, LLC,

### Plaintiff-Appellee

### v.

## UNITED STATES OF AMERICA,

### Defendant-Appellant

———————————

## ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

———————————

## REPLY BRIEF FOR THE APPELLANT

———————————

## INTRODUCTION

Fitzgerald manufactured over 12,000 highway tractors between

2012 and 2017 and paid no excise taxes when it sold them for a profit.

Fitzgerald claims that under I.R.C.[1] § 4052(f), it may avoid those taxes

---

[1] Terms have the same meaning as in the Government's opening brief. (*See* Gov't Br. xi–xii.) Additionally, "Gov't Br." refers to the Government's opening brief and "Fitz. Br." refers to Fitzgerald's answering brief.

because it used engines that it bought from junkyards and because it installed them in the same "type" of vehicle they came from.

As the Government explained in its opening brief, Fitzgerald's position is belied by the statute it relies on. Section 4052(f) only applies when (1) a taxpayer "repairs or modifi[es]" a preexisting "article" (2) that was capable of being taxed (that is, was not exempt) when it was new. Fitzgerald failed to prove that its trucks qualified under either requirement.

In its response, Fitzgerald fails to address most of the Government's textual arguments under subsection (1). It ignores the statutory and regulatory definitions of "article." It also has no explanation for the clause limiting the safe harbor to instances of alleged manufacturing occurring "solely by reason of repairs or modifications to the article." Instead, it places undue significance on the word "wrecked," which was included to address prior administrative tests. The word "wrecked" does not allow a taxpayer to avoid taxation by "repairing" anything other than an "article." Fitzgerald also invokes *Schneider National Leasing, Inc. v. United States*, 11 F.4th 548, 551–52

(7th Cir. 2021), but Schneider was not buying $4,000 engines from junkyards and installing them into new trucks.

Fitzgerald's arguments under subsection (2) fare no better. It tries to brush aside this Court's decision and regulations providing that the term "taxable" necessarily excludes tax-exempt sales. It claims that those authorities are irrelevant because they address "sales" and "taxable" modifies "article" within § 4052(f)(2). But the statute does not discuss "taxable articles." It refers to articles that are "taxable *under section 4051*." And § 4051 provides that articles are taxable *when sold*. Moreover, Fitzgerald's explanation of subsection (2)'s purpose (ensuring that the "type" of vehicle remains the same) can't be right because "modifications" can change the "type" of vehicle. Indeed, the statute expressly states in subsection (1) that it "includ[es] any modification which changes the transportation function of the article. . . ." Section 4052(f)(2) best makes sense if it is read to preclude taxpayers from abusing the safe harbor by reusing vehicles that had already been exempted once.

Fitzgerald's other contentions concerning purported "factual" disputes, authorities allegedly supporting its position, waiver, and jury instructions do not withstand scrutiny.

When it filed this case, Fitzgerald's understanding of § 4052(f) was not so different from the Government's. It claimed that although its trucks might "have a new cab, new wheels and tires and a fresh coat of paint," underneath all that was "a used highway tractor" and that it "retains a copy of the previously taxed tractor's title." (Compl., 19R. 1, #3–4.) But that turned out not to be true.

Congress did not provide for manufacturers to avoid the heavy-truck excise tax by reusing engines of unknown origin in the production of otherwise new trucks. The District Court's judgment should be reversed.

## ARGUMENT

### A. Fitzgerald could not show that the production of any of its glider tractors occurred "solely by reason of repairs or modifications" to a preexisting "article" as required by I.R.C. § 4052(f)(1)

#### 1. Fitzgerald's responses to the Government's textual arguments are unavailing

The Government demonstrated in its opening brief that the text of § 4052(f) does not permit a taxpayer to avoid liability when it combines

a salvaged engine with other new and used components to produce a functioning tractor. An engine is a "component," not an "article" capable of being repaired for the purposes of I.R.C. § 4052(f). (Gov't Br. 32–42.) And § 4052(f)(1) is limited to instances of alleged manufacturing occurring "solely by reason of repairs or modifications to the article." (Gov't Br. 42–44.) Because Fitzgerald repaired engines, not articles (as defined by the relevant statutes and regulations), it could not qualify for the safe harbor. (Gov't Br. 44–50.) Fitzgerald's response largely fails to engage with these textual arguments.

Fitzgerald does acknowledge that the use of the definite article ("the") indicates that the statute applies to the repair of a single, preexisting article. (*See* Fitz. Br. 29; Gov't Br. 32–33.) Indeed, the Supreme Court recently reaffirmed this principle. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2455 (2024).

Fitzgerald also agrees that "article" is a "statutorily defined term that includes highway tractors." (Fitz. Br. 15–16.) But it simultaneously claims the Government has "no support whatsoever" for its contention that "article" has a specific meaning under the relevant statutes and regulations. (Fitz. Br. 29.) It fails to address the statutes

and regulations cited by the Government, which define statutory terms rather than setting forth a "parts-and-pieces test." (*Compare* Gov't Br. 33–36 (discussing I.R.C. § 4051(a)(1)(E); Treas. Reg. § 145.4051-1(e)(1)(i); Treas. Reg. § 48.4061(a)-1(d)(1)), *with* Fitz. Br. 16.) And a taxpayer attempting to rely on the safe harbor must satisfy the relevant definition of "article" as a threshold matter. In this context, an "article" is a self-propelled vehicle designed to transport a load over the public roads. (*See* Gov't Br. 33–36.)

