RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0072p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

FITZGERALD TRUCK PARTS AND SALES, LLC,

   *Plaintiff-Appellee*,

*v.*

UNITED STATES OF AMERICA,

   *Defendant-Appellant*.

No. 24-5078

---

Appeal from the United States District Court for the Middle District of Tennessee at Cookeville.
No. 2:20-cv-00026—Waverly D. Crenshaw, Jr., District Judge.

Argued: October 31, 2024

Decided and Filed: March 31, 2025

Before: BATCHELDER, STRANCH, and READLER, Circuit Judges.

---

## COUNSEL

**ARGUED:** Douglas C. Rennie, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Kendall C. Jones, EVERSHEDS SUTHERLAND (US) LLP, Washington, D.C., for Appellee. **ON BRIEF:** Douglas C. Rennie, Michael J. Haungs, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Kendall C. Jones, Zachariah W. Lindsey, EVERSHEDS SUTHERLAND (US) LLP, Washington, D.C., for Appellee.

---

## OPINION

---

  READLER, Circuit Judge. For years, Fitzgerald Truck Parts & Sales, LLC built and sold highway tractors by installing old engines and transmissions from third-party salvage yards into otherwise new tractors. Ordinarily, the sale of a newly manufactured tractor triggers a 12%

excise tax. *See* 26 U.S.C. §§ 4051(a)(1), 4052(a)(1). Fitzgerald believes its sales are exempt from those taxes due to its reincorporation of engines and transmissions. For support, it points to 26 U.S.C. § 4052(f)(1), which authorizes a safe harbor applicable when "repairs or modifications" to an existing tractor "do[] not exceed 75 percent of the retail price of a comparable new [tractor]." The IRS disagreed and assessed unpaid excise taxes, penalties, and interest to the tune of $268 million. Fitzgerald sued. And it won before a jury, a verdict the government now appeals.

We agree with Fitzgerald that § 4052(f)(1) poses a bright-line, 75% test without any further qualitative inquiry, meaning its vehicles constructed with used engines and transmissions could qualify for the safe harbor. But there is more to consider, namely, that § 4052(f)(2) forecloses this exemption for tractors that never triggered the excise tax when they were new. And so far, Fitzgerald has not met its burden of proving that this latter provision does not apply to its tractors. In fact, evidence suggests that at least some of those vehicles were first sold in tax-exempt transactions, *see* 26 U.S.C. § 4221(a)(2), (4), with the original purchasers being either entities abroad or state or local governments. Accordingly, to escape § 4052(f)(2) and invoke the safe harbor, Fitzgerald must show that each refurbished tractor, when new, incurred the excise tax under § 4051. We reverse and remand on that basis.

I.

Beginning in 1989, Fitzgerald built and sold "glider tractors" using repaired engines, repaired transmissions, and "glider kits." Each glider kit contained a "set of unassembled new parts" that, when installed with other new or used components, formed a functional large-scale highway tractor. Rev. Rul. 86-130, 1986-2 C.B. 179. For Fitzgerald, these kits "essentially" constituted "new tractor[s] . . . missing the engine and transmission." R. 208, PageID#16766. That meant they included a cab, chassis, axles, and wheels, among other new parts. In its early years, Fitzgerald combined glider kits with old engines and transmissions that the company itself extracted from recently purchased, second-hand tractors. Over time, however, it increasingly forewent acquiring ownership of these "salvaged" tractors, and instead began buying used engines and transmissions alone for their assembly into new glider kits.

That latter practice gave rise to the issues contested in this appeal. Between 2012 and 2017, Fitzgerald built glider tractors using old engines and old transmissions. Those used items were delivered by salvage yards, which had dismantled the components from worn and wrecked tractors. Following delivery, Fitzgerald would typically remanufacture the engines in-house and send the transmissions to a third party to do the same. Due to these partially outsourced operations, Fitzgerald often did not receive title to, nor did it know the vehicle identification numbers of, the salvaged tractors. And at least some of the salvaged tractors came from government agencies and municipalities. Fitzgerald bought other engines from salvaged tractors that had first been sold in Mexico and Canada.

Through this process, Fitzgerald restored and sold 12,830 tractors. Each one facially triggered a corresponding sales tax. Specifically, § 4051(a) imposes on the seller a 12% excise tax on the "first retail sale" of certain "articles" (including highway tractors) above specified "gross vehicle weight[s]," thresholds that captured all of Fitzgerald's vehicles. 26 U.S.C. § 4051(a)(1)–(2). Section 4052(a)(1) defines "first retail sale" as the "first sale, for a purpose other than for resale or leasing in a long-term lease, after production, manufacture, or importation." *Id.* § 4052(a)(1); *see also id.* § 4052(a)(3)(A) (taxing first use of a tractor if it occurs before first retail sale). Because Fitzgerald partly "manufacture[d]" glider tractors by assembling them, the company landed within the tax's reach. If that were the end of the story, Fitzgerald's sales would have incurred over $175 million in excise taxes from § 4051(a).

Like many provisions in the Tax Code, however, § 4051(a) has an exception. In 1997, Congress codified a safe harbor from this excise tax for restored tractors "if the cost of such repairs and modifications does not exceed 75 percent of the retail price of a comparable new [tractor]":

> (f) Certain repairs and modifications not treated as manufacture
>
> > (1) In general
> >
> > > An article described in section 4051(a)(1) shall not be treated as manufactured or produced solely by reason of repairs or modifications to the article (including any modification which changes the transportation function of the article or restores a wrecked article to a functional condition) if the cost of such repairs and modifications does not exceed 75 percent of the retail price of a comparable new article.