An engine is incapable of either self-propulsion or transporting a load by itself. Rather, an engine is an individual "component." *E.g.*, Rev. Rul. 79-36, 1979-1 C.B. 336, 1979 WL 50891, at *1–2. And if Congress wanted engines to be considered articles for some or all purposes, it knew how to say so—as it has in other instances. (*See* Gov't Br. 38.) Fitzgerald does not dispute this.

Fitzgerald also fails to address the purpose of the "repairs or modifications" clause, which indicates that the safe harbor applies "solely" when "repairs or modifications to the article" have occurred. (Gov't Br. 42–44). There was no need to include this language if it did not serve the limit the safe harbor's applicability. (*See* Gov't Br. 43–44);

*Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) ("solely" indicates that unspecified actions do not qualify). Under Fitzgerald's reading of the statute, the language is purely superfluous. *See Ysleta del Sur Pueblo v. Texas*, 596 U.S. 685, 698–99 (2022).

Moreover, "repairs or modifications" do not encompass a replacement. (Gov't Br. 53–54.) Fitzgerald's interpretation of the statute, however, would allow a taxpayer to replace an existing truck while retaining nothing (or only *de minimis* aspects) of the donor truck. (Gov't Br. 53–54.) Fitzgerald acknowledges that it "obviously" had to retain something from the donor truck and that it "could not have met the safe harbor if it was just using the windshield wipers and rear-view mirrors." (Fitz. Br. 31.) Thus, under Fitzgerald's interpretation, a taxpayer could indeed satisfy the safe harbor if it replaced an existing truck with a cheaper one while only retaining the windshield wipers. (Gov't Br. 53–54.) And that could occur when the taxpayer has enough purchasing power to command bulk discounts—as was the case in *Schneider*, 11 F.4th at 559.

At bottom, to obtain relief under § 4052(f)(1), a taxpayer must repair a preexisting vehicle, which is "the article" under § 4051(a)(1). Fitzgerald did not do that here.

### 2. The inclusion of "wrecked" vehicles does not change the meaning of § 4052(f)(1)

Fitzgerald's primary textual hook for its reading of § 4052(f)(1) is the word "wrecked." (Fitz. Br. 20, 28–30.) It suggests that since subsection (1) contemplates that an "article" may be "wrecked" before being repaired, it encompasses situations when the vehicle is destroyed. The parenthetical including "wrecked" was intended to do away with any inquiry into the reason for repairing "the article." But it does not allow a taxpayer to qualify for relief under § 4052(f)(1) *without* repairing an article.

When interpreting a statute, a court "consider[s] not only the bare meaning of the word but also its placement and purpose in the statutory scheme." *United States v. Miller*, 734 F.3d 530, 540 (6th Cir. 2013) (citation omitted). And "if a word is obviously transplanted from another legal source . . . it brings the old soil with it." *Hall v. Hall*, 584 U.S. 59, 73 (2018) (citation omitted).

As the Government explained in its opening brief, the parenthetical including the word "wrecked" was included to make the safe harbor applicable to all categories of repairs and modifications that existed under prior law. (*See* Gov't Br. 27–31.) The IRS had applied separate tests to determine whether manufacturing occurred for "worn" vehicles, "wrecked" vehicles, and vehicles that had a "change in transportation function."[2] (*See* Gov't Br. 27.) A "wrecked" tractor was one "damaged as the result of an accident" which might require "one or more" components to be repaired or replaced to restore it to "operating condition." Tech. Adv. Mem. 78-36-003, 1978 WL 49021 (Jan. 1, 1978); *see also* Rev. Rul. 91-27, 1991-1 C.B. 192, 1991 WL 734870, at *3 ("A vehicle will be considered 'wrecked' when it has incurred damage as a result of a collision or similar mishap and extensive repairs are necessary to return the vehicle to a fully functional condition."). But if a taxpayer disassembled such a tractor and replaced too many components, the IRS would hold the taxpayer liable for the excise tax on its use of the restored vehicle. *See* Tech. Adv. Mem. 78-36-003.

---

[2] A "change in transportation function" includes, for example, lengthening or shortening a truck chassis. *See* Rev. Rul. 78-217, 1978-1 C.B. 346, 1978 WL 42806.

Repairing a wrecked vehicle, however, never included purchasing an engine from a parts dealer and combining it with a new glider kit.

Fitzgerald incorrectly suggests that the Government is contending that a donor truck "must be operational or complete" when repairs begin. (Fitz. Br. 20.) Something that needs repairs may need to be "restore[d] . . . to a functional condition." I.R.C. § 4052(f)(1). Thus, it may be "inoperable," not "fully functional," Rev. Rul. 91-27, 1991 WL 734870, at *3, or even "disabled," (Fitz. Br. 28).