26 U.S.C. § 4052(f)(1); *see* Taxpayer Relief Act of 1997, § 1434, Pub L. No. 105-34, 111 Stat. 788, 1052. Fitzgerald claims that § 4052(f)(1) exempts it from § 4051(a)'s otherwise applicable grasp. To show why, the company resorts to some basic math. On average, Fitzgerald paid $4,000 for each salvaged engine and incurred about $110,000 in restoration costs per glider tractor. It then sold the vehicles for a modest profit, roughly $8,000 per vehicle. But the retail price of a comparable new tractor—the meaning of which is now undisputed by the parties as "the amount at which an article is sold in individual, arms-length transactions"—hovered around $210,000. In other words, Fitzgerald's expenses ($114,000) totaled just over half of the benchmark price ($210,000) in § 4052(f)(1), a figure far below that provision's 75% threshold. So Fitzgerald claimed it qualified for the exemption and accordingly opted not to pay any excise taxes on the sales.

The government took issue with this position. Across two assessments, the IRS determined that Fitzgerald's sales triggered § 4051(a)(1) without any applicable exemptions. That meant Fitzgerald needed to pay approximately $175 million in uncollected excise taxes. Adding unpaid penalties and interest, the company's tax bill rose to a staggering $267,796,595. Fitzgerald paid taxes on one tractor for each disputed tax quarter and claimed a refund. When the IRS denied those requests, Fitzgerald sued in federal district court for tax refunds as well as an abatement of unpaid assessments. *See* 28 U.S.C. § 1346(a)(1). Following a five-day trial, a jury returned a verdict for Fitzgerald.

The government moved for judgment as a matter of law and a new trial. It argued that Fitzgerald failed to satisfy the safe harbor because it did not repair or modify an "article" (in other words, a "tractor") under § 4052(f)(1) and, regardless, triggered an exception to the safe harbor in § 4052(f)(2) because not all of its tractors were taxable when new. The district court rejected both arguments, *Fitzgerald Truck Parts & Sales, LLC v. United States*, No. 20-cv-00026, 2023 WL 8100540, at *15 (M.D. Tenn. Nov. 21, 2023), and the government timely appealed.

II.

We review de novo the district court's legal conclusions, including matters of statutory interpretation. *Johnson v. United States*, 64 F.4th 715, 721 (6th Cir. 2023). We do the same as to the district court's ruling on the government's motion for judgment as a matter of law, viewing the evidence "in the light most favorable to" Fitzgerald, "the party against whom the motion [wa]s made," and giving Fitzgerald "the benefit of all reasonable inferences." *K & T Enters., Inc. v. Zurich Ins.*, 97 F.3d 171, 175–76 (6th Cir. 1996). By contrast, we review the denial of a motion for a new trial for an abuse of discretion, which occurs when a district court "improperly applies the law[] or uses an erroneous legal standard." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 405 (6th Cir. 2006) (citation omitted). Employing these standards, we agree with the district court that Fitzgerald's operations qualified for the safe harbor in § 4052(f)(1). Nevertheless, we reverse and remand for further proceedings regarding the applicability of § 4052(f)(2), which hinges on whether Fitzgerald's salvaged tractors, when new, incurred taxes under § 4051.

A. Begin with Fitzgerald's eligibility for § 4052(f)(1)'s safe harbor. And start, as we must, with the statute's text. *Hardt v. Reliance Standard Life Ins.*, 560 U.S. 242, 251 (2010). Section 4052(f)(1) exempts "[a]n article described in section 4051(a)(1)" from the latter's excise tax when the cost of "repairs or modifications" to the article "does not exceed 75 percent of the retail price of a comparable new article." 26 U.S.C. § 4052(f)(1). At issue here is whether this provision applies when repairs or modifications were made to deconstructed articles (i.e., tractors) that are not identifiable. Do § 4052(f)(1)'s plain terms, in other words, require more than Fitzgerald's mere installation of salvaged engines and transmissions into otherwise new tractors?

We agree with Fitzgerald that they do not. The company's reused engines and transmissions originally derived from once-functional tractors sold or donated to salvage yards. Those vehicles, when new, were "[t]ractors of the kind chiefly used for highway transportation in combination with a trailer or semitrailer," *id.* § 4051(a)(1)(E), rendering them "article[s] described in section 4051(a)(1)," *id.* § 4052(f)(1). The salvage yards then "modifi[ed]" the tractors so that only their engines and transmissions remained, and Fitzgerald further

"modifi[ed]" and "repair[ed]" those remnants such that they could resume functioning within a glider kit. This series of changes never cost Fitzgerald more than 75% of the retail price of a comparable new tractor. Taking these steps together, Fitzgerald's tractors are "article[s] described in section 4051(a)(1)" that received "repairs or modifications" that did "not exceed 75 percent of the retail price of a comparable new article," thereby satisfying the plain text of § 4052(f)(1).