The safe harbor evolved over time. It was initially proposed by Congress and adopted by the IRS as applying only to "worn" vehicles. (Gov't Br. 27–28.) When Congress codified it years later, it included all vehicles undergoing repairs or modifications, whatever the reason for those repairs or modifications. (Gov't Br. 31.) Thus, it added the parenthetical indicating that the repairs can "includ[e] any modification which changes the transportation function of the article or restores a wrecked article to a functional condition." I.R.C. § 4052(f)(1). Accordingly, the safe harbor may apply to a truck in a state of disrepair, regardless of whether the cause is an accident or extensive use. And it

can apply to a "wrecked" tractor even if multiple components are replaced in the restoration process. *Cf.* Tech. Adv. Mem. 78-36-003.

But that does not suggest—as Fitzgerald seems to imply (*e.g.*, Fitz. Br. 30–31)—that the safe harbor can apply to a component or part of an article that has been "destroyed." *E.g.*, Ohio Rev. Code Ann. § 4505.18(A)(4) (title must be surrendered in the case of "destruction or dismantling"); *see also id.* § 4505.11(C)(3) (vehicles deemed "impossible to restore for highway operation" must be labeled "for destruction" (capitalization omitted)). In such an instance, the donor vehicle would only have value for "parts and scrap metal," *id.* § 4505.11(G), and not be capable of being restored to a functional condition. (*Cf.* Gov't Br. 37–38 (discussing "parts")); Treas. Reg. § 48.0-2(a)(4)(i) (manufacturing can include use of "scrap"); *Scrap*, *Ballentine's Law Dictionary* 1145–46 (3d ed. 1969) ("Metal from worn out machines and vehicles, particularly automobiles, of value only for reprocessing").

Fitzgerald obtained most of its engines from salvage yards (*see* Fitz. Br. 5), which Fitzgerald's own witness acknowledged are "graveyard[s]" where "big trucks go to die." (Tr., R. 206, #16047.) Thus,

the trucks at a salvage yard are generally only useful to dismantle for their parts or for scrap material. (*See* Tr., R. 207, #16374.)

Fundamentally, the repair process must start with something meeting the definition of an "article." (Gov't Br. 33–36.) And individual components or parts do not meet that definition. (Gov't Br. 36–38.) An engine alone does not because it cannot propel itself down a highway or tow a loaded trailer, even when operable.

Thus, the safe harbor does contemplate that a "wrecked" article may be restored to functional condition. But it does not allow a manufacturer to avoid taxation by repairing individual components or parts (whether from worn or wrecked vehicles) and installing them into new trucks.

### 3. The Government did not misconstrue the facts

Unable to otherwise respond substantively, Fitzgerald accuses the Government of distorting the facts. (*See* Fitz. Br. 20–25.) This claim is ill-founded. The "identification" process that Fitzgerald contends the Government is ignoring is immaterial.

Fitzgerald asserts that it "did not buy engines at some imagined engine store," that it was not "only repairing engines," and that the

Government is "start[ing] the repair process mid-way through, instead of at the beginning." (Fitz. Br. 6, 20–21.) "Instead," it supposedly "identified" or "located" the used engines before purchasing them. (*See id.*) Thus, it claims that the Government's recitation of the facts is "false." (Fitz. Br. 20.)

Fitzgerald's "identification" process was simply calling junkyards to see if they had engines to sell. (Tr., R. 207, #16334.) Although Fitzgerald claims that it "extracted the engine from a worn or wrecked tractor" (Fitz. Br. 21), it acknowledges that during the relevant period, the "salvage yards cut out the engines and transmissions rather than" hauling "the entire tractor" to Fitzgerald. (Fitz. Br. 22 n.11 (citing Tr., R. 206, #16185–86); Gov't Br. 8.) Fitzgerald would then have the engines picked up from the junkyard. (Tr., R. 207, #16334; *see also* Gov't Br. 8.) Thus, it did not take possession of engines until after they were extracted from the donor trucks. (Fitz. Br. 20.) And the junkyards "shredded" the rest of the tractors (Fitz. Br. 3, 12, 14, 20–23), so Fitzgerald never took possession of them. Even Tommy Fitzgerald admitted that the "start" of its process was to "bring" in "the engines." (Tr., R. 205, #15943.)

-14-

There are no material distinctions between the process Fitzgerald describes and the one the Government recited in its opening brief. Fitzgerald even acknowledges the very fact it claims that the Government is misconstruing—that it "only repaired the engines." (Fitz. Br. 22.)

4.      **Revenue Ruling 91-27 does not support Fitzgerald's arguments**

Fitzgerald claims that Revenue Ruling 91-27 held that glider kits "could be used to restore tractors" and that the Government has "abandon[ed]" it.  (Fitz. Br. 32–33.)  Revenue Ruling 91-27 provides that the safe harbor can apply when a "glider kit" is used "to repair the vehicle" (that is, a preexisting article).  But Fitzgerald did not do that. *See* Rev. Rul. 91-27, 1991 WL 734870, at *3.  The mere fact that something which could be called a "glider kit" is used does not matter.