True, such extensive changes to the tractors—extracting their engines and transmissions for installation into otherwise new vehicles—exceed the traditional understanding of "repair" and "modify," terms that typically accommodate only incremental changes. *See, e.g.*, *Modification, Merriam-Webster's New International Dictionary* 1577 (2d ed. 1934) ("Alteration or change of a partial character . . . ."). But § 4052(f)(1) supplants the qualitative scope of these standards with a bright-line rule: if the cost of restoration falls below the 75% threshold, § 4051(a)(1) does not apply. 26 U.S.C. § 4052(f)(1); *see also Digital Realty Tr. v. Somers*, 583 U.S. 149, 160 (2018) ("'When a statute includes an explicit definition, we must follow that definition,' even if it varies from a term's ordinary meaning." (quoting *Burgess v. United States*, 553 U.S. 124, 130 (2008))). Of course, "repair[]" and "modification[]" still wield an independent bite in that they require the safe harbor–qualifying restoration process to involve an old tractor. Beyond that categorical determination, however, the 75% test replaces any degree-based limit implied by the plain meaning of those words.

That conclusion may sweep broadly, but the result here is in line with thrust of the statute. The 75% threshold itself implies the existence of repairs and modifications totaling three-fourths of a comparable new tractor's price. Had Congress intended this exemption for only middling changes, it would have picked a lower number. *See Walters v. Metro. Educ. Enters.*, 519 U.S. 202, 209 (1997) (holding that laws "must be interpreted, if possible, to give each word some operative effect"). Likewise, the safe harbor encompasses modifications that "change[] the transportation function of the article or restore[] a wrecked article to a functional condition," 26 U.S.C. § 4052(f)(1), developments that are themselves substantial. Consider, for example, a taxpayer who, after her tractor sustains a serious head-on collision, restores the vehicle with a new cab and engine. No one would likely describe that restoration as incremental.

Yet so long as the effort satisfies the 75% threshold, the safe harbor applies. *See id.* This generous phrasing thus fortifies Fitzgerald's position regarding the safe harbor's application to its operations. After all, as even textualism's most prominent champions recognize, "[w]ords are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a technical sense." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012); *see also United States v. Tate*, 999 F.3d 374, 378 (6th Cir. 2021) ("[W]e do not woodenly interpret a legal text in a vacuum . . . but instead discern the meaning of a statement in a law from the context in which it is made . . . ." (citations and quotations omitted)); James J. Brudney & Corey Ditslear, *The Warp and Woof of Statutory Interpretation: Comparing Supreme Court Approaches in Tax Law and Workplace Law*, 58 Duke L.J. 1231, 1266–67 (2009) (observing that the Supreme Court disproportionately invokes "presumptions about the larger cohesion or structural integrity of the text" in tax cases).

Before the safe harbor's enactment, we note, courts routinely engaged in an open-ended inquiry into whether changes to an existing tractor qualified as "production, manufacture, or importation" of a new vehicle to determine whether it was exempt from an excise tax on its first retail sale. *See, e.g.*, *Boise Nat'l Leasing, Inc. v. United States*, 389 F.2d 633, 636 (9th Cir. 1968) (approving qualitative test that considered extent and nature of changes to vehicle); *Ruan Fin. Corp. v. United States*, 976 F.2d 452, 455 (8th Cir. 1992) (affirming district court's application of test from *Boise*). Now, § 4052(f)(1) gives taxpayers a readily calculable guideline for determining when they qualify for the safe harbor. Such a marked shift exhibits Congress's desire for the tax exemption's applicability to hinge on solely a quantitative inquiry. *See, e.g.*, *Lomax v. Ortiz-Marquez*, 590 U.S. 595, 602–03 (2020) (concluding the purpose of a new statute was to go beyond existing laws regulating the same topic and rejecting an interpretation that would have made the new statute coextensive with prior coverage). Were the rule otherwise, taxpayers, left to engage in an imprecise inquiry into the meanings of "repair" and "modification," could claim the exemption only at the risk of the IRS's interpreting those words differently—and in turn imposing a substantial, unanticipated tax liability, with penalties and interest to boot. *Cf. Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 453 (2009) (noting importance of clearly defined safe harbors in antitrust). That concern is not so far-

fetched; it describes the facts of this case. This undesirable outcome may be avoided by recognizing the statutory inclusion of a bright-line, 75% threshold to trigger § 4052(f)(1).

B. We are not the first to do so. In *Schneider National Leasing, Inc. v. United States*, 11 F.4th 548 (7th Cir. 2021), the Seventh Circuit addressed whether a trucking company qualified for § 4052(f)(1)'s safe harbor when "overhaul[ing]" and then using its own worn tractors. *Id.* at 551; *see also* 26 U.S.C. § 4052(a)(3)(A) (imposing excise tax on "use[]" of a tractor if such use occurs before the first retail sale). Like Fitzgerald, Schneider had been restoring tractors with glider kits that "[a]t a minimum, . . . came with a cab, chassis, radiator, front axle, front suspension, front wheels, front tires, front brakes, brake system, and trailer connections." *Schneider*, 11 F.4th at 551. Many of them even included remanufactured engines in "powered" variants of glider kits. *Id.* When Schneider tried invoking § 4052(f)(1), the IRS resisted. *Id.* at 552. According to the agency, Schneider could not claim exemptions for tractors with new engines because its refurbishment process "exceeded permissible 'repairs or modifications' and instead resulted in the manufacture of new 'articles.'" *Id.*