Fitzgerald's misapplication of the ruling seems to be based on its definition of "glider kit" as potentially including everything "except the engine and/or transmission."  (Fitz. Br. 25.)  But Revenue Ruling 91-27

did not define "glider kit," which has no fixed meaning.[3]  Indeed, most of

the glider kits at issue in *Schneider*, 11 F.4th at 551, *included* engines.

In this case, Fitzgerald repaired salvaged engines, then installed

them (along with remanufactured transmissions, which may have

originated in a different truck) into the glider kits.  (Gov't Br. 7, 45–50.)

It did not "use[ ] a glider kit to repair the vehicle."  Rev. Rul. 91-27,

1991 WL 734870, at *3.

### 5.     The IRS's pre-codification guidance does not support Fitzgerald's arguments

In its opening brief, the Government explained how the IRS

applied Revenue Ruling 91-27 in technical advice memoranda issued in

1992 and 1993 before codification of the safe harbor.  (Gov't Br. 29–31.)

Those rulings showed that the safe harbor can apply when "the restored

tractors are essentially the same vehicles as the prerestoration

---

[3] *Compare*, *e.g.*, Rev. Rul. 63-210, 1963-2 C.B. 497, 1963 WL 13243, at *1 ("assembled parts" including "a cab, a frame, sheet metal, mounting brackets, steering gear, front axle, front wheels, and front tires" and possibly "a transmission or rear axle" but not "an engine, rear wheels, and rear tires"), *with* Rev. Rul. 86-130, 1986-2 C.B. 179, 1986 WL 327974, at *1 ("a set of unassembled new parts" that "usually consist[ed] of a cab, fenders, dash instruments, wiring, steering wheel, steering gear, seats, chassis frame, front axle, and copper tubing for the brake system"), *and* Rev. Rul. 71-584, 1971-2 C.B. 358, 1971 WL 26825, at *1 (same).

tractors," Tech. Adv. Mem. 93-33-007, 1993 WL 315090 (Aug. 20, 1993), but not when "there is no existing vehicle that has been modified, repaired, or restored" and the process results in what is "essentially a new vehicle," Tech. Adv. Mem. 92-38-008, 1992 WL 226784 (Sept. 18, 1992). Thus, although each case had a different outcome, they both indicate that a taxpayer must repair a continuously existing vehicle to qualify for the safe harbor. (*See* Gov't Br. 39–40.)

Although Fitzgerald now calls this guidance "internal,"[4] "unreliable," and "obviously conflicting," it has previously acknowledged that the IRS's pre-codification guidance "correctly appl[ied]" the safe harbor. (*Compare* Fitz. Br. 32 , 41–42, *with* Mem., 19R. 62-1, #1369.)

And while disparaging it, Fitzgerald also tries to rely on the 1993 memorandum, claiming that it describes a factual scenario that is "precisely" the same as its own. (Fitz. Br. 41–42.) But in the 1993 case, the taxpayer combined glider kits with the engines, transmissions, and both axles of trucks from its own fleet. Tech. Adv. Mem. 93-33-007. "The used components of the worn tractors were not intermingled, that

---

[4] The memoranda cited by the Government are publicly available. *See* I.R.C. § 6110(a), (b)(1).

is, the engine, transmission, and axles of a particular tractor were combined with a glider kit in the restoration process." *Id.* The safe harbor applied because "the restored tractors [we]re essentially the same vehicles as the prerestoration tractors." *Id.* Here, as it admits, Fitzgerald only reused the engines, which it bought from junkyards. (*See* Fitz. Br. 42.) These facts are far from being "precisely" the same.

### 6. Section 4052(f) is a tax exemption

As the Government demonstrated in its opening brief, exemptions from taxation are to be construed narrowly. (Gov't Br. 41 (citing *United States v. Detroit Med. Ctr.*, 557 F.3d 412, 414–15 (6th Cir. 2009); *Wilson v. United States*, 588 F.2d 1168, 1171 (6th Cir. 1978)).) Seeking to avoid a narrow construction, Fitzgerald argues that § 4052(f) is "not an exemption statute" because it "provides a definitional rule." (Fitz. Br. 44–45 (emphasis omitted).) Fitzgerald is wrong.

The statute provides that in certain instances, remanufacturing an article—an event which would otherwise make the article's next retail sale taxable—is not "manufacturing." It thereby "exempts" those qualifying activities from taxation. *See Schneider*, 11 F.th at 558; *see also id.* at 552. It is irrelevant that it does so in a "definitional"

-18-

manner. *Cf. Hostar Marine Transp. Sys., Inc. v. United States*, 592 F.3d
202, 208, 212–14 (1st Cir. 2010) (noting the principle in the context of a
definitional exclusion from the § 4051 tax under Treas. Reg.
§ 48.4061(a)-1(d)(2)(ii)); *see also DeNaples v. Commissioner*, 674 F.3d
172, 176 (3d Cir. 2012) (provision defining "State or local bond" as part
of exclusion should be construed narrowly).  The only case Fitzgerald
cites that supports its contentions to the contrary was construing a
state law. *Sandoz v. State of La. Dep't of Rev. & Taxation* (*In re Oilfield
Instruments)*, 53 B.R. 199, 203 (Bankr. W.D. La. 1985).  In contrast,
Fitzgerald's own documents and witnesses referred to the safe harbor as
an "exemption."  (Ex. 100, R. 225-3, #17698; Tr, R. 206, #16145; *see also*
Tr., R. 208, #16811–13 (jury instructions); Mot., 19R. 55, #1176.)