The Seventh Circuit thought otherwise. Section 4052(f)(1)'s "safe harbor," the appeals court thoughtfully explained, "does not contemplate a measurement for 'repairs or modifications' apart from the 75% test." *Id.* at 554. Whereas the IRS supported supplementing § 4052(f)(1) with a qualitative test based on the quantity or kind of replacement parts utilized, the statute, the Seventh Circuit concluded, forbids "defin[ing] what does (and does not) constitute 'manufacture' with qualitative standards"; rather, it establishes "a quantitative test based on cost." *Id.* at 556. As for the IRS's alternative claim that "article" in § 4052(f)(1) requires "that the same identifiable article exist before and after the repairs," this argument too, the appeals courts held, lacked support in the statute's text. *Id.* at 557. The Seventh Circuit took particular issue with the government's inability to offer a text-based standard "for determining whether the same identifiable article survived the refurbishment process." *Id.* Rather, the government merely "posited" that all parts rendering a vehicle "self-propelled" constitute "the immutable core of a single, identifiable tractor." *Id.* As the Seventh Circuit aptly explained, § 4052(f)(1)'s express accommodation for wrecked tractors needing replacement engines readily contradicted the government's amorphous test. *Id.*

That reasoning applies with equal force here. As in *Schneider*, Fitzgerald conducted tractor restorations that, while facially extensive, nevertheless fell below the 75% threshold in § 4052(f)(1). Unlike Fitzgerald, Schneider installed new engines into hundreds of its overhauled trucks, and yet still qualified for the safe harbor. *See Schneider*, 11 F.4th at 552, 555. So too, then, does Fitzgerald. Perhaps even more squarely so, given that its restoration process preserved each old tractor's engine, a component essential to maintaining "the immutable core" of the vehicle. *Cf.* Walter Raleigh, 1 *The War in the Air* 414 (1922) ("The engine is the heart of an aeroplane . . . .").

The government nevertheless points out another distinction: whereas Fitzgerald purchased engines and transmissions from third-party salvage yards, Schneider refurbished portions of its own fleet. That fact matters, says the government, in view of a pair of technical advice memoranda issued after a 1991 revenue ruling that established an IRS-created predecessor to § 4052(f)(1), before Congress's 1997 enactment of the safe harbor itself. *See* Rev. Rul. 91-27, 1991-1 C.B. 192. One memorandum clarified that the safe harbor applied to a taxpayer who assembled each glider kit with salvaged parts from a single used tractor, reasoning that the restored tractors were "essentially the same vehicles as the prerestoration tractors" because used parts from multiple vehicles "were not intermingled." I.R.S. Tech. Adv. Mem. 93-33-007 (May 11, 1993). The other concluded that the safe harbor did not apply to a taxpayer who manufactured tractors utilizing glider kits consisting of parts from more than one salvaged tractor. I.R.S. Tech. Adv. Mem. 92-38-008 (June 11, 1992). Under those facts, the IRS reasoned, the resulting tractor "[wa]s essentially a new vehicle." *Id.* The government urges us to read these conclusions into § 4052(f)(1), equating the facts of the former with Schneider's operations, and the facts of the latter with Fitzgerald's business model.

Based on the language of the statute, we decline the invitation. Consider its source. Technical advice memoranda "have no precedential value to parties other than the taxpayer they are issued to." *Downs, Inc. v. Comm'r*, 307 F.3d 423, 429 (6th Cir. 2002). Nor can we accept the government's suggestion that Congress looked to these documents when enacting the safe harbor. Whereas the IRS infers that Congress tacitly endorsed the agency's earlier guidance when codifying § 4052(f)(1), it could just as easily be inferred that Congress tacitly rejected it by

failing to write the IRS's conclusions into the statute.  *Cf. Girouard v. United States*, 328 U.S. 61, 69 (1946) ("It is at best treacherous to find in Congressional silence alone the adoption of a controlling rule of law.").

Even if we set aside these fundamental flaws in the IRS's position, the IRS reads its memoranda in a way that makes the two difficult to reconcile with each other, let alone with the statute that purportedly incorporated them.  The guidance documents seemingly tease out legal relevance in the number of salvaged tractors from which the taxpayer extracts second-hand parts, not in tractor ownership itself.  According to the memoranda, a taxpayer may claim an exemption for tractors with reused engines alone but may not claim an exemption for tractors with reused engines and transmissions if those parts each came from a different salvaged tractor.  *Compare* I.R.S. Tech. Adv. Mem. 93-33-007 ("The used components of the worn tractors were not intermingled, that is, the engine, transmission, and axles of a particular tractor were combined with a glider kit . . . ."), *with* I.R.S. Tech. Adv. Mem. 92-38-008 ("The taxpayer fabricated a truck tractor by combining a newly-purchased glider kit . . . with other new parts and certain salvaged parts . . . from two truck tractors that were originally built by different manufacturers.").  That is an unusual way to read § 4052(f)(1).  As the statute's text seemingly favors rehabilitating used tractor parts by rewarding those efforts with favorable tax consequences, it is odd to understand the law as including a non-textual limit tied to parts that originate from multiple vehicles.  *See* 26 U.S.C. § 4052(f)(1) (exempting *all* sales of repaired or modified articles that pass the 75% test).  After all, refurbishment is refurbishment, whether it encompasses one vehicle or many.

As the government portrays things, because Fitzgerald bought engines and transmissions from salvage yards after those parts had been extracted from donated tractors, the acquired parts were detached from any identifiable tractor.  That characterization, however, is in tension with the fact that both parties recognize that the used engines and transmissions had all previously been part of functional tractors.  Equally true, even if, as the government stresses, Fitzgerald did not secure title to these trucks before their dismantling, § 4051(a)(1) contains no prior-ownership-related condition.  Instead, its application rests on whether the 75% threshold has been eclipsed.  We accordingly reject the government's invitation to read such a condition into

the statute. *See Nestlé Waters N. Am., Inc. v. Mountain Glacier LLC (In re Mountain Glacier LLC)*, 877 F.3d 246, 248 (6th Cir. 2017) ("[C]ourts cannot add to statutes."); *cf. Polselli v. IRS*, 598 U.S. 432, 438–39 (2023) (declining to read judicially fabricated limit into Tax Code due to its lack of support in the act's plain text).