### 7. Fitzgerald's other arguments are irrelevant and off-the-mark

Fitzgerald's additional contentions can be summarily refuted.

First, the Government is not arguing that other provisions in
§§ 4051 and 4052 "modif[y]" § 4052(f).  (*Cf.* Fitz. Br. 34.)  Rather, "[t]he
meaning of a statute is to be looked for, not in any single section, but in
all the parts together and in their relation to the end in view."  Antonin
Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal*

*Texts* 168 (2012) (citation omitted); *accord United States v. Spoor Trustee*, 838 F.3d 1197, 1202 (11th Cir. 2016). Those provisions provide the statutory context in which to correctly interpret § 4052(f). *See Allen v. United States*, 83 F.4th 564, 569–72 (6th Cir. 2023). It is thus significant that Congress specifically contemplated that a taxpayer reusing a $4,000 engine might get a proportionate tax break, but not escape the tax in its entirety. (Gov't Br. 36–37, 47–48 (citing I.R.C. § 4052(b)(1)(B)(iii).)

Second, Fitzgerald suggests that it did "the same thing" as the taxpayer in *Schneider*. (Fitz. Br. 35.) But Schneider was repairing trucks from its existing fleet and reused multiple components from each donor truck without intermingling them. *Schneider*, 11 F.4th at 551–52. Thus, there arguably was a continuously existing article in *Schneider*, unlike this case. (Gov't Br. 51–52.) Fitzgerald's other contentions regarding *Schneider* (Fitz. Br. 35–36) have already been addressed or are non-responsive to the Government's arguments.

Third, Fitzgerald invokes an estoppel theory that the District Court did not reach, claiming that the Government "agreed" that its glider tractors "met the safe harbor" in prior tax periods. (Fitz. Br. 6.)

It provides no citations for these propositions, which are contrary to the law. *Owensby & Kritikos, Inc. v. Commissioner*, 819 F.2d 1315, 1329 (5th Cir. 1987) ("By accepting a practice in an audit, the Commissioner does not necessarily approve that practice for use in the future.").  And, in fact, the record shows that Fitzgerald took increasingly aggressive positions on the safe harbor—even ignoring its own accountant's advice. (*See* Tr., R. 206, #16238–40 (accountant advised Fitzgerald to retain the title of donor trucks), #16243–45 (Fitzgerald switched from buying entire trucks to only purchasing engines); Tr., R. 207, #16305–06 (similar)); *see also Michigan Exp., Inc. v. United States*, 374 F.3d 424, 427 (6th Cir. 2004).

Fourth, Fitzgerald claims that title cannot be transferred for a "wrecked" tractor.  (Fitz. Br. 12.)  But the testimony it cites merely indicates that a junkyard could not transfer title for an engine alone when the buyer was not purchasing the "whole truck."  (Tr., R. 207, #16343–44.)

Finally, the Government did not "badly misstate" (Fitz. Br. 30 n.13) the District Court's initial suggestion that Fitzgerald could not

-21-

meet the safe harbor if it was merely purchasing engines. The court stated:

> In its Complaint, Fitzgerald alleged that its "gliders begin as worn or wrecked highway tractors," and that "for every highway tractor th[at] is refurbished, Fitzgerald retains a copy of the previously taxed tractor's title." However, the Government has pointed to evidence in the limited record suggesting that Fitzgerald simply purchased salvaged engine cores without acquiring title to the highway tractors from which those parts had been salvaged, and in other cases simply purchased engines and transmission[s] separately and rebuilt them and placed them into kits. As a consequence, some of the glider-kit sales . . . may fall within the Section 4052(f)(1) exemptions, while others may not because Fitzgerald did not repair or modify an "article" that had previously been taxed.

(Order, 19R. 74 #1817 (citations and alterations omitted).)

## B. Fitzgerald could not show that its trucks were "taxable" when new as required by I.R.C. § 4052(f)(2)

To qualify for relief under the safe harbor, § 4052(f)(2) requires that a taxpayer show that the repaired article was "taxable" when new. As the Government explained in its opening brief, under this Court's precedent and the relevant regulations, to be "taxable" an article must have been capable of being taxed and not exempt under the law when sold. (Gov't Br. 55–65.) But below, the District Court ignored those

authorities and allowed Fitzgerald to escape liability without satisfying subsection (2).

In response, Fitzgerald fails to engage with those authorities and proposes an explanation for the requirement that has no basis in its text and that would render it effectively meaningless. And, despite its protestations, it was Fitzgerald that bore the burden below and failed to carry it.

> **1. Fitzgerald fails to substantively address the applicable caselaw and regulations**

This Court held in *CenTra, Inc. v. United States*, 953 F.2d 1051, 1054 (6th Cir. 1992), that an exempt Canadian sale was not "taxable" because it was not "capable of being taxed" under the law. And under the regulatory definition of "taxable sale," Treas. Reg. § 145.4052-1(a)(2), sales that are "exempt" under I.R.C. § 4221—including exports and sales to municipalities—are not "taxable." An additional regulatory provision also makes the exemption rules under § 4221 generally applicable here. Treas. Reg. § 145.4052-1(f)(5).