At a surface level, it is perhaps fair to say (as does the government) that Fitzgerald simply paid salvage yards for standalone engines and transmissions. In practice, however, the salvaging and subsequent refurbishment together reflected one process for purposes of the excise tax and its safe harbor. And that process began with salvaged tractors; that is, "self-propelled vehicle[s] . . . designed to perform a function of transporting a load over public highways"—the very definition of "article" endorsed by the government. 26 C.F.R. § 48.4061(a)-1(d)(1).

C. Besides factually distinguishing *Schneider*, the government offers a laundry list of reasons that, in its view, justify departing from that case on its merits. None persuade us.

*Plain Meaning.* The government first tries its hand at plain meaning. It reads the terms "repair[]" and "modification[]," as used in the safe harbor, to carry a "connotation of increment or limitation." Appellant Br. 43 (quoting *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994)). With this understanding in mind, the government argues that the installation of an old engine into a new glider kit far eclipses the mere repair or modification of the salvaged tractor from which the engine derived.

Its point is misplaced for several reasons. Most notably, as explained earlier, § 4052(f)(1) supplants the lay scope of "repair[]" and "modification[]" by establishing a quantitative 75% test to identify when repairs and modifications, in the aggregate, receive the exemption. True, a statute's use of "modify" can sometimes connote "increment or limitation." *E.g.*, *MCI Telecomms.*, 512 U.S. at 225. Yet the safe harbor here, it bears reminding, also includes the word "repair[]." 26 U.S.C. § 4052(f)(1). The government reads that latter term to mean "to restore by replacing a part or putting together what is torn or broken." But in many instances, "restor[ation]" of a once-"broken" object or structure requires more than merely "increment[al]" alterations. *See, e.g.*, Glenn Brown, *History of the United States Capitol* 140 (2008) (referring to "the repairs of the [U.S.] Capitol" after it had been severely damaged in the

Burning of Washington). At any rate, § 4052(f)(1) accommodates more extensive restorations by using "modification*s*" and "repair*s*" in the plural. So even if those terms connote an incremental change in the singular, modest alternations taken together can form a substantial change in the aggregate. And whereas the government depicts Fitzgerald's business as a single, dramatic overhaul (i.e., the manufacturing of essentially new trucks), one can also describe it as a series of smaller, incremental changes. The repeated invocation of "repairs" and "modifications" in § 4052(f)(1) fairly indicates that Congress codified protection based on the latter understanding. *See Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 149–50 (2017) (deeming a statute's use of the plural form legally significant).

*The Whole-Text Canon.* Reminding us that we must construe statutory text as a whole, the government next directs us to 26 U.S.C. § 4052(b)(1)(B)(iii). That provision grants a lower tax base for reusing "any component" of an "article" when building a new truck. *See* 26 U.S.C. § 4052(b)(1)(B)(iii) (excluding the value of used components from a tractor's purchase price if those components were "furnished by the first user of [the] article"). Based on this distinct tax benefit, the government asserts that Congress intended taxpayer reuse of "individual" parts, including parts as significant as engines, to qualify only for a reduced sales price under § 4052(b)(1)(B)(iii)—not complete exemption under § 4052(f)(1).

Not so. For one thing, the government's position raises more questions than it purports to answer. Chief among them, at what point does the reuse of "individual" components suffice to render § 4052(f)(1) available? In the government's eyes, engines and transmissions, without more, seemingly fall short, but it otherwise fails to quantify how many more used parts would have been needed for Fitzgerald to claim the safe harbor. For another, as the government concedes, Fitzgerald cannot even claim the milder benefit under § 4052(b)(1)(B)(iii) because it was not "the first user" of its tractors. 26 U.S.C. § 4052(b)(1)(B)(iii)(I). True, in other circumstances not before us, Fitzgerald's reading of § 4052(f)(1) creates partial overlap with § 4052(b)(1)(B)(iii). *See, e.g.*, *Schneider*, 11 F.4th at 551–52 (involving a taxpayer who qualifies for both provisions). But such coextension makes sense: taxpayers can enjoy a full exemption for modifications and repairs of reused components that do not exceed the 75% test but can still receive a more modest tax benefit for simply employing a used component or two

when the 75% threshold is exceeded. The Tax Code is rife with comparable instances of cascading tax breaks. *See, e.g.*, 26 U.S.C. § 25A (establishing the American Opportunity Tax Credit and Lifetime Learning Credit, the former of which demands stricter qualifications but always delivers equal or better tax benefits). Even were we to disagree with this legislative calibration, we may not unsettle those choices due to our preferred view of tax policy.

*The Absurdity Doctrine.* The government next points to a seeming loophole in Fitzgerald's reading of § 4052(f)(1), which it says leads to an absurd result. *See United States v. Kirby*, 74 U.S. (7 Wall.) 482, 486 (1868) ("All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to . . . an absurd consequence.") Recall that Fitzgerald bought engines for roughly $4,000 yet incurred around $110,000 in other expenses for each tractor. Emphasizing the $106,000 disparity in those costs, the government argues that "[i]t would make no sense for the reuse of [engines alone] to entitle Fitzgerald to eliminate the tax in its entirety." Appellant Br. 48.