But Fitzgerald, like the District Court, never addresses the regulatory provisions that specifically define "taxable sale" and make § 4221 applicable. Treas. Reg. § 145.4052-1(a)(2); Treas. Reg.

§ 145.4052-1(f)(5).  And Fitzgerald only addresses *CenTra* in passing, claiming that it "has nothing to do" with this case (Fitz. Br. 53), even though it addressed the definition of "taxable" in this same regulatory scheme.  *See* 953 F.2d at 1054.

Moreover, while purporting to rely on its "ordinary meaning" (Fitz. Br. 48–49), Fitzgerald fails to address the authorities and examples clarifying the definition of "taxable."  (Gov't Br. 57–58.)  The one case it cites suggests that "taxable" means "liable" or "assess[able]."  *See Am. Bankers Ins. v. United States*, 265 F. Supp. 67, 73 (S.D. Fla. 1967), *aff'd,* 388 F.2d 304 (5th Cir. 1968).  In other words, "taxable" refers to something that is not exempt.  (Gov't Br. 56–59.)

## 2.    An article becomes "taxable under section 4051" only upon its first retail sale

Fitzgerald's excuse for ignoring the applicable authorities is its claim that § 4052(f)(2) "requires that the repaired tractors, *not the sales,* were taxable when new and says nothing about sales."  (Fitz. Br. 48.)  It claims that "taxable" is an adjective modifying "article."  (Fitz. Br. 49.)  But the statute does not refer to a "taxable article."

Rather, it says that the exemption does not apply if "the article . . . would, if new, be *taxable under section 4051* and the article when new

was not *taxable under such section*." I.R.C. § 4052(f)(2) (emphasis added). Section 4051 does not make articles inherently "taxable" by reason of their existence. *Cf. Bromley* v. *McCaughn*, 280 U.S. 124, 136 (1929) (excise power does not extend to "ownership of property"). Nor does it make articles taxable because of their manufacture. (*Cf.* Fitz. Br. 60 (referring to "the manufacturing tax").)[5] Rather, an article is "taxable under section 4051" *only* upon its "first retail sale." I.R.C. § 4051(a)(1).

Thus, as § 4052(f)(2) explicitly incorporates the § 4051 concept of taxation, it necessarily means that its requirements are not satisfied if the article was not taxable at its "first retail sale."

### 3. Fitzgerald's explanation of subsection (2) makes no sense

The apparent purpose of subsection (2) is to ensure that all qualifying vehicles can be taxed at least once. (Gov't Br. 59.) Fitzgerald disputes this common-sense explanation, claiming that subsection (2)'s purpose is "to make sure that . . . [the taxpayer] ha[s] the same type of

---

[5] Even the repealed manufacturers tax (Gov't Br. 5) imposed the tax upon the manufacturer's *sale* of the article. *See Indian Motorcycle Co. v. United States*, 283 U.S. 570, 574 (1931).

tractor before and after the repairs." (Fitz. Br. 61.) But that cannot be true.

First, under subsection (1), a repair process may change a vehicle's transportation function. I.R.C. § 4052(f)(1). In such a case, the "type" of vehicle at issue can change. *See Schneider*, 11 F.4th at 555 (suggesting that such changes may encompass converting a tractor "into a wrecker vehicle with a crane, or altering it from a straight truck . . . to a truck tractor").

Second, there is little point to merely ensuring that the "type" of tractor remains the same. Fitzgerald acknowledges that the only instance in which it might apply would be to preclude a manufacturer from upgrading a light-duty truck (Fitz. Br. 60)—although it also claims it would not be "economically feasible" to do that since it would require a new engine (Fitz. Br. 11). In contrast, the Government's reading intuitively makes sense and ensures that this statutory language is not superfluous. (*See* Gov't Br. 64.) And precluding a manufacturer who is reselling a tractor that has been sold tax-free once from escaping tax a second time benefits the Highway Trust Fund.

Third, although most "resales" are not taxable (*cf.* Fitz. Br. 52), there are exceptions. Most articles will have tax paid on the "first retail sale" and may be resold without incurring the tax. *See* Treas. Reg. § 145.4052-1(a)(2)(iii). And Congress gave certain entities (like states, municipalities, and certain nonprofits, I.R.C. § 4221(a)) the benefit of both purchasing articles and reselling them without incurring the tax. *See* I.R.C. § 4052(a)(1); Treas. Reg. § 145.4052-1(a)(2)(i). But resales of exported articles (which are initially nontaxable) are taxed when sold after subsequent importation. *See* I.R.C. § 4052(a)(1); *CenTra*, 953 F.2d at 1052. Similarly, sales from a manufacturer to a dealer that sells to end users may also be tax exempt, with the resale to the end user then being taxable. *See* I.R.C. § 4052(a)(1); Treas. Reg. § 145.4052-1(a)(2)(ii), (a)(6); Treas. Reg. § 48.4052-1. Thus, Congress's decision to tax the resale of articles undergoing a remanufacturing process after they had already been sold tax-free once would not be unique.