At bottom, however, this perceived absurdity derives less from a reading of "the article" in § 4052(f)(1), than it does from how the government would read the phrase "retail price of a comparable new article" in that same provision. Yet there is no need for assumptions. On appeal, it bears emphasizing, the parties do not dispute the latter's meaning, agreeing with *Schneider* that the "retail price" of a "comparable new" tractor refers to "the amount at which an article is sold in individual, arms-length transactions." *Schneider*, 11 F.4th at 559. That sets a relatively high sales-price input for the 75% test (around $210,000 here), conferring on taxpayers like Fitzgerald substantial room to qualify for the safe harbor even after conducting extensive repairs. By contrast, the government in *Schneider* argued (albeit unsuccessfully) "that 'retail price' reflects the price the taxpayer actually paid for comparable tractors, including any discount off the market price." *Id.* This alternative reading would often result in a dramatically stricter threshold for the 75% test, foreclosing the safe harbor for a higher proportion of taxpayers performing significant restorations. But this is not a case where that point is contested. For today's purposes, it is enough to recognize that Congress plausibly could have wanted to create a strong incentive for even mild reuse of worn truck components. This consideration alone suffices to reject application of the absurdity doctrine. *See Crooks v. Harrelson*, 282 U.S. 55, 60

(1930) (noting the doctrine applies only "under rare and exceptional circumstances" when the absurdity is "so gross as to shock the general moral or common sense").

*Legislative History.*  The government also posits that its statutory reading is consistent with the conference committee's report on § 4052(f)(1).  But beyond the existing disputes regarding reliance on legislative history, the highlighted report at most suggests that Congress intended the exemption for only those taxpayers who modify "existing vehicle[s]."  H.R. Rep. 105-220, at 727 (1997) (Conf. Rep.).  When viewing their respective businesses as one cohesive operation, Fitzgerald and its supplying salvage yards did exactly that.

*The "Strict" Construction of Exemptions.*  Lastly, the government relies on a familiar friend in tax jurisprudence: the statement that "exemptions from taxation are to be construed narrowly."  *Wilson v. United States*, 588 F.2d 1168, 1171 (6th Cir. 1978) (quotation marks and citations omitted)).  It is fair at the outset to question the assertion's pedigree, as "many Supreme Court cases denying an exemption make no mention of this rule, and even some cases granting an exemption ignore it."  Scalia & Garner, *supra*, at 359; *see also id.* (labeling the presumption a "false notion" and endorsing precedent that ignores it).  At any rate, even when taking the point at face value, Fitzgerald has met the allegedly strict burden to justify exemption.  As explained above, the company's operations land within the plain language of § 4052(f)(1), which sets out a bright-line, 75% threshold.

III.

A.  Section 4051(f)(1) aside, Fitzgerald is still not out of the woods.  Once again, like many exemptions in the Tax Code, § 4052(f)(1) *itself* has an exception.  When codifying the safe harbor, Congress also enacted a carveout in an adjoining paragraph of the statute.  *See* Taxpayer Relief Act of 1997, § 1434, Pub L. No. 105-34, 111 Stat. 788, 1052.  That companion paragraph instructs that § 4052(f)(1) "shall not apply if the article (as repaired or modified) would, if new, be taxable under section 4051 and the article when new was not taxable under such section or the corresponding provision of prior law."  26 U.S.C. § 4052(f)(2).

This provision too informs today's resolution, as it requires us to ask about the origin of the used engines and transmissions Fitzgerald purchased from salvage yards.  Record evidence

suggests that the salvage yards received at least some of their tractors from government agencies and municipalities as well as sellers who had originally bought the vehicles in Mexico and Canada. Those tractors would not have been taxable when new, says the government, because 26 U.S.C. § 4221(a) generally exempts transactions with those kinds of buyers from federal sales taxes. If so, § 4052(f)(2) kicks in to render the safe harbor unavailable.

By and large, we agree with the government. Walking through these statutory commands, begin with § 4051(a)(1)'s imposition of a tax on the "first retail sale" of certain trucks. *Id.* § 4051(a)(1). Section 4052(a)(1) in turn defines "[f]irst retail sale" to "mean[] the first sale, for a purpose other than for resale or leasing in a long-term lease, after production, manufacture, or importation." *Id.* § 4052(a)(1). Treasury Regulations clarify this definition, explaining that "'first retail sale' means a taxable sale," and that "[t]he sale of an article is a taxable sale unless . . . [t]he sale is a tax-free sale under section 4221." 26 C.F.R. § 145.4052-1(a)(2)(i). Turn then to § 4221(a), which lists six types of sales on which "no tax shall be imposed," including exports, 26 U.S.C. § 4221(a)(2), and sales "to a State or local government," *id.* § 4221(a)(4). Read together, this series of intertwined statutes and regulations instructs that tractors first sold abroad or to state and local governments were not taxable under § 4051 when new. And for purposes of § 4052(f)(1)'s safe harbor, § 4052(f)(2) makes clear that articles that "when new w[ere] not taxable under [§ 4051]" do not qualify. *Id.* § 4052(f)(2).