Fourth, Fitzgerald's reading of "taxable" would make the meaning of that term in subsection (2) inconsistent with the preexisting regulation defining "taxable sale." (*See* Gov't Br. 56–57 (discussing Treas. Reg. § 145.4052-1(a)(2)).) The heavy-truck excise tax laws

should be interpreted "as a symmetrical and coherent regulatory scheme, one in which the operative words have a consistent meaning throughout." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995); Scalia & Garner, *supra*, at 170–73 (the presumption of consistent usage is particularly apt where the provisions have a close connection, such as those on the same subject matter). Thus, the word "taxable" should have the same meaning in subsection (2) as it does in the Treasury regulations and elsewhere in the Code. *See Hall v. USDA*, 984 F.3d 825, 840 (9th Cir. 2020) (giving later-enacted statutory term the "same meaning that the agency has consistently given it").

### 4. Fitzgerald failed to carry its burden under subsection (2)

Fitzgerald acknowledges that it only sought to show that its glider tractors were "*of the type* that is subject to tax under § 4051." (Fitz. Br. 17 (emphasis added).) But being "of the type" that is taxable is different from being taxable. A taxpayer must establish "all the facts necessary" to show that it is entitled to relief. *Sherwin-Williams Co. v. United States*, 403 F.3d 793, 796 (6th Cir. 2005) (citation omitted). Fitzgerald merely demonstrated that its trucks *could have been* taxable, not that they actually were taxable. Consequently, it failed to meet its burden.

*E.g.*, *United States v. Balderas-Gonzalez*, 264 F. App'x 415, 419 (5th Cir. 2008) (a "mere possibility is insufficient" to satisfy preponderance standard).

Nor was that burden unduly difficult to meet. (*Cf.* Fitz. Br. 61.) Indeed, in most cases, it is easily satisfied. For example, there was never any question in *Schneider* that the taxpayer satisfied § 4052(f)(2) because it was restoring tractors from its own fleet. 11 F.4th at 551. Since it bought the tractors, it could have easily shown that they were "taxable" when new. The same result would apply for any private party repairing vehicles in its own fleet, including the situations discussed in Revenue Ruling 91-27, 1991 WL 734870, at *1.[6]

But the fact that the bar is low does not mean that it is non-existent. The taxable-when-new requirement only becomes difficult to establish when a manufacturer produces articles by installing used individual components of unknown origin in otherwise new tractors, as was the case here. And even then, it can still be satisfied without

_____

[6] Fitzgerald complains (Fitz. Br. 62–63) that the Government did not discuss this requirement in Revenue Ruling 91-27, but—in addition to the fact that it would have been satisfied in that instance—the requirement was not adopted until Congress codified the safe harbor six years later. (*See* Gov't Br. 31.)

"identifying every purchaser of the original tractors" (Fitz. Br. 52) or "an exhaustive investigation of the tractor's provenance" (Fitz. Br. 61). The same type of "business model" evidence that Fitzgerald relied on to satisfy the 75% test could be used to satisfy subsection (2). (*See* Gov't Br. 63.) The fact that Fitzgerald could not satisfy that burden here does not render it impossible for other taxpayers to meet—it simply means that Fitzgerald does not qualify for relief under the safe harbor. (Gov't Br. 63–64.)

Fitzgerald also misses the mark with its claim that "the government offered no credible evidence that any" donor tractor was exempt. (Fitz. Br. 56–58.) That was not the Government's burden—rather, "Fitzgerald bore the burden of proof." (Fitz. Br. 56.) Under the correct interpretation of "taxable," Fitzgerald had to show that it obtained its engines from non-exempt sources. It did not attempt to do so. In any event, as the District Court itself acknowledged, the evidence showed that Fitzgerald bought engines from exported vehicles and that its suppliers obtained trucks from municipalities.[7] (Gov't Br. 60; *see*

---

[7] Fitzgerald asserts that it "could not use" engines from vehicles exported to Mexico, but the cited testimony does not support that claim.

(continued…)

*also* Tr., R. 206, #16076–77.)  Consequently, Fitzgerald failed to carry its burden.

### 5.  The Government preserved its argument

Fitzgerald incorrectly asserts that the Government "waived" its subsection (2) argument.  (Fitz. Br. 53.)  The Government raised its argument both before, during, and after the trial.  (Mem., R. 129, #11283–84, 11287, 11289; Reply, R. 134, #11689; Tr., R. 208, #16722, 16725–26; Rev. Br., R. 213-1, #17081, 17084–86.)  Although the Government also suggested that Fitzgerald could have met its burden by showing that its tractors were "previously taxed," it did so because Fitzgerald had *repeatedly* proposed that standard.  (*E.g.*, Gov't Br. 11 (citing examples); Compl., 19R., #2–3, 6, 11–13 ("previously taxed"); Mem., 19R. 62-1, #1358, 1360–62, 1364, 1373 (same); Compl., R. 1, #2, 13–15 (same); First Am. Compl., R. 36, #2805, 2816–17, 2819 (same); Tr., R. 206, #16044, 16062 (same); Resp., R. 212, #17053 (same); *see also* Fitz. Br. 30 n.13 (acknowledging that it made "several allegations" that it "did not prove").)  And, in any event, even if the Government's filings

---

(…continued)
(Fitz. Br. 57 (citing Tr., R. 206, #16077–80 (witness could not tell from exhibit whether Fitzgerald used the engines)) (emphasis omitted).)

below can be construed as arguing for a "previously taxed" standard in the alternative, it would not matter because the Government need not raise all arguments on appeal.