Precedent confirms this conclusion. In *CenTra, Inc. v. United States*, 953 F.2d 1051 (6th Cir. 1992), we interpreted "taxable sale" in 26 C.F.R. § 145.4052-1(a)(2) to exclude truck sales in Canada. *Id.* at 1054. Rejecting the taxpayer's attempt to deem the nontaxation of these exports "immaterial," *CenTra* read "prior taxable sale" to "mean[] a prior sale that was in fact capable of being taxed under current law." *Id.* *CenTra*, we note, then deemed § 4051(a)(1) applicable to imports of American-made trucks that had first been leased abroad. *Id.* at 1056–57. In so doing, it relied on a revenue ruling and invoked *Chevron* deference, *id.* at 1055—a practice we have since abandoned, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). Exercising our "independent judgment," *id.* at 412, however, we continue to agree with *CenTra*'s holding because it accurately reflects the statute's plain meaning. After all, § 4051(a)(1) applies

to an article's "first retail sale," which § 4052(a)(1) defines to include "the first sale . . . after . . . importation."

Of course, § 4052(f)(2), the provision at issue here, does not itself include the words "prior taxable sale." But it does reference articles previously "taxable" under a provision applicable only to their "first retail sale[s]." 26 U.S.C. § 4052(f)(2); *id.* § 4051(a)(1). In substance, then, we see no meaningful reason that this analysis of "prior taxable sale" in § 145.4052-1(a)(2) does not apply equally to "taxable" in § 4052(f)(2).

Whether we approach this issue through first principles or case law, the outcome is the same: to escape § 4052(f)(2), a taxpayer must prove that the respective tractor was capable of being taxed when new. In other words, § 4051's excise tax must have been payable, taking all cross-referenced statutes and regulations—including § 4221—into account. And on that front, Fitzgerald seemingly comes up short. For any restored tractor lacking sufficient proof, by a preponderance of the evidence, that it incurred the excise tax under § 4051 when new, Fitzgerald cannot claim the safe harbor. *See Sherwin-Williams Co. v. United States*, 403 F.3d 793, 796 (6th Cir. 2005) ("The taxpayer must prove its entitlement to a tax refund by a preponderance of the evidence."). The language of § 4052(f)(2) does not require taxpayers to show that money was remitted to the Treasury in satisfaction of the excise tax. Rather, consistent with the statute's plain meaning, the taxpayer must show that every tractor was "subject to" and caused the imposition of § 4051 when new. *See Taxable*, 17 *Oxford English Dictionary* 678 (2d ed. 1989) ("Liable to be taxed; subject to a tax or duty.")

At this juncture, Fitzgerald has not done so. Again, the record reflects that at least some of the salvaged tractors acquired by Fitzgerald were likely first sold in foreign countries or to state and local governments. Fitzgerald alleges that the government gave no "credible evidence" that these tractors first derived from tax-exempt sales. But beyond disregarding the government's numerous citations to that exact kind of evidence, Fitzgerald has implicitly shirked its burden of proof. "[T]axes paid are rightly collected upon assessments correctly made by the Commissioner, and in a suit to recover them the burden rests upon the taxpayer to prove all the facts necessary to establish the illegality of the collection." *Niles Bement Pond Co. v. United*

*States*, 281 U.S. 357, 361 (1930).  With Fitzgerald having failed to do so, we cannot affirm the wholesale exemption of all 12,830 of the company's tractor sales without further factfinding.

B.  Fitzgerald resists the government's reading of § 4052(f)(2) on several fronts.  We analyze each in turn.

*Forfeiture.*  First up are procedural matters.  According to Fitzgerald, the government failed to preserve its argument under § 4052(f)(2) because it never objected to the absence of jury instructions that captured its reading of the statute.  True, the government did not object to the district court's jury instructions at trial.  But that makes no difference because a party's failure to object to jury instructions does not change our "normal appellate review" when, as here, that party moves for judgment as a matter of law after trial.  *K & T Enters., Inc.*, 97 F.3d 174–75; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 118–20 (1988) (plurality opinion).  And besides, for its own part, Fitzgerald never raised this argument in its briefing on the motion before the district court, which is itself forfeiture.  *See, e.g.*, *Ford v. County of Grand Traverse*, 535 F.3d 483, 490 (6th Cir. 2008).

Even then, Fitzgerald continues, the government committed a second forfeiture, this time by making a different argument on appeal than it did in district court.  Before us, says Fitzgerald, the government argues that "taxable" means "the tax had to be 'payable,'" whereas in district court the government argued that "taxable" means "previously taxed."  The record citations relied upon by Fitzgerald, however, reflect the government stating that Fitzgerald *could* prove the inapplicability of § 4052(f)(2) by showing that taxes were actually paid on the salvaged tractors—not that such payments were the *only* method of escaping this provision.  As Fitzgerald repeatedly used the same "previously taxed" language before the district court, the government was merely responding to those assertions without endorsing Fitzgerald's interpretation.  At the end of the day, the government squarely equated "taxable" with "payable" before the district court, and it permissibly raises that exact argument here.

*Plain Meaning.*  Turning to the merits, Fitzgerald asserts that the plain text of § 4052(f)(2) is satisfied only when articles—not sales thereof—are taxable as a class under § 4051.  In other words, says Fitzgerald, in analyzing whether § 4052(f)(2) exempts a tractor

from the safe harbor, we ask only whether the tractor landed within the taxable weight thresholds of § 4051 when new, regardless whether the original sale was in fact a taxable event.  According to Fitzgerald, because its salvaged tractors met such thresholds, they facially triggered the excise tax and were therefore all taxable under § 4051 when new.