### C. Fitzgerald's jury-instruction arguments are red herrings

Fitzgerald contends that the Government's arguments under both subsection (1) and (2) fail because the Government did not "object to the *lack of* a jury instruction" parroting its arguments. (Fitz. Br. 17 (emphasis added); *see also* Fitz. Br. 23–24, 53–54.) But here, the Government is challenging the District Court's incorrect statutory interpretation of § 4052(f) and court's denial of its motions seeking judgment as a matter of law and a new trial. (*See* Gov't Br. 23.) The Government is not challenging any jury instructions or the "lack of" any jury instructions.

In any event, the District Court itself directed the parties to agree on instructions concerning § 4052(f) "recognizing that the IRS is preserving this issue for appeal."[8] (Order, R. 161, #13833.) Thus,

---

[8] The authorities that Fitzgerald relies on are readily distinguishable. *See Howe v. City of Akron*, 723 F.3d 651, 660 (6th Cir. 2013) (trial court found waiver after party did not object to rejection of

(continued…)

requesting instructions to elaborate on the Government's arguments would have been, at best, a "pointless formality," *United States v. Latouf*, 132 F.3d 320, 327 (6th Cir. 1997), particularly given that they were raised and repeatedly rejected by the District Court (*see* Part B.5, *supra*; Gov't Br. 13–15 & n.3 18–20; Prop. Jury Instrs., R. 153, #13705–711; Order, R. 161, #13833; Joint Prop. Jury Instrs., R. 167, #13857–69; Rev. Br., R. 213-1, #17089–91). And regardless, the district court "must instruct the jury properly on the controlling issues in the case even though there has been no request for an instruction or the instruction requested is defective." *Pryor v. Gulf Oil Corp.*, 704 F.2d 1364, 1375 (5th Cir. 1983); *accord* 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2556 (3d ed. 2024).

## D.    This case matters

Despite acknowledging the $267 million at stake for the Highway Trust Fund, Fitzgerald finds the Government's decision to appeal this

---

(…continued)
requested instruction while objecting to other instructions); *United States v. Veggacado*, 37 F. App'x 189, 191 (6th Cir. 2002) (party "affirmatively stated" that "he had no objections" to instructions challenged on appeal); *Scott v. Miller*, 361 F. App'x 650, 651–53 (6th Cir. 2010) (similar).

case "puzzling." (Fitz. Br. 5–6 n.4, 7 n.5.) But cases involving successful refund claims tend to spur more refund claims. And as Fitzgerald itself recognized in an amicus brief it filed in other litigation, this case has implications for at least one other pending refund action. *See* Motion for Leave to File Brief of Amici Curiae at 2, *D&B Truck & Equip. Sales, LLC v. United States*, No. 1:17-cv-45 (W.D. Ky. Sept. 14, 2017) (stating that the cases present "identical" issues), ECF No. 25. Moreover, although EPA regulations have limited the glider industry for now (a position which could always be reversed), the Government expects that the interpretation of § 4052(f) will have continuing relevance for electric vehicles. In particular, § 45W provides a tax credit for qualified commercial clean vehicles that may prompt similar questions. *See* Evolectric, Inc., Comment on IRS Notice 2022-56 (Dec. 8, 2022) https://www.regulations.gov/comment/IRS-2022-0027-0119 (suggesting that the credit should be interpreted to apply to "up-cycled electric vehicles which are based on gliders from used trucks").

# CONCLUSION

The judgment of the District Court should be reversed.

Respectfully submitted,

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

/s/ Douglas C. Rennie

| | |
|---|---|
| MICHAEL J. HAUNGS | (202) 514-4343 |
| DOUGLAS C. RENNIE | (202) 305-7546 |

  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel:*
HENRY C. LEVENTIS
  *United States Attorney*

AUGUST 2, 2024

# CERTIFICATE OF COMPLIANCE

## Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

    1.  This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    [X]   this document contains 6,490 words, **or**

    [ ]   this brief uses a monospaced typeface and contains _____ lines of text.

    2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X]   this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

    [ ]   this brief has been prepared in a monospaced typeface using _____ with _____.

(s)   /s/ Douglas C. Rennie

Attorney for  the United States of America

Dated:    August 2, 2024

# CERTIFICATE OF SERVICE

It is hereby certified that on August 2, 2024, the foregoing brief for the United States was electronically filed with the Clerk of the Court by using the ECF system.  Counsel for other parties are registered ECF users and will be served by the ECF system.


   /s/  Douglas C. Rennie   

DOUGLAS C. RENNIE
*Attorney*