Fitzgerald's narrow interpretation of the Tax Code fails to consider its cross-references.  As explained above, § 4051(a)(1) imposes an excise tax on the "first retail sale" of certain articles, 26 U.S.C. § 4051(a)(1), which, as other statutes and regulations make plain, exclude the tax-exempt transactions listed in § 4221, *id.* § 4052(a)(1); 26 C.F.R. § 145.4052-1(a)(2)(i).  In lieu of the word "sale," § 4052(f)(2) utilizes the phrase "taxable under section 4051" to describe whether articles were subject to tax upon being sold, leased, or used—a condition that at least some of Fitzgerald's tractors likely did not meet when new.

Even the plain meaning of § 4052(f)(2)'s terms alone does not support Fitzgerald's position.  Laypeople and legislators alike frequently label goods "taxable" when describing the taxation of such goods upon sale.  *See, e.g.*, 26 U.S.C. § 4181 (referring to firearms and ammunition, which are subject to tax only "upon . . . sale," as "[a]rticles taxable"); *Taxable*, 17 *Oxford English Dictionary*, *supra*, at 678.  Consider a real-world example.  If someone buys a can of pop in Ohio, it would be entirely normal for them to describe the can as being "taxable in Ohio" given the sales tax incurred upon their purchase.  *See* Ohio Rev. Code. Ann. §§ 5739.01(CCC)(1), 5739.02(A)(1), (B) (2024).  By contrast, it would be entirely abnormal for that person to describe the same can as being "taxable in Minnesota" even though pop, as a class of goods, is taxable when sold in the Land of 10,000 Lakes.  *See* Minn. Stat. § 297A.61, subdiv. 3(d)(2) (2024).  It seems equally odd to say that donor trucks sold in foreign countries are "taxable under section 4051" because they are subject to tax as a class when sold in the United States.

Fitzgerald's reading of § 4052(f)(2) also raises statutory consistency concerns.  What does it mean for an article—rather than the sale thereof—to be "subject to tax" when new?  The Tax Code does not impose an excise tax on trucks due to their mere existence.  Rather, § 4051(a)(1) is triggered only upon "the first retail sale" of certain articles.  26 U.S.C.

§ 4051(a)(1).  From an administrability standpoint, holding otherwise would demand that the IRS somehow determine when new trucks come into existence.

*Statutory Purpose.*  Fitzgerald next contests the purpose behind § 4052(f)(2).  Whereas the government argues the statute "ensure[s] that the excise tax is payable at least once for each article," Fitzgerald labels that explanation as little more than "guesswork" and "conjecture."  True, as Fitzgerald reminds, presumed congressional intent should not be prioritized over a statute's clear, ordinary meaning.  *See, e.g.*, *Hudson v. Reno*, 130 F.3d 1193, 1199 (6th Cir. 1997) ("[I]f the words of the statute are unambiguous, the judicial inquiry is at an end, and the plain meaning of the text must be enforced . . . ." (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989))).  Our analysis above honors that longstanding principle by beginning and ending with the statute's ordinary meaning.  *See, e.g.*, *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (plurality opinion); *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 126–27 (2018).  That a rational legislative purpose can be gleaned from said meaning—Congress's desire to ensure that each truck triggers the excise tax at least once—further bolsters the propriety of our analysis.

Ironically, Fitzgerald, after criticizing any reliance on congressional intent, asserts that the government's reading "produce[s] unintended results" and "create[s] unintended taxpayer burdens" in enabling repeated taxation of certain trucks.  That criticism warrants some context.  In *CenTra*, we held that the sale of a used truck can nevertheless constitute its "first retail sale" when a tax-paying entity buys or leases the truck from a tax-exempt original owner.  *See* 953 F.3d at 1056.  If that truck is later repaired, however, § 4052(f)(2) potentially denies invoking the safe harbor because the truck was first sold to a tax-exempt entity "when new."  26 U.S.C. § 4052(f)(2).  The rub, says Fitzgerald, is that trucks under those circumstances will always trigger § 4052(f)(2).  In other words, tertiary purchasers or beyond will still be required to pay excise taxes even when those trucks otherwise land within the safe harbor.  That presumably rare anomaly is an odd basis to support Fitzgerald's contorted interpretation of § 4052(f)(2).  Equally true, it is an issue for a future case, not this one.

*Agency Procedure.*  Fitzgerald closes with a virtual Hail Mary.  In its view, the IRS violated its "duty" to inform taxpayers of the interaction between the safe harbor and § 4221

rather than merely announcing that interpretation during litigation.  We see at least two flaws in this claim.  First, considering that regulations to § 4052 expressly invoke the list of tax-exempt transactions in § 4221, *see* 26 C.F.R. § 145.4052-1(a)(2)(i), the IRS had no obligation to redundantly confirm that it would follow binding law.  Second, it has long been the case that the choice between a general rule and individual litigation "lies primarily in the informed discretion of the administrative agency."  *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947).  This point deserves particular emphasis in the tax law realm, where sophisticated parties are constantly on the lookout for novel and unanticipated workarounds.  That said, it remains true that the government had no obligation to inform Fitzgerald that articles eligible for the safe harbor had to be capable of being taxed when new, excluding sales listed in § 4221.

\*     \*     \*     \*     \*

Because the statute sets out a bright-line, 75% threshold for articles that were capable of being taxed when new, we reverse the judgment of the district court and remand for proceedings consistent with this opinion